## No. 22-2925

# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE,

*Plaintiff-Appellant,*

v.

LOYOLA UNIVERSITY CHICAGO,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:18-cv-07335.
The Honorable **Steven Charles Seeger**, Judge Presiding.

## BRIEF AND APPENDIX OF PLAINTIFF-APPELLANT

JONATHAN M. CYRLUK (*Counsel of Record*)
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street
Suite 2105
Chicago, Illinois 60601
(312) 777-4300

PATRICIA HAMILL
LORIE DAKESSIAN
CONRAD O'BRIEN, P.C.
1500 Market Street, Suite 3900
Philadelphia, PA 19102
(215) 864-9600

*Counsel for Plaintiff-Appellant*
*John Doe*

 COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2925

Short Caption: John Doe v. Loyola University Chicago

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Doe

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Carpenter Lipps & Leland LLP; Conrad O'Brien PC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jonathan M. Cyrluk    Date: January 3, 2023

Attorney's Printed Name: Jonathan M. Cyrluk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: Jonathan M. Cyrluk, Carpenter Lipps & Leland LLP, 180 N. LaSalle St., Suite 2105, Chicago, IL 60601

Phone Number: 312-777-4820    Fax Number: 312-777-4839

E-Mail Address: cyrluk@carpenterlipps.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2925

Short Caption: John Doe v. Loyola University Chicago

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Doe

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Carpenter Lipps & Leland LLP; Conrad O'Brien PC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Patricia M. Hamill    Date: January 19, 2023

Attorney's Printed Name: Patricia M. Hamill

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 1500 Market St., Centre Square, West Tower, Suite 3900, Philadelphia, PA 19102

Phone Number: 215-864-9600    Fax Number: 215-864-0793

E-Mail Address: phamill@conradobrien.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2925

Short Caption: John Doe v. Loyola University Chicago

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Doe

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Carpenter Lipps & Leland LLP; Conrad O'Brien PC

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Lorie K. Dakessian          Date: January 19, 2023

Attorney's Printed Name: Lorie K. Dakessian

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]     No [✔]

Address: 1500 Market St., Centre Square, West Tower, Suite 3900, Philadelphia, PA 19102

Phone Number: 215-864-9600          Fax Number: 215-523-9710

E-Mail Address: ldakessian@conradobrien.com

rev. 12/19 AK

# TABLE OF CONTENTS

Circuit Rule 26.1 Disclosure Statements.....................................................i

Table of Contents........................................................................iv

Table of Authorities ....................................................................vi

Jurisdictional Statement ................................................................1

Statement of the Issues .................................................................2

Statement of the Case ..................................................................3

   I.   The Parties ........................................................................3

   II.  Procedural History ...............................................................3

   III.  Statement of Facts ...............................................................4

       A.   Loyola faced pressure to crack down on sexual misconduct. ......................4

       B.   John and Jane's interactions..................................................5

       C.   Jane made several statements to Loyola officials about her interactions with John...........................................................6

       D.   Loyola took action against John after Jane complained about seeing him on campus. ...............................................................7

       E.   The investigation ...........................................................8

       F.   The hearing................................................................10

       G.   The decision letter .........................................................11

       H.   The appeal................................................................12

Summary of the Argument...............................................................15

Argument .............................................................................19

   I.   Standard of Review ...............................................................19

       A.   The applicable law concerning Title IX claims...................................19

       B.   John presented evidence of genuine issues of material fact demonstrating that Loyola violated Title IX. ..............................23

1.  John presented material evidence of pressure against Loyola and Love. ........................................................................ 23

2.  John presented evidence of numerous lopsided and important irregularities in John's proceeding leading to his expulsion. .................. 26

    a.  Loyola failed to disclose Khan Harvey's report that Jane did not believe the sexual activity was "forced or coerced." ........................... 26

    b.  The board and appeals officer refused to listen to the audio recording of John's interview. ................................................ 31

3.  John presented evidence that Love improperly intervened on Jane's behalf and against John. ................................................ 37

    a.  Love was improperly involved in deciding John's appeal. ................... 38

    b.  Love participated in the decision not to interview male witnesses who later submitted declarations favorable to John. .......................... 40

    c.  Love improperly told the board members about another disciplinary hearing involving John. ................................................ 42

4.  John presented material evidence that the board was biased against him based on his gender. ................................................ 43

    a.  Houze's and Landis' additional reasons for finding John not credible are themselves evidence of bias. ........................................... 44

    b.  The board judged Jane's and John's credibility differently. ................. 46

II.  The district court erred in granting summary judgment in favor of Loyola on John's breach of contract claim where John presented evidence that Loyola acted arbitrarily, capriciously or in bad faith in expelling him. ......... 49

Conclusion ................................................................ 53

# TABLE OF AUTHORITIES

## Cases

*Barbera v. Pearson Educ., Inc.*, 906 F.3d 621 (7th Cir. 2018) ................................... 37

*Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486
    (Ill. App. Ct. 2019) ...................................................................... 49, 50, 52

*Cephus v. Blank*, No. 21-CV-126-WMC, 2022 WL 17668793
    (W.D. Wis. Dec. 14, 2022) ............................................................ 26

*DeMarco v. Univ. of Health Scis./Chicago Med. Sch.*, 352 N.E.2d 356
    (Ill. App. Ct. 1976) ...................................................................... 52

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ........................................ 20

*Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. Feb. 28, 2017) ........................ 40

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) .................................................... 21

*Doe v. Colgate Univ.*, 457 F. Supp. 3d 164 (N.D.N.Y. April 30, 2020) ...................... 22

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ............................................ 16, 41

*Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987
    (N.D. Iowa July 20, 2022) ............................................. 22, 27, 29, 50

*Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909 (S.D. Iowa 2019) .............................. 27, 44

*Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018) ................................ 44

*Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020) ...................................... 25

*Doe v. Purdue Univ.*, 464 F. Supp. 3d 989 (N.D. Ind. 2020) .......................... 22, 30, 44

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) .......................................... passim

*Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2022 WL 3279234
    (N.D. Ind. Aug. 11, 2022) .............................................. 22, 45, 46

*Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643 (D. Conn. 2019) ................................ 36

*Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930 (9th Cir. 2022) ................. 21, 24, 43

*Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668
    (N.D. Tex. Dec. 13, 2022) ............................................. 18, 22, 26

*Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799
(E.D. Pa. 2017).............................................................................................. 45

*Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th Cir. 2020) ........... 18, 21, 40

*Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021)............................................. 21, 22

*Doe v. Univ. of S. Ind.*, 43 F.4th 784 (7th Cir. 2022) ........................................ passim

*Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020) ................................................ 18, 21

*Doe v. Washington & Lee Univ.*, No. 6:19-CV-00023, 2021 WL 1520001
(W.D. Va. Apr. 17, 2021) .............................................................................. 22, 44

*Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832 (7th Cir. 2014) ................. 19

*Hossack v. Floor Covering Assocs. of Joliet*, 492 F.3d 853 (7th Cir.2007) ................ 20

*Johnson v. Marian Univ.*, 829 F. App'x 721 (7th Cir. 2020) ..................................... 26

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923 (7th Cir. 2020)................................ 17, 19

*Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016)....................................... 17

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)....................... 31, 45

*Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109
(N.D. Ill. Mar. 23, 2018) ...................................................................................... 35

*Schwake v. Arizona Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020)...................... 18, 21

*Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230 (4th Cir. 2021) ..................... 21

*Unknown Party v. Arizona Bd. of Regents*, No. CV-18-01623-PHX-DWL,
2022 WL 3841065 (D. Ariz. Aug. 30, 2022) ........................................................ 22

*Van Overdam v. Texas A&M Univ.*, 43 F.4th 522 (5th Cir. 2022)....................... 18, 21

## Statutes

20 U.S.C. § 1681............................................................................................... 1, 3, 19

28 U.S.C. § 1291........................................................................................................ 1

28 U.S.C. § 1331........................................................................................................ 1

28 U.S.C. § 1343........................................................................................................ 1

28 U.S.C. § 1367 ................................................................................ 1

**Other Authorities**

Meriam-Webster's Dictionary (online), www.merriam-
    webster.com/dictionary/arbitrary .............................................. 52

**Rules**

Fed. R. App. P. 4 ............................................................................ 1

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over plaintiff's claim arising under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, under 28 U.S.C. §§ 1331 and 1343. The district court had subject-matter jurisdiction over plaintiff's state-law claims for breach of contract, unjust enrichment, and negligent infliction of emotional distress under 28 U.S.C. § 1367 because they are so related to the claim in the action the court's such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a). This is an appeal from a final order or judgment that disposes of all claims. On August 13, 2019, the district court dismissed plaintiff's claim for emotional distress. [Dkt. 47-48.][1] On September 28, 2022, the district court issued its memorandum opinion granting defendant's motion for summary judgment on plaintiff's remaining claims and denying plaintiff's motion for partial summary judgment on his breach of contract claim. [SA1.] On September 30, 2022, the clerk entered judgment. [SA75.] On October 25, 2022, plaintiff timely filed his notice of appeal. [Dkt. 185.]

---

[1]     All citations to the required short appendix attached to this brief are of the form "[SA__.]" All citations to the record in the district court are of the form "[Dkt. __ at __ ]" or "[Dkt. ¶__]", when appropriate including the specific page or paragraph referenced. Where it is clearer, plaintiff has used the ECF page number printed in the ECF header, indicated by "ECF__." Plaintiff has not filed a separate appendix.

## STATEMENT OF THE ISSUES

1.     Was there a material issue of fact as to whether defendant was motivated in part by plaintiff's gender when it expelled him from the university which precluded summary judgment on plaintiff's Title IX claim?

2.     Was there a material issue of fact as to whether defendant acted arbitrarily, capriciously or in bad faith when it expelled him from the university which precluded summary judgment on plaintiff's breach of contract claim?

## STATEMENT OF THE CASE

### I.    The Parties

Plaintiff-appellant John Doe (John) was a student at defendant–appellee Loyola University Chicago (Loyola) from September 2014 until Loyola expelled him in January 2017. [Dkt. 161 ¶2.] Loyola is a private university that receives federal funding. [Dkt. 26 ¶19.]

### II.    Procedural History

After an accusation by a fellow Loyola student, Jane Doe (Jane), and a university disciplinary hearing, Loyola found John responsible for sexual misconduct and expelled him. Alleging Loyola violated Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, by discriminating against him based on his gender and asserting claims for breach of contract, unjust enrichment, and negligent infliction of emotional distress, John filed the present action in the district court. [Dkt. 1.] John and Loyola eventually filed cross-motions for summary judgment. [Dkt. 126; Dkt. 130.] The district court granted Loyola's motion and denied John's. [SA1.]

### III.  Statement of Facts

#### A.  Loyola faced pressure to crack down on sexual misconduct.

In 2011, the Department of Education's Office for Civil Rights (OCR) published what it termed a "Dear Colleague Letter" criticizing universities for not adequately addressing sexual harassment, including sexual assault, on their campuses and providing guidelines to remedy the problem. In 2014, OCR publicly disclosed a list of institutions it was investigating for failing to follow OCR's guidance on handling sexual assault on their campuses. Loyola acknowledged that its goal was to "stay off" that list. [Dkt. 26 ¶19; Dkt. 171 ¶2.]

In 2016, Loyola administrators faced campus-based pressure criticizing their handling of gender-based misconduct allegations, including campus protests and numerous media articles. [Dkt. 171 ¶36.] During this period, a university-sponsored newsletter also suggested that men's groups perpetuate a "rape culture ... that normalizes violence" [Dkt. 171 ¶36.]

In fall 2016—the semester in which John's case was adjudicated—the campus pressure intensified. On November 4, a female-led group, which Loyola's vice president characterized as the "bane of [her] existence," demanded that Loyola fire its interim Deputy Title IX Coordinator, Tim Love, over his alleged mishandling of sexual assault cases. [Dkt. 171 ¶¶40, 44.] Love was not fired, but instead would become involved in every facet of John's case and make multiple decisions adverse to John and favorable to Jane.

Additional media reports in October through December 2016 criticized Loyola's handling of sexual assault claims involving female accusers and alleged male perpetrators. [Dkt. 164-57; Dkt. 164-58; Dkt. 164-59; Dkt. 171 ¶41.] The criticism made national news, when it was discovered that a male member of Loyola's golf team had remained on campus for two years while rape charges were pending against him. [Dkt. 164-59; Dkt. 164-64; Dkt. 164-65; Dkt. 164-66; Dkt. 164-67; Dkt. 171 ¶¶47-49.]

During the entirety of the investigation and adjudication of John's case, the criticism of Loyola's handling of gender-based misconduct was a "reputational concern" and discussed often at Loyola's "Reputation Management" meetings. [Dkt. 171 ¶¶50-52.]

### B. John and Jane's interactions

John was an undergraduate student who served as an assistant manager to a Loyola men's athletic team. [Dkt. 158 ¶¶2, 26; Dkt. 161 ¶1.] Jane was an undergraduate student on a Loyola athletic team. [Dkt. 158 ¶2; Dkt. 161 ¶4.] After being introduced by a mutual friend (WT), Jane and John went on a date on January 13, 2016. [Dkt. 128-4 ECF 1363.] They returned to John's apartment, and after speaking with John's roommate (CR), went into John's bedroom where they performed oral sex on each other. [*Id.*] John and Jane walked back to her dorm, where they met with WT. [*Id.*]

A few days later, at John's apartment, they talked about their first date: they agreed that they had moved too fast, should take things slower, and didn't "want physical activity to be the cornerstone of the relationship." [Dkt. 128-4 ECF1363

5

(lines 198-207), ECF1367 (lines 360-69); Dkt. 129-7 ECF1452 (96:11-97:7); Dkt. 161 ¶5.]

On January 17, 2016, Jane returned to John's apartment, where she again performed oral sex on him. [Dkt. 161 ¶6.] They then watched a video, but Jane became bored and wanted to leave. [Dkt. 128-4 ECF1367-1368; Dkt. 128-7 at 101:7-118:4.] John offered to walk with Jane back to her dorm, but she declined and left by herself. [*Id.*] Back at her dorm, Jane texted John that the campus police had driven her home due to the cold weather. [*Id.*] A few days later, John and Jane were at a party and got into an argument. [Dkt. 161 ¶7.]

### C. Jane made several statements to Loyola officials about her interactions with John.

Shortly after the party, Jane's coach overheard Jane complaining to her teammates about John. [Dkt. 128-5 ECF1382-1383 (emphasis added); Dkt. 158 ¶80.] After meeting with Jane, the coach filed a written report with Loyola's Title IX office in which she stated, in part, that Jane "didn't feel comfortable and was *pressured* into physical contact, even saying no." [*Id.*]

The coach's report prompted Rabia Khan Harvey, then Loyola's Deputy Title IX Coordinator, to interview Jane. [Dkt. 161 ¶¶9-10.] In Khan Harvey's report, she wrote:

> [Jane] shared that on two separate occasions, the Respondent [John] "moved too quickly sexually" which made the student uncomfortable. *While she doesn't believe she was forced or coerced*, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her.

6

[Dkt. 161 ¶11 (emphasis added); *see also* Dkt. 158 ¶7]. In her deposition, Khan Harvey testified that she would have asked Jane: "Did you feel like you were forced to do that [the sexual activity]?" [Dkt. 164-1 at 99:8-101:7; Dkt. 158 ¶5.] Khan Harvey also testified that "coercion" includes "[r]epeatedly asking. Please do this, please do this, you know you want it." [*Id.*] Jane did not file a formal complaint at that time. [Dkt. 161 ¶12.]

Jane's statement that she was not forced or coerced into sexual activity was not provided to John, the hearing board, or Loyola's appeals officer. [Dkt. 161 ¶¶28-30.] The first time John learned of Khan Harvey's report was when Loyola produced it in discovery in this lawsuit. [Dkt. 161 ¶32.]

### D. Loyola took action against John after Jane complained about seeing him on campus.

In June 2016, Jane complained to Loyola's Associate Athletic Director for Title IX Compliance, Jay Malcolm, that she saw John in the varsity weight room. In response, Loyola barred John from the weight room, falsely telling him that there was an existing policy that only athletes were allowed to use the weight room, when in fact the "policy" was created in response to Jane's complaint. [Dkt. 164-28 at 50:8-53:1, 59:6-61:9, 65:7-21; Dkt. 171 ¶¶7-8, 10.]

In October 2016, Jane told Malcolm that she again saw John on campus, his presence made her feel unsafe, and she was considering transferring "due to the anxiety she feels knowing she may run into" John. [Dkt. 171 ¶¶9-10.] Malcolm contacted Tim Love (who had become the interim Deputy Title IX Coordinator) and asked for his "help and guidance" to determine whether Loyola could permanently remove John

from his athletic department position and exclude him from Loyola's athletics facility. [Dkt. 135-17; Dkt. 171 ¶10.]

Malcolm advised Jane that Loyola could not take action unless she filed a formal complaint against John. [Dkt. 171 ¶11.] After meeting with Love, Jane filed a formal complaint. [Dkt. 171 ¶12.] Love told Malcolm that Jane's complaint would "add another tool in our belt." [Dkt. 135-17.]

In addition to filing her own complaint, Jane indicated to Loyola officials that she had "connected" with a former student (Elizabeth) who claimed to have been assaulted by John. [Dkt. 171 ¶¶14-15.] Jane provided Love with Elizabeth's contact information. Soon after, Elizabeth filed her complaint. [Dkt. 159 ¶14; Dkt. 164-41.]

### E. The investigation

Loyola investigated the two complaints pursuant to its published 2016-2017 Community Standards, which governed its formal "Gender-Based Discrimination and Misconduct" process. [Dkt. 159 ¶16; Dkt. 164-87.] On November 4, 2016, Love assigned two Loyola investigators, Leslie Watland and Ray Tennison, to investigate the allegations against John. [Dkt. 161 ¶17.] On November 8, 2016, Love met with John, and told him that the Jane contended that she was "coerced" into sexual activity. [Dkt. 128-23 ECF1844-1846, ¶9; Dkt. 161 ¶20.]

The investigators interviewed Jane and John separately and audio-recorded them to allow Loyola to determine the "precise language" used in the interviews. [Dkt. 128-3 ECF1347, ¶9.] Jane stated that she met both of John's roommates the first time

she went to his apartment. [ECF 128-4 ECF1360-1363.] With respect to sexual activity that night, she said she "gave in" and engaged in mutual oral sex. [*Id*.] Jane stated that after their first sexual interaction, John walked with her home where they talked with WT, claiming that John attempted to coax Jane into disclosing to WT that she performed oral sex on John. [*Id*.]

At his interview, John stated that all sexual activity was consensual. [*Id*. ECF1366-1369] Echoing the words Love used when they met in early November, John stated twice that "no one was coerced." [*Id*. ECF1366-1367.]

Immediately after John's interview, Watland left Love a voice message asking about witnesses identified during the interviews. [Dkt. 158 ¶42 ECF4157 bottom of page.] The investigators then interviewed Jane's female witness (Witness #1). [Dkt. 128-4 ECF1369-1372.]

The investigators did not interview the two male witnesses (WT and John's roommate, CR) identified in their interviews. [*Id*. at ECF1360-1372.] Although Loyola's training materials instructed investigators to include a rationale in their Final Investigative Report (FIR) if they did not interview witnesses, and instructed the Deputy Title IX Coordinator to make sure the investigators did so, the investigators did not explain why they did not interview the male witnesses. [Dkt. 128-4 ECF1360-1372; Dkt. 171 ¶82.]

The investigators and Love prepared the FIR for submission to the board. [Dkt. 161 ¶27.] Love wrote the "History of the Case" section attaching Jane's coach's report, which included the statement that Jane felt "pressured" into sexual contact. [*Id*.

9

¶¶27-28.] While Love noted that Jane had met with Khan Harvey on January 26, 2016, he omitted Khan Harvey's report that Jane "doesn't believe she was forced or coerced" into sexual activity. [Dkt. 128-4, 128-5.] At his deposition, Love could not recall why he omitted the report or otherwise explain his omission. [Dkt. 161 ¶¶28-29.]

Before finalizing the FIR, Love suggested the investigators leave out details of consensual interactions between the parties because "[t]hey distract from the attention on the alleged nonconsensual encounter." [ECF 164-12 ECF5717 (MS Word comment bubble at lines 147-67).]

### F. The hearing

The hearing on Jane's claims occurred on December 14, 2016. [Dkt. 161 ¶34.] The three board members were Jessica Landis, Angela King Taylor, and Brian Houze. [*Id.* ¶33.] During the hearing, the board asked John about a statement attributed to him in the third person in his interview summary concerning his and Jane's second meeting: "They [Jane and John] mutually agreed that they moved fast physically and 'no one was coerced.'" [Dkt. 128-7 at 93:7-96:16.] The board asked John "how did coercion come up in that conversation [with Jane]." [*Id.*] John said: "it didn't," explaining that he only told the investigators that he and Jane agreed that they moved too fast physically, and that he separately stated that he told the investigators that "no one was coerced" because he learned either from Love or documents provided to him that the case concerned whether he "coerced [Jane]." [*Id.*]

On December 15, 2016, Landis told Love the board would likely find John responsible and expel him. [Dkt. 171 ¶67.] She told Love that the board found John not credible because he allegedly told the investigators that he and Jane agreed that "no one was coerced" and then, at the hearing, denied that he and Jane had discussed coercion. [*Id.*] In response, Love told Landis that he had, in fact, told John that the case concerned "coercion." [Dkt. 171 ¶67.] The same day, before learning of the board's decision, John complained to Love that the board had been unfair to him. Love told John to "trust the process" and that John could raise his concerns on appeal. [*Id.*]

### G. The decision letter

On December 20, 2016, the board issued a written opinion ("Decision Letter") finding him responsible for sexual misconduct and expelling him. [Dkt. 128-32; Dkt. 158 ¶73.] The board based its entire decision on its credibility determinations of Jane and John. [Dkt. 128-32.] The board found Jane's testimony credible, in part, because it concluded that Jane had told a consistent story throughout to her coach, Witness #1 and the investigators. [*Id.* at ECF1976.] The board did not have Khan Harvey's report that Jane did not "believe she was forced or coerced" into sexual activity because Love failed to include it in the FIR or otherwise disclose it. [*Id.* ("The Board did not have any other information to consider to evaluate the Complainant's credibility.").]

The board concluded that John's testimony at the hearing that "neither the word 'coercion' nor the topic of coercion was discussed with the Complainant as *implied* in the FIR" contradicted what John told the investigators. [*Id.* (emphasis

added).] The investigators' written summary stated that John and Jane "agreed that they moved fast physically and 'no one was coerced.'" [*Id.*] The board continued:

> All things considered, Respondent's inconsistency regarding the discussion of coercion, *while a singular instance*, is noteworthy to the Board. The presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction. As such, the Respondent's inconsistency around this topic in particular holds significant weight.

[*Id.* at ECF1977 (emphasis added).] While board member Landis listened to the audio recording of the hearing to determine precisely what John said at the hearing, she did not listen to (or ask the investigators to listen to) the interview recording to confirm the context in which he said, "no one was coerced." [Dkt. 161 ¶150.]

### H. The appeal

John appealed the board's decision. [Dkt. 128-34; Dkt. 128-35; Dkt. 158 ¶¶99, 103.] John stated that it was error for the board to find that he contradicted his interview statements without first reviewing a transcript of his interview. [Dkt. 128-34 ECF2042-2043; Dkt. 128-35 ECF2046-2049 (amended appeal document).] On January 17, 2017, while John's appeal was pending, his attorney sent Loyola a litigation hold letter demanding that Loyola preserve all documents, including "audio tapes," relating to John's case. [Dkt. 128-23.]

In the same letter, John's attorney included declarations from John and the two male witnesses (WT and John's roommate, CR) that Loyola failed to interview, and asked the appeals officer Jack McLean to consider them on appeal. [*Id.*] Although Loyola's Community Standards gave John the right to submit new substantive information, Love told McLean not to be "persuaded" by the letter, and McLean did

not read the declarations. [Dkt. 158 ¶¶9, 105; Dkt. 164-24; Dkt. 171 ¶101.] Loyola's vice president, Jane Neufeld, testified that Love's comments to McLean were not appropriate. [Dkt. 164-21 at 75:14-23; Dkt. 171 ¶101.]

Meanwhile, Loyola's "Reputation Management Committee" reported in its January 9-meeting minutes that an "on-campus survivor group was interested in writing an op-ed for the Phoenix in response to Students for Reproductive Justice," (SRJ) which had called for Love's firing. [Dkt. 171 ¶53.] On January 18, 2017, the group – *which included Jane* – published their letter in Loyola's newspaper, cautioning against Love's dismissal. [Dkt. 171 ¶54.]

On January 18, 2017, Jane learned that John was still on campus. [Dkt. 164-70.] The next day, on January 19, she sent Love an email (copying Landis, Malcolm and Neufeld) reminding him that she had "advocated" for Loyola ("especially" for Love) and that she now questioned whether Loyola supported survivors, stating in part:

> The last thing that I want is for survivors of gender-based misconduct to have reasoning [sic] to distrust the office of the Dean of Students, or to feel unsafe on campus because of a situation or lack of communication such as this one. As someone who recently advocated for the Office of the Dean of Students, especially for you, in the Loyola Phoenix[,] I am extremely disappointed and truly expected better. I advocated for you because I truly believed Loyola was ready and willing to hear the experiences of survivors and support us through them. However, I, as well as other survivors who contributed to the article, question as [sic] if this truly [is] the case anymore.

[*Id.*] Later that day, Love urged McLean to issue the appeal decision the next day, and a Loyola official met with Jane to assure her of "our continuing support" [Dkt. 171 ¶¶57-58.]

The next day, on January 20, McLean denied John's appeal, asserting that he was not allowed to review the recording of John's interview and the declarations John submitted. [Dkt. 128-40; Dkt. 161 ¶¶57-58.] Love then called Jane to inform her of the decision, and reported to Loyola officials that the call was "productive" and that he believed "that this matter has been fully resolved, *and expect continued positive relations and partnership with [Jane] and the survivor community moving forward* . . . I believe we are back on track." [Dkt. 158 ¶111 (emphasis added).] Loyola vice president Neufeld admitted that Love's continued expressions of support for Jane were unfair to John. [Dkt. 158 ¶111; Dkt. 164-21 at 75:14-23; Dkt. 171 ¶101.]

In discovery, John learned that Loyola destroyed the audio recording of his interview. [Dkt. 161 ¶75.] Loyola cannot provide the chain of custody for the recording, or state how and when it was destroyed. [*Id.*]

## SUMMARY OF THE ARGUMENT

John presented competent evidence to support his claims for gender-based discrimination under Title IX and for breach of contract. To survive summary judgment on his discrimination claim, John was required to establish that his gender was a motivating factor in Loyola's decision to expel him. *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). In deciding a Title IX discrimination claim, courts take a holistic approach and consider the totality of the circumstances, including circumstantial evidence. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022). Under Seventh Circuit precedent, factors indicating *case-specific* gender bias can include: numerous, lopsided, and important irregularities in the university's handling of the student's case; gender-biased statements or actions by relevant university decision makers; significant on-campus pressure directed at university officials playing an important role in the accused student's case; and perplexing credibility decisions by university adjudicators. *Purdue*, 928 F.3d at 669; *Southern Indiana.*, 43 F.4th at 792, 793, 799. Evidence of some or all of these factors, against a backdrop of generalized pressure, entitles a plaintiff to present his claim to a jury.

John presented evidence of campus-wide pressure on the university about its handling of sexual misconduct allegations, pressure that Loyola both acknowledged and actively tried to address, convening "reputational" meetings and taking steps to assuage complainants. John also presented evidence of gender-biased attitudes by members of the board that decided his case; and at least temporary bias against him

15

by the relevant Loyola Title IX official. *Purdue*, 928 F.3d at 668, citing *Doe v. Columbia Univ.*, 831 F.3d 46, 58 n.11 (2d Cir. 2016) ("A covered university that adopts, *even temporarily*, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex"; emphasis added). John also presented evidence of numerous "lopsided" and important irregularities in Loyola's investigation and hearing. In a disciplinary proceeding where the sole issue was whether John had forced or coerced Jane into non-consensual sexual activity and whose outcome rested entirely on John and Jane's credibility, Loyola withheld a key report that Jane did not believe that she had been forced or coerced. This procedural irregularity figured prominently in John's expulsion. The board, without having considered Jane's materially inconsistent statement, wrongly concluded that she had told a consistent story throughout the process.

That was far from the only irregularity that prejudiced John. Prominent in the board's decision was its determination that John's credibility had been impugned based on a statement in the investigators' report that the district court recognized had "some ambiguity." [SA47.] The board could have cleared up the dispute regarding what John said to the investigators by listening to the interview recording. Yet the board and appeals officer chose not to listen to it. Loyola then destroyed the recording. The result was a decision where the full scope of the evidence gathered by Loyola contradicted the board's finding of responsibility against John.

16

The pressure campaign waged against Loyola on campus along with the numerous lopsided and important errors in John's disciplinary proceeding, and indications of gender bias by key Loyola officials are the type of circumstantial evidence the Court has found sufficient to create a trial issue. Based on the totality of the evidence, John established an issue of material fact which precluded summary judgment on his Title IX claim.

In concluding otherwise, the district court "erred by doing what [the Seventh Circuit has] repeatedly said a court should not: 'asking whether any particular piece of evidence proves the case by itself,' rather than aggregating the evidence 'to find an overall likelihood of discrimination.'" *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924 (7th Cir. 2020) (quoting *Ortiz v. Werner Enterprises*, 834 F.3d 760, 765 (7th Cir. 2016)). The district court listed some (though not all) of the specific irregularities identified by John, only to conclude as to each specific item—no matter how "lousy" or "unfair" to John or "difficult to understand" Loyola's explanations—that John could not prevail because he did not prove each act was done for discriminatory reasons. [SA63.] Having reached that conclusion, the court chose not to "consider the more general evidence Doe provides (meaning, the evidence about outside influences and Loyola's sexual assault case statistics)," saying "[t]hose buckets only become relevant when he has 'combine[d] [them] with facts creating an inference that, in *his specific case*, the institution treated him differently because of his sex.'" [SA64; emphasis in original.]

17

In other words, the district court concluded that because John lacked direct proof that each act of mistreatment was due to discrimination, it did not need to consider any *other* evidence of discrimination. That turns the standard on its head. The Seventh Circuit requires evaluation of *all* the evidence. A plaintiff need not show that each irregularity or "perplexing" decision was due to gender bias; those flaws themselves are the evidence from which a reasonable jury could conclude that gender was a motivating factor in the decision. *See, e.g.*, *Purdue,* 928 F.3d at 669-70; *Southern Indiana,* 43 F.4th at 794.[2]

Based on its erroneous application of law, the district court disregarded what it dismissed as "more general evidence." Ignoring this evidence, all of which was highly probative of discriminatory intent, was reversible error. The district court compounded its error at each step, misapplying the summary judgment standard, speculating about possible justifications for Loyola's decisions, weighing evidence, and drawing inferences in Loyola's favor.

The district court also erred in granting Loyola's motion for summary judgment on John's breach of contract claim. The same Title IX evidence allows a reasonable jury to conclude that John's expulsion—after an investigation and review process riddled with errors—was arbitrary, capricious, or in bad faith.

---

[2]     Nor is the Seventh Circuit an outlier in employing a holistic analysis in Title IX cases. *See, e.g., Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 865-66 (8th Cir. 2020); *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 951 (9th Cir. 2020); *Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668, at *2 (N.D. Tex. Dec. 13, 2022) (citing *Van Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022)).

18

## ARGUMENT

### I.    Standard of Review

Orders granting summary judgment are reviewed *de novo*, "viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Courts "reverse a grant of summary judgment if there is a material issue of fact that would allow a reasonable jury to find in favor of the nonmoving party." *Id.* (quotation omitted). It is reversible error for a district court to "choose between competing inferences," "balance the relative weight of conflicting evidence," or make credibility findings. *Id.* (same). "[T]he court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll*, 953 F.3d at 928.

### II.   The district court erred in granting Loyola summary judgment on John's Title IX claim where John presented evidence of pressure on Loyola to address cases of sexual misconduct along with numerous, lopsided and important irregularities in Loyola's handling of his case.

#### A. The applicable law concerning Title IX claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

In *Purdue*, the foundational case for accused students pleading a violation of Title IX, the Court saw "no need to superimpose doctrinal tests on the statute" to show sex was "a motivating factor" in a university's "decision to discipline a student."

928 F.3d at 667. Instead, the Court asked: "[D]o the alleged facts, if true, raise a plausible inference that the university discriminated against [the accused student] 'on the basis of sex'?" [*Id.* at 667-68 (emphasis added).][3] As in *any* discrimination case, "the ultimate inquiry must consider the totality of the circumstances." *Southern Indiana*, 43 F.4th at 792 (citing *Purdue*, 928 F.3d at 667-68, 670).

Because direct evidence of discrimination is rare, the Supreme Court has "often acknowledged the utility of circumstantial evidence in discrimination cases." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003). The Court, both in *Purdue* and, last year, in *Southern Indiana*, addressed types of circumstantial evidence that establish a violation of Title IX. It recognized the federal pressure on universities over Title IX matters that began with the Dear Colleague Letter of 2011. This pressure provides "a story about why [a university] might have been motivated to discriminate against males accused of sexual assault." *Purdue*, 928 F.3d at 669. Indeed, "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." *Id.* at 668. University-specific pressure to crack down on accused students and university responses to that pressure also are relevant, partic-

---

[3]     The district court misstated the standard for proving discrimination, increasing John's burden to prove that "sex discrimination was the *driving force* behind Loyola's" decisions. [SA61 (emphasis added).] John does not have to show that gender was the "driving force" behind Loyola's decisions; he just has to show that a reasonable jury could conclude that it was one of several potentially "motivating" factors behind his expulsion. *Purdue*, 928 F.3d at 667. "To prove that sex was *a* motivating factor, a plaintiff must demonstrate that [his] sex was *one of* the reasons" that the adverse action occurred. *Hossack v. Floor Covering Assocs. of Joliet*, 492 F.3d 853, 860 (7th Cir.2007) (emphasis added).

ularly when, as here, it is directed at the "Title IX coordinator, [who] bore some responsibility for [a university's] compliance" and whose decision-making process in the accused student's case is "perplexing." *Purdue*, 928 F.3d at 668, 669; *see also Southern Indiana*, 43 F.4th at 792-93.

To withstand summary judgment, an accused student may combine evidence of pressure "with other circumstantial evidence of bias in [a] specific proceeding" to support an inference that the university "acted at least partly on the basis of sex in his particular case." *Purdue*, 928 F.3d at 668-89 (*quoting Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)).[4] The kinds of circumstantial evidence supporting a discrimination claim in a particular case can include significant procedural irregularities, gender-biased statements, and findings that are irrational or clearly against the weight of the evidence. *See, e.g., Purdue*, 928 F.3d at 669-70; *Southern Indiana*, 43 F.4th at 792. As the Court emphasized in *Southern Indiana*, "if procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination." 43 F.4th at 793-94 (citing employment discrimination cases where summary judgment was reversed, as well as *Purdue*, 928 F.3d at 669 and *Doe v. Univ. of Denver*, 1 F.4th 822, 831-34 (10th Cir. 2021)); *see also, e.g., Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022) ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins

---

[4]     Since *Purdue*, six circuits have adopted this Court's approach. *Van Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 528 (5th Cir. 2022); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021); *Doe v. Univ. of Ark.- Fayettevill*e, 974 F.3d 858, 864-65 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020).

21

to look like a biased proceeding despite the [university's] protests otherwise."). In sum, the pressure supplies a motive for universities to discriminate against men, and the lopsided and important irregularities provide the circumstantial evidence that they acted on that motive.

Separately, establishing that a university engages in gender-based stereotyping "allows a reasonable inference that the defendants acted with a nefarious discriminatory purpose and discriminated against [plaintiff] based on his membership in a definable class." *Doe v. Purdue Univ.*, 464 F. Supp. 3d 989, 1008 (N.D. Ind. 2020) (quotation omitted); *see also Joll*, 953 F.3d at 931-32.

Courts have followed the framework of *Purdue* and *Southern Indiana* on summary judgment, holding that pressure against the university to crack down against accused male students, when combined with procedural and substantive irregularities, dubious findings of responsibility, or engaging in gender-stereotyping suffice for the plaintiff to survive summary judgment.[5]

---

[5]     *See Doe v. Univ. of Denver*, 1 F.4th 822, 824 (10th Cir. 2021) (significant procedural irregularities, statistical disparity between treatment of male and female complainants, dubious finding of responsibility); *Texas Christian Univ.*, 2022 WL 17631668 (illogical finding of responsibility, gender stereotypes in writing of key Title IX-related official, exclusion of exculpatory evidence); *Unknown Party v. Arizona Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 3841065 (D. Ariz. Aug. 30, 2022), *reconsideration denied*, No. CV-18-01623-PHX-DWL, 2022 WL 17081309 (D. Ariz. Nov. 18, 2022) (finding against weight of the evidence, procedural irregularities, statistical disparities in punishment); *Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2022 WL 3279234, at *1 (N.D. Ind. Aug. 11, 2022); *Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987, at *17 (N.D. Iowa July 20, 2022) ("[T]he Court finds the undisputed evidence shows one theory which is sufficient in itself—specifically, the procedural and substantive deficiencies in Doe's Title IX process."); *Doe v. Washington & Lee Univ.*, No. 6:19-CV-00023, 2021 WL 1520001 (W.D. Va. Apr. 17, 2021) (procedural irregularities, differing treatments of parties' personal sexual mores). *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 172 (N.D.N.Y. April 30, 2020) ("[A] reasonable factfinder could find that [the

## B. John presented evidence of genuine issues of material fact demonstrating that Loyola violated Title IX.

John presented evidence that fits squarely within the *Purdue* and *Southern Indiana* framework. John presented evidence of: (1) intense pressure on Loyola, including pressure directly against Love and others involved in his case, (2) numerous lopsided and important irregularities, which led directly to a factually unsustainable decision; and (3) indications of potential gender bias by relevant Loyola officials. Based on this evidence, a reasonable jury could conclude that John's gender was a motivating factor in Loyola's decision to expel him. The district court erroneously disregarded the first and third types of evidence and misapprehended the importance of the second. The district court also impermissibly made fact findings, chose competing inferences, and made credibility determinations.

### 1. John presented material evidence of pressure against Loyola and Love.

Jane's allegations came at a time when Loyola and other universities were under government pressure to address sexual assault on campus or risk being investigated by the OCR. *See Purdue,* 928 F.3d at 668. Loyola was aware of OCR's list of universities under investigation for not following its guidance on handling sexual assault cases. [Dkt. 171 ¶2.] Loyola's Deputy Title IX Coordinator for most of 2016, Rabia Khan Harvey, testified that "it was Loyola's goal to stay off" OCR's list. [*Id.*]

---

university's investigator] was biased against Plaintiff when she entangled herself in [the] criminal investigation, failed to investigate inconsistencies in Roe's account, and did not question Roe about Plaintiff's potentially accurate account of the incident.").

*See Purdue*, 928 F.3d at 669; *see also Doe v. Regents of Univ. of California*, 23 F.4th 930, 937, 939 (9th Cir. 2022) ("Statements by pertinent university officials, not just decision makers, can support an inference of gender bias.").

Throughout 2016, Loyola administrators also faced campus-based pressure criticizing their handling of gender-based misconduct allegations. [Dkt. 171 ¶¶38-52.] In spring 2016, a newsletter from Loyola's Community Coalition on Gender-Based Violence reported that student activists staged "counter protests" on campus over a planned off-campus meeting of a Men's Rights Activist ("MRA") group. [Dkt. 171 ¶36.] The MRA event was canceled, and a university newsletter reported that MRA and groups like them "perpetuate rape culture and contribute to a culture that normalizes violence." [*Id.*]

In fall 2016—the semester in which John's case was adjudicated—campus pressure on Loyola intensified. [*Id.* ¶38.] At the time, Love had become Loyola's Deputy Title IX Coordinator. [Id. ¶16.] On November 4, the SRJ protested the perceived mishandling of sexual assault cases at the inauguration of Loyola's new president, and a local newspaper reported that the SRJ demanded that "the university fire Tim Love . . . for continuing to mishandle sexual assault cases." [*Id.* ¶¶40, 44.] Four days later, Loyola's vice president, Jane Neufeld, met with the organizer of SRJ, whose "active voices" were five or six women. [*Id.* ¶45.] Neufeld described the SRJ as the "bane of [her] existence." [*Id.*]

On December 15, 2016—the day after John's hearing—the Loyola Phoenix published an article questioning why Loyola allowed a male student to remain on campus

for more than two years while rape charges against him were pending. [Dkt. 164-64; Dkt. 171 ¶47.] The matter made national news, with the Washington Post and Time Magazine publishing articles about students' outrage over the issue. [Dkt. 164-67; Dkt. 171 ¶49.]

In this charged atmosphere, Jane provided university administrators with potential relief. Loyola's "Reputation Management Committee" reported in its January 9-meeting minutes that an "on-campus survivor group was interested in writing an op-ed for the Phoenix in response to" the SRJ. [Dkt. 164-68; Dkt. 171 ¶53.] This group, which planned to write a letter defending Loyola against attacks for its inadequate responses to sexual assault and calls for Love's firing, included Jane. [Dkt. 171 ¶54.] The group's op-ed supporting Loyola and Love was published *after* the board found John responsible and while his appeal was pending. [*Id.*][6]

The district court, however, disregarded the evidence of pressure against Loyola, stating that:

> The Court *doesn't need to consider the more general evidence (meaning, the evidence about outside influences and Loyola's sexual assault case statistics)*. Those buckets only become relevant when he has "combine[d] [them] with facts creating an inference that, in his specific case, the institution treated him differently because of his sex."

---

[6]     Circumstantial statistical evidence suggests that this gender-based pressure influenced Loyola. All four men whom Loyola charged with sexual misconduct in the fall of 2016 were found responsible for at least one gender-based misconduct charge. [Dkt. 128-32; Dkt. 164-76; Dkt. 171 at ¶89.] This type of statistical evidence is additional support for a discrimination claim. *See Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) (noting that a "100 percent responsibility rate" in ten cases involving male respondents supports an inference regarding bias in the hearings themselves.").

[SA64-65 (*citing Johnson v. Marian Univ.*, 829 F. App'x 721, 723 (7th Cir. 2020).]⁷

### 2. John presented evidence of numerous lopsided and important irregularities in John's proceeding leading to his expulsion.

Treating Jane's complaint as a "tool in [its] belt," Loyola (mainly through Love), used it to remove John and appease Jane and Loyola's mounting critics. While there were many "lopsided" irregularities, two stand out as directly impacting the board's decision: (1) Love's failure to disclose exculpatory evidence; and (2) Loyola's failure to review, and its subsequent destruction of, the recording of John's interview.

### a. Loyola failed to disclose Khan Harvey's report that Jane did not believe the sexual activity was "forced or coerced."

Failure to disclose exculpatory evidence is a procedural irregularity that supports a finding of discriminatory intent. *Southern Indiana*, 43 F.4th at 795 (analogizing suppression of Title IX exculpatory evidence to criminal cases "in which the prosecution fails to disclose material exculpatory information that the accused did not know about"); *see also Cephus v. Blank*, No. 21-CV-126-WMC, 2022 WL 17668793, at *7 (W.D. Wis. Dec. 14, 2022) (external pressure and refusal to "wait for exculpatory evidence it knew existed" gives rise to a plausible claim); *Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668 (N.D. Tex. Dec. 13, 2022) (summary judgment denied based on, among other things, "exclusion of exculpatory evidence"

---

⁷       Although the district court cited *Johnson v. Marian Univ.* to justify its choice to simply ignore general evidence of discrimination, *Johnson* (in line with Seventh Circuit precedent) does not support this proposition: "We have acknowledged this sort of background can be relevant for assessing Title IX sex discrimination claims," though such generalized pressure was not enough by itself. 829 F. App'x at 732.

combined with general motive evidence); *Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987 (N.D. Iowa July 20, 2022) (summary judgment denied due to failure to consider exculpatory evidence among deficiencies that supported inference that "gender bias was a motivating factor"); *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 928 (S.D. Iowa 2019) (in coercion case, omission of evidence from investigation raises material fact that precludes summary judgment).

Here, Love withheld exculpatory evidence from John, the board, and the appeals officer. In November 2016, Love met with John and explained that Jane's case, and cases like it, tend to hinge "on a question of whether there was pressure, unreasonable pressure, coercion, et cetera." [Dkt. 128-11 at 153:18-54:3; Dkt. 161 ¶20.] Yet Love, who knew of Khan Harvey's report that Jane "did not believe she was forced or coerced" into sexual activity, failed to disclose it to John. [Dkt. 161 ¶¶14, 32; Dkt. 136-46 at 254:6-255:6.]

Love was directly involved in the preparation of the FIR, which included three statements containing assertions that Jane was "pressured" into sexual activity: (1) her statement in the coach's report; (2) her statement to Witness #1; and (3) her statement to investigators saying she "gave in" to John's requests. [Dkt. 161 ¶¶27-29; Dkt. 128-4 and 5.] Love attached the entirety of the inculpatory coach's report to the FIR. [*Id.*] But while he mentioned that Jane met with Khan Harvey on January 26, 2016 [Dkt. 128-4 ECF1359], Love omitted Khan Harvey's report that Jane "doesn't believe she was forced or coerced" and, unlike the coach's report, did not attach Khan Harvey's report to the FIR. [Dkt. 161 ¶29.]

27

When questioned about the omission, according to the district court, "Love couldn't give much of an explanation for his failure to share potentially explosive evidence" [SA63.] Love testified at his deposition:

> Q:     Why didn't you put in the final investigation report that Jane had previously said that she didn't believe that she was forced or coerced?
>
> A:     I don't recall.
>
> Q:     Is that a mistake?
>
> A:     I don't – I don't recall.
>
> Q:     Do you agree with me that it would be relevant for the hearing officers to hear that Jane, on a previous occasion, said that she didn't believe she was forced and coerced in connection with the same encounters that are at issue in Jane's claim in this case?
>
> A:     Again, it really depends on the details of the case. The investigation did explore her feelings of being uncertain on how – what to make – how to make sense of the incident that she experienced that was I believe referenced in other materials.
>
> Q:     Sir, did you make a conscious choice not to include the statement that Jane made to Rabia Kahn Harvey, as Rabia Khan Harvey reports, that: Jane doesn't believe she was forced or coerced? Did you make a conscious choice not to put that in the FIR?
>
> A:     No.

[Dkt. 136-46 at 254:6-255:6.]

Love's failure to disclose Jane's statement led directly to the board's decision. In its written decision, the board maintained that Jane "consistently shared her account" to her coach, Witness #1, the investigators, and the board. [Dkt. 161 ¶44.] The board stated that it "did not have *any other information* to consider to evaluate [Jane's] credibility." [*Id.* (emphasis added).] This was only because Love omitted

28

Khan Harvey's report that Jane "*doesn't believe she was forced or coerced*" into sexual activity.

Viewing the facts in the light most favorable to John, a reasonable jury could conclude that, as a result of both federal and on-campus pressure, Love intentionally withheld exculpatory evidence to make it more likely that John would be found responsible for sexual misconduct. This fact alone, or coupled with the evidence of pressure, mandated denial of Loyola's motion for summary judgment with respect to John's Title IX claim. *Dordt*, 2022 WL 2833987, at *17 ("[T]he Court finds the undisputed evidence shows one theory which is sufficient in itself—specifically, the procedural and substantive deficiencies in Doe's Title IX process.").

While the district court agreed that Love's failure to include the statement was "lousy," "seems unfair," and is "hard to understand," it nevertheless granted summary judgment because, even though the court was considering the *university's* motion for summary judgment, it believed "the burden rest[ed] on *Doe* . . . to come forward with evidence that [the board] did not have Khan Harvey's write-up because of a discriminatory animus." [SA60, 63 (emphasis added).] The district court erred. Under *Purdue* and *Southern Indiana*, when coupled with the evidence of campus pressure, important procedural irregularities themselves are circumstantial evidence of discrimination. *Southern Indiana*, 43 F.4th at 792; *Purdue*, 928 F.3d at 667.

The district court also incorrectly stated that "the fact that Doe didn't see the summary did not violate Doe's rights under [Loyola's internal] standards, because

29

the Board didn't see it either." [SA61.] Not so. There is no requirement that an irregularity must constitute a violation of a school's own policy to qualify as circumstantial evidence of discrimination. *Purdue*, 464 F. Supp. 3d at 1008. Here, exculpatory evidence was withheld from *both* the board and John.

In any event, Love's failure to disclose Jane's statement *did* violate §§ 201.6, 401.4, 401.5, 409, and 409.6.b of Loyola's Community Standards, which required (a) investigators to gather "all relevant evidence," (b) a thorough and impartial investigation, (c) a fair investigation and resolution, and (d) allowing parties to review "all documentation concerning the potential policy violations during the hearing" and to "refute information provided by witnesses" [Dkt. 136-2 ECF 2757, 2783, 2793-2797] Plainly, Jane's statement was (i) "relevant information," (ii) which refuted information provided by Jane, and (iii) its absence rendered the proceeding incomplete and unfair.[8]

While the district court agreed that "Love couldn't give much of an explanation for" omission of "potentially explosive evidence" [SA63], it nevertheless credited Love's testimony that he did not make a "conscious choice" to exclude Khan Harvey's report. This, too, was error.

The district court questioned "what to do about the lack of [Love's] explanation" but failed to properly answer it. Instead, it held that Doe couldn't connect the decision

---

[8]     Moreover, because Loyola was the party that chose what "relevant evidence" to present to the board, it had a contractual duty to do so in good faith. *McCleary v. Wells Fargo Sec., L.L.C.*, 29 N.E.3d 1087, 1093 (Ill. App. 2015). The fair inference from *all* the evidence suggests that Love acted in bad faith when he omitted the statement in violation of Section 409.6(c).

to withhold the "explosive evidence" to Love's discriminatory intent. [*Id*. 63-64.] The district court's unstated premise is that a court must credit as truthful the testimony of a moving party's witness unless the non-moving side has direct evidence refuting the testimony. [*See, e.g.*, SA11 n. 5.] This is wrong. A reasonable jury could conclude that Love's explanation is implausible and strains credibility, which *itself* is circumstantial evidence of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination.") Here, a reasonable jury could conclude that Love's claim that he did not make a "conscious" decision to withhold exculpatory information is untrue because (1) he cherry-picked which information to include in the FIR, (2) knew that John's case "hinged" on "coercion," (3) faced pressure (including calls for his firing) from campus groups.

### b. The board and appeals officer refused to listen to the audio recording of John's interview.

Prior to interviewing him, the investigators informed John in writing that his interview would be recorded. The written notice, entitled "Title IX Interview: Overview and Expectations," read in part:

> **Audio Recording.** This interview WILL be recorded. The purpose of the audio recording is to assist the investigation team with capturing the precise language that was shared during your interview for the purpose of the final investigation report.

[Dkt. 128-3 ECF1347, ¶9 (capitalization in original).] John and each of the two investigators signed and dated the form. [*Id*.]

Despite advising John that his interview would be recorded "to assist the investigative team with capturing [his] precise language," Loyola refused to review the recording to clarify a statement confusingly summarized by the investigators and introduced at the hearing. [Dkt. 128-32.] Based on this statement, which the district court recognized had "some ambiguity" [SA47] the board found John not credible. [Dkt. 128-32.]

According to the board, John's hearing testimony contradicted what he told the investigators. During his interview, John told Watland that he and Jane mutually agreed they had moved too fast physically; and that he (recalling Love's explanation that the case hinged on coercion) he stated clearly: "no one was coerced." [Dkt. 128-23 ECF1845, ¶16.] Watland's interview summary, however, conflated the two points: "They mutually agreed that they moved too fast physically and 'no one was coerced.'" [Dkt. 128-4 ECF1367]

At the hearing, John corrected the record about Watland's imprecise phrasing. The relevant portions of the hearing proceeded as follows:

> LANDIS: Maybe I'll just pose a question. What did you mean by they agreed they had moved fast physically?
>
> JOHN: That the two of us had agreed that we rushed into like sexual acts.
>
> LANDIS: Okay. Got it. So you meant that you had rushed in. Okay. The second part of that statement, it says they mutually agreed that no one was coerced. How did coercion come up in that conversation?
>
> JOHN: It didn't. I was stating that because of like the prompt that I received for this investigation says that I coerced her. One of the — one of the prompts

32

— in one of them, it says coercion. And so, that's why I brought that up during the interview is I said no one was coerced. It had nothing to do with that exact conversation.

LANDIS:        Okay.

JOHN:          It's just overall was a statement.

HOUZE:         Do you know what — sorry. I didn't mean to interrupt. Do you know what document that was in or can you be more specific in any way around where you — I imagine the appendix, unless it was an email, the appendix should have most of the documents there.

JOHN:          It was either one of those or it was my conversation with Tim Love, when I first met with him to discuss this.

HOUZE:         Okay.

* * * *

LANDIS:        Can you help me understand then why you told the investigators that they mutually agreed that they had moved physically fast and no one was coerced?

JOHN:          That was a misinterpretation of what I had stated.

LANDIS:        Okay. So to the investigators, can you all speak to that line, if you can recall anything about the conversation in the interview with the Respondent?

WATLAND:       Yes. He did say that when they had had that conversation, that they were — he kept saying they had mutually agreed that they had moved too quickly and he had said that they mutually agreed that no one was coerced and that was intentionally put in quotations just because, to me, the phrasing — it seems more formal than I think I anticipate people usually talking to each other. So that was what was said.

LANDIS:          Okay.

WATLAND:         But he — I don't know if I followed up or I don't know
                 if Ray [Tennison] followed up. I don't recall us ask-
                 ing, hey, did you say those exact words to her or did
                 she say those exact words to you. But when asking
                 for what did you two talk about, what did you two
                 agree upon, that was something that he had said
                 multiple times was that language.

[Dkt. 128-7 at 93:7-96:16.]

The board, in short, confronted a disagreement between two witnesses over an imprecise, "some[what] ambigu[ous]" clause in the FIR. It could easily have resolved the question of precisely what John said to Watland by taking a few minutes to listen to the audio of their interview. After all, Loyola had previously notified John that the audio was intended to "captur[e] [the] precise language that was shared during your interview." [Dkt. 161 ¶22.]

The board, perplexingly, took a different approach. First, it did not listen to the audio recording of the interview. [Dkt. 161 ¶50.] Then, it concluded John had changed his story, rather than the Loyola investigator had erroneously conflated two statements in an ambiguous sentence. [Dkt. 128-32.] Finally, it used this supposed finding to disregard John's entire testimony. [*Id.*]

Ironically, in preparing the board's decision letter, board member Landis reviewed the audio recording from the hearing itself to determine precisely what John said. [Dkt. 128-32 ECF1976.] The selective use of the audio recordings is another irregularity that prejudiced John.

34

On appeal, John contended that it was error for the board to make its credibility determination without reviewing the transcript of his interview. [Dkt. 128-34 and35.] To justify its refusal to consider the recording or transcript, Loyola claimed that its policies prohibited such a move. [Dkt. 128-40; Dkt. 161 ¶¶57-58.] But this is not so, as the appeals officer and other Loyola officials later admitted in their depositions. [Dkt. 161 ¶¶59-60; Dkt. 128-11 at 289:17-292:20; Dkt. 128-33 at 73:22-74:5, 79:13-80:19, 168:21-169:3; Dkt. 136-2.] Moreover, in 2015, the same appeals officer who handled John's case authored a decision holding that failing to disclose exonerating evidence—a standard that John had clearly met—mandated a finding in favor of the respondent. [Dkt. 161 ¶61.]

Counsel also sent Loyola a litigation hold letter demanding the preservation of all documents, including specifically "audio tapes." [Dkt. 128-23.] Loyola instead destroyed the recording, later claiming that its policies had mandated its destruction. [Dkt. 161 ¶75.] This, too, was incorrect. Loyola's policies and training materials required investigators to preserve the recordings. [Dkt. 161 ¶¶67-68.] Khan Harvey testified that recordings were "never" deleted while an appeal was pending and "nothing would be deleted while a case [including an appeal] is still open." [Dkt. 161 ¶69.] Moreover, Loyola cannot explain the destruction in the face of a litigation hold letter, which required Loyola to suspend any policies that would have otherwise deleted the recording. *Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *6 (N.D. Ill. Mar. 23, 2018). And Loyola has not provided any competent evidence that

it destroyed the recording before receipt of the litigation hold letter—much less before a reasonable person would have anticipated litigation.

There is ample evidence from which a reasonable jury could conclude that Loyola destroyed the recording *after* the litigation hold letter. First, per their training, both investigators testified that they did not delete the recording and took steps to preserve it, which (according to Khan Harvey) meant the recording should have been preserved through the appeal. [Dkt. 161 ¶71.]

Second, immediately after receipt of the litigation hold letter, Love instructed Loyola's personnel to preserve all documents relating to John's case. [Dkt. 161 ¶73.] After the investigators uploaded the recorded interviews, "[s]omeone would have to manually go in and delete it." [Dkt. 161 ¶69.]

Third, Loyola cannot provide the chain of custody of the recording or explain how or when or by whom the recording was deleted. [Dkt. 161 ¶75.]

Finally, there is evidence that interview recordings in other cases were preserved. Of the eight cases (including John's cases) in 2016 and 2017 in which Loyola preserved audio recordings of interviews, Loyola preserved the respondent's interview audio recording in every case except one: John's case. [Dkt. 158 ¶120[B].]

Loyola's failure to preserve the recording alone justified denial of its motion. *See Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 657, 662-63 (D. Conn. 2019). In all events, a reasonable jury could conclude that Loyola's destruction of the recording is itself an admission that the recording would have proven John's consistency and is

further evidence that Loyola expelled John based on his gender. *E.g., Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 627-28 (7th Cir. 2018) (lower court appropriately accepted as true plaintiff's proposed stipulations of fact concerning emails' content when defendant failed to preserve evidence).

In sum, the two significant lopsided irregularities that marred John's case had a direct impact, generating a decision divorced from the facts. The board found Jane had "consistently shared her account" without having been informed of Jane's materially inconsistent statement three days after the encounter that formed the basis of her complaint. The board then found an inconsistency in John's account only by refusing to listen to the recording that could have supported his hearing testimony and cleared up the investigator's "some[what] ambigu[ous]" sentence.

### 3. John presented evidence that Love improperly intervened on Jane's behalf and against John.

As noted above, Jane defended Love after the SRJ demanded that "the university fire" him. [Dkt. 171 ¶44; Dkt. 158 ¶11; Dkt. 164-107.] Against this backdrop, Love, armed with Jane's complaint as "a tool in [his] belt," was ubiquitous in John's case, consistently acting in ways that disadvantaged John—even as he told John to "trust the process" —and favored Jane. [Dkt. 158 ¶26 ECF4143; Dkt. 171 ¶67.] Beyond his failure to disclose the exculpatory report, the most concerning aspects of Love's actions included his: (a) improper involvement in the decision of John's appeal; (b) participation in the decision not to interview male witnesses who would support John; and (c) improper communication to Board members about another disciplinary hearing involving John.

### a. Love was improperly involved in deciding John's appeal.

John's attorney sent Loyola's appeals officer, McLean, declarations from John and two male witnesses (WT and John's roommate, CR) whom the investigators knew about, but failed to interview. WT declared that: (1) he met with Jane and John after their first date and they "seemed happy, were friendly with each other and talkative"; (2) "the next few times" he saw Jane, "she only had positive and affectionate things to say about" John; (3) a few weeks later, WT saw Jane and said that John was "'an asshole' and had not walked her home one night"; and (4) Jane "told me that she and [John] never did anything she did not want to do." [Dkt. 128-23.]

The Community Standards gave John the right to have new substantive information considered on appeal. [Dkt. 158 ¶9; Dkt. 171 ¶101.] Nevertheless, Love told McLean not to be "persuaded" by the attorney's letter, and McLean did not read the declarations. [Dkt. 158 ¶105; Dkt. 171 ¶101.] Loyola vice president Neufeld admitted that Love's comments to McLean were not appropriate. [Dkt. 171 ¶101.]

Love also was involved in preparing McLean's appeal decision. In a draft, McLean stated:

> Loyola's administrative process does not allow the recording or transcribing of interviews. Investigators do compile an interview summary, verified by the witness, but that summary is only used to prepare the Final Investigation Report. It does not become part of the case file. Thus, neither the hearing board nor the Appeals Officer has access to the "interview transcript."

[Dkt. 161 ¶55.] In response, Love stated this was "not 100% accurate" and edited McLean's draft to read:

> However, Loyola's administrative process does not make investigation interviews available to the hearing officers after the interviewed parties have certified the written summaries prepared by the investigators. Though the interview of the Respondent/Appellant was originally audio recorded, this recording was only to be used by the investigators to draft their interview summary.

[Dkt. 161 ¶56.] But Love's edits *also* incorrectly summarized Loyola's policies. McLean and others admitted that Loyola's policies did not preclude anyone from reviewing the recording or asking the investigators to review it. [Dkt. 161 ¶¶59-60; Dkt. 128-11 at 289:17-292:20; Dkt. 128-33 at 73:22-74:5, 79:13-80:19, 168:21-169:3; Dkt. 136-2.]

By this point, Jane had become a public advocate for Loyola and Love. Loyola's "Reputation Management Committee" reported in its January 9 meeting minutes that an "on-campus survivor group" planned to publish a letter in Loyola's defense. [Dkt. 171 ¶53.] On January 18, the group – *which included Jane* – published their letter, saying Loyola and Love were "nothing but supportive" of "survivors. . . . The idea of firing Love is terrifying to us – we would not be able to go through our investigations, or even continue to thrive on campus, without his support." [*Id*. ¶54.] Jane emailed the article to Malcolm, commenting: "I hope this is a good start to clearing up a lot of the negative portrayals of Loyola's handling of sexual assault." [*Id*. ¶55.] That same day, however, Jane learned that John was on campus because his sanction had been stayed during his appeal. [*Id*. ¶56.]

On January 19, 2017, Jane emailed Love and other officials, reminding them that she had advocated for Loyola, "especially" for Love, and now questioned if Loyola truly supported survivors. [*Id*. ¶¶56, 59.] Love then told McLean it would be "ideal"

for him to issue the appeal decision the next day, and a Loyola official met with Jane to express Loyola's "continuing support." [*Id.* ¶¶57-58.]

The next day, on January 20, 2017, McLean denied John's appeal. [Dkt. 161 ¶57.] Love immediately called Jane. [Dkt. 171 ¶60.] He reported back to Loyola officials that he and Jane had "dialogue[d] in a very productive and positive manner about [Jane's] experience and our office's mistake. I believe, based on our conversation, that this matter has been fully resolved, *and expect continued positive relations and partnership with [Jane] and the survivor community moving forward* ... I believe we are back on track." [Dkt. 158 ¶111 at ECF4231 (emphasis added).] Neufeld testified that Love's continued expression of support for Jane was not fair to John. [*Id.* at ECF4232.]

Love's conflict of interest based on Jane's "partnership" with him and her advocacy for him to keep his job, and Jane's status as a complainant, presents the same issue found in two other similar Title IX cases. Both cases highlighted the complainant's contemporaneous activism and pressure on the university as among the grounds for allowing a Title IX claim to proceed. *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. Feb. 28, 2017).

### b. Love participated in the decision not to interview male witnesses who later submitted declarations favorable to John.

A university's failure to interview witnesses that could be helpful to the accused male can be circumstantial evidence of gender bias. *Purdue*, 928 F.3d at 669 (refusal to hear from male witness who had relevant information can suggest gender

bias); *Doe v. Columbia Univ.*, 831 F.3d 46, 56 n.10 (2d Cir. 2016) (failure of investigators to seek witness could be attributable to discrimination). Here, Jane and John both identified (i) WT as a person who had significant interaction with them after their first encounter, and (ii) John's roommate as someone they interacted with at John's apartment the night of their first sexual encounter. [Dkt. 128-4 ECF1360-1369.]

Under Loyola's policies and training materials, both WT and John's roommate were relevant witnesses. [Dkt. 136-2 ECF2797, ECF2800; *see also* Dkt. 136-46 at 52:5-12.] Immediately after John's interview (on December 2), Watland left Love a voice message asking to meet with him to discuss potential witness interviews. [Dkt. 158 ¶42 at ECF4157, bottom of page.] Thereafter, the investigators only interviewed Witness #1 (Jane's friend). [Dkt. 128-4 ECF1369-1372.] The investigators and Love failed to explain why they did not interview WT and John's roommate in the FIR, which violated Loyola's policies requiring investigators to "include [the] rationale [for not interviewing the witnesses] in the final investigation report." [Dkt. 128-47 ECF2216.] A reasonable inference from this evidence is that Love instructed them not to interview the male witnesses. *See Purdue*, 928 F.3d at 664, 669 (failure even to find out what witnesses had to say supports an inference of gender bias); *see also Columbia*, 831 F.3d at 56 & n.10 (same).

Even though the district court recognized that "it is hard to know whether witnesses are important without talking to" them [SA57], it disregarded *Purdue* and stated that Loyola's failure to "talk []" to them was not evidence of discrimination.

41

Instead, the district court impermissibly found that Loyola did not interview the male witnesses because the investigators "were under time pressure[.]" [SA57.] The record contains no evidence that the investigators or Love ever attempted to interview the male witnesses or otherwise provided any explanation – let alone the one offered by the district court – for their decision not to interview the male witnesses. The district court's conclusion also is mistaken. John's interview was completed on December 2, 2016 and the investigators did not interview Witness #1 (Jane's friend) until December 7.

### c. Love improperly told the board members about another disciplinary hearing involving John.

In an email, Love represented to John, that the hearing boards would be free from bias:

> However, to preserve the impartiality and fairness of the hearing process, *each complaint . . . will result in separate and distinct investigative reports, which will then each be heard by separate and distinct hearing boards (with different personnel serving on each board). This is the best way that we can preserve your rights as a student not to be subject to any inappropraite [sic] bias as a result of having two complaints under investigation at the same time.* I assure you that I am committed to balancing your rights with the rights of the complainants who have come forward with these reports. . . .

[Dkt. 158 ¶28 at ECF4147; emphasis added.]

Despite his professed concern, Love told Jane's hearing board chair (Landis) that John was the subject of another proceeding (Elizabeth's). [Dkt. 136-49 at 102:16-103:6.] Love also sent an email to another board member, Brian Houze, and others that disclosed that John was a respondent in both Jane's and Elizabeth's cases. [Dkt. 158 ¶23 at ECF4140; Dkt. 136-46 at pp. 145-48; Dkt.136-50 at pp. 109, 114.] Despite

42

recognizing the potential bias and committing to protecting John from that bias, Love failed to keep the cases separate.

The district court's discussion of Elizabeth's case reveals further error. John was found not responsible in Elizabeth's case. [Dkt. 171 ¶89.] The district court stated that, because John won Elizabeth's case and won a portion of the claims against Jane, John "has a hard time arguing that the deck is stacked against him, because he won one of the two hands." [SA38-39.] The district court's statement is "simply untenable." *See Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 939, 941 (9th Cir. 2022). Evidence that a claimant prevailed on some claims does not mean that discrimination did not occur. [*Id.* at 941 ("The fact that the Regents ultimately found Doe not responsible for twelve of the thirteen allegations made against him does not make the allegations of irregularities in the proceedings any less to relevant to our inquiry.").] The district court's statement also disregards the facts of this case. By the time John's second case went to hearing, Love already knew that John had lost Jane's case and would be expelled. [Dkt. 171 ¶67.] Therefore, a reasonable inference is that Love had no reason to put his thumb on the scale in Elizabeth's case. *See Regents of the Univ. of Cal.*, 23 F.4th at 939 n. 12.

### 4. John presented material evidence that the board was biased against him based on his gender.

While John presented multiple examples of the board's bias against him, he notes two instances that led courts to overrule university challenges to Title IX claims. *First*, two board members expressed biased views. *Second*, the board applied greater rigor to evaluating John's credibility than to Jane's.

### a. Houze's and Landis' additional reasons for finding John not credible are themselves evidence of bias.

The omission of Jane's statement to Khan Harvey and the refusal to consult the recording of John's interview eviscerate the basis for the board's credibility determination. Loyola advanced two other reasons below to bolster the board's credibility determinations, both of which provide *further* evidence of discrimination.

*First*, board member Houze, who had authored a decision earlier in 2016 expressly tying "gender-based violence" "to a cultural narrative that glorifies masculine domination [and] masculine imposition of power" [Dkt. 171 ¶37], testified that, even before the hearing, he considered Jane more credible because he deemed it unlikely that Jane would consensually engage in the sex acts at issue when she was sexually inexperienced. [Dkt. 158 ¶90.] He said that this was a "first and foremost" factor that supported the decision to expel John. [*Id*.] Houze admitted that he reached that conclusion without knowing John's level of sexual experience and about which he never asked. [*Id*.] Moreover, Houze's supposition also prejudged that Jane was telling the truth when she said she was inexperienced.

Houze's expressed views were in line with gender stereotypes that women are reserved sexually, while men (no matter their experience) are the sexual aggressors. Such "outdated and discriminatory views of gender and sexuality" "alone" create an inference of gender discrimination. *Doe v. Marymount Univ*., 297 F. Supp. 3d 573, 586 (E.D. Va. 2018); *see also Grinnell*, 473 F. Supp. 3d at 927; *Doe v. Purdue Univ*., 464 F. Supp. 3d at 1008; *Doe v. Washington & Lee Univ*., 2021 WL 1520001, at *14 (W.D. Va. Apr. 17, 2021).

44

*Second*, Landis testified that she didn't believe John was credible because he disagreed with the portions of Jane's testimony that, if uncontroverted, would portray him in an unfavorable light or would constitute a violation of the Community Standards. [Dkt. 158 ¶¶92-93.] In other words, Landis (and Houze) considered Jane's testimony as the baseline for the truth and, therefore, John was not credible *because* he denied Jane's accusations – *i.e.*, Landis credited Jane "based on her accusation alone." *See Purdue*, 928 F.3d at 669.

Given Houze's and Landis' statements, it seems hard to imagine anything John could have said or done to have proved his innocence to them, akin to the two panelists in *Purdue* who also credited the female before hearing from the accused student. *See Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2022 WL 3279234, at *12 (N.D. Ind. Aug. 11, 2022).[9]

The district court never addressed these arguments, but instead stated that Loyola's attempt to bolster its credibility analysis with new reasons itself did not give rise to an inference of gender discrimination. [SA51.] That was wrong. A reasonable jury could conclude that, by proffering *post hoc* reasons to bolster its credibility determinations, Loyola tacitly admitted that its original credibility determination was the result of gender discrimination. *Reeves*, 530 U.S. at 147 (unworthy explanation is circumstantial evidence probative of intentional discrimination.).

---

[9]     Houze and Landis' implicit bias is consistent with Loyola's training materials that depicted men as aggressors who didn't tell the truth. [Dkt. 171 ¶¶26-29.] Such biased training materials are further evidence of gender bias and were disregarded by the district court. *See e.g. Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017).

### b. The board judged Jane's and John's credibility differently.

In its summary judgment opinion, the district court in *Purdue* noted that summary judgment was precluded in part because the record showed that "[j]ustified or not, the investigators appeared to scrutinize John's character more than Jane's." *Purdue Univ.*, 2022 WL 3279234, at *11. Here too, the board judged Jane's and John's credibility in a disparate manner. It looked to excuse Jane's inconsistent statements while using a single "some[what] ambigu[ous]" statement from John's interview to discredit his denial and to find him responsible.

When she was interviewed on December 7, 2016, Witness #1 told the investigators what Jane had provided her with details about the first encounter with John. This portion of the FIR began: "Complainant told Witness the following had occurred." The FIR then listed several bullet points, including verbatim:

- Respondent told Complainant to take her shirt off and that they would not do anything further.

- Respondent "did that to Complainant's] shirt, her pants, her bra, her underwear" until "everything was off."

[Dkt. 128-4 ECF1369.]

At the hearing, the board asked investigators Watland and Tennison about Jane's statements to Witness #1. They testified as follows:

WATLAND:      I think what the witness was stating before was that the Respondent had told the Complainant that we're going to remove the one article of clothing and then it's not going to go further. But then, that it did go further and that was the witness' statement. So I think when she's referring to that, she meant the removal of additional articles of clothing.

46

TENNISON:    Each subsequent article of clothing mentioned.

WATLAND:    Correct.

[Dkt. 128-7 at 89:21-90:14.]

Both investigators testified, consistent with the quoted language in their re-
port, that Witness #1 relayed that Jane told her John said they were going to remove
a particular article of clothing and that it would go no further, and then repeated the
same line after each item was removed. [Dkt. 128-7 at 90:21-91:4.]

When the hearing the board questioned Jane about the statements Witness#1
attributed to her, Jane backed away from them. The board, however, was nonplussed
and handled Jane's inconsistencies with kid gloves:

> LANDIS:    [I'd] have [a] couple of follow-up questions for that. So
> [Jane], you didn't specifically outline that in your state-
> ment. But is that something that happened or can you tell
> us more about that? *This is an account of what the witness
> said you told her that evening.*
>
> JANE:    [John] never said to me that we would not do anything fur-
> ther after each article of clothing was taken off. I
> think[Witness #1 is] just kind of trying to say that things
> just like escalated maybe like one thing at a time.
>
> LANDIS:    Okay. So what was just described by the investigators that
> the Complainant – or that the witness described is not com-
> pletely accurate is what you're saying?
>
> JANE:    Yeah. Yeah.
>
> LANDIS:    But what you're wondering if the witness was trying to con-
> vey is that things escalated in that order.
>
> JANE:    In that way, yes.

> LANDIS:     Okay. *Thank you for clarifying that*. Because [Jane] has clarified that that's not exactly how that occurred, I don't know that there's a need to ask you [i.e., John] about that because you've already described how the clothing came off. But if there anything else you wanted to add about how clothing came off?

[Dkt. 128-7 at 91:4-92:6; emphasis added).] Confronted with the inconsistency between Jane's statements to her friend, Witness #1 (as memorialized by the investigators and confirmed by the investigators' live testimony) and Jane's hearing testimony, the board simply concluded that Jane's hearing testimony must have been the correct version and thanked her for the clarification.

The board's easy acceptance of Jane's new version of events stood in stark contrast to the way it viewed a single and somewhat ambiguous statement's effect on John's credibility. Instead of thanking him for the clarification, it found him responsible for sexual misconduct and expelled him.

Addressing the unequal treatment, the district court impermissibly found that John's contradiction "is a self-contradiction," whereas Jane "contradicted a witness." [SA49.] The district court is wrong. Jane did not contradict a witness; she contradicted herself. As Landis recognized, Witness #1's interview summary indicates that *Jane* "told her" John said they "would not go any further" after each article of Jane's clothing was removed. [Dkt. 128-7 at 89:21-92:6.] At the hearing, Jane said that did not happen. [*Id*. at 91:19-23.] A reasonable jury could conclude that the board's favorable treatment of Jane on credibility issues came from the gender-biased views Houze and Landis expressed elsewhere.

Alongside the dubious nature of Loyola's finding and the backdrop of federal pressure, intense campus activism, and direct pressure on Loyola's relevant Title IX official, any one of the primary items discussed above—the two significant procedural irregularities (which included destruction of the audio despite a litigation hold); Love's handling of the case, which featured still more procedural irregularities, even as Jane defended him from calls for his dismissal; gender bias among the hearing panelists—would have sufficed for John to survive summary judgment. "Taken together" (*Purdue,* 928 F.3d at 670), John's evidence easily creates sufficient fact issues requiring denial of Loyola's motion. In ruling otherwise, the district court repeatedly drew inferences in Loyola's favor regarding disputed facts, and ignored the Court's admonition that "the ultimate inquiry must consider the totality of the circumstances." *Southern Indiana*, 43 F.4th at 792.

## II. The district court erred in granting summary judgment in favor of Loyola on John's breach of contract claim where John presented evidence that Loyola acted arbitrarily, capriciously or in bad faith in expelling him.

John presented more than sufficient evidence from which a reasonable jury could conclude that Loyola acted arbitrarily, capriciously or in bad faith when it expelled him, thereby breaching its contract with him.

In Illinois, a student can bring a claim for breach of the implied promise to grant a degree to a student who completes required coursework. *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486, 498 (Ill. App. Ct. 2019). To bring the claim, the student does not need to cite any specific promise in a document from the university, as the promise to grant a degree is implied in the relationship between the student

49

and university and accepted by completion of required coursework. *Id.* at 495-98. University documents may be *relevant* to proving breach of that contract—*e.g.*, unexplained violation of procedural protections would be probative of caprice—but are not required. *Id.* at 498. A court "will only reverse an educational institution's academic decision if [it is] arbitrary and capricious or the product of bad faith or malice." *Id.* at 496. That occurs when an academic decision "lacks any discernable rational basis" or "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 497 (quotations omitted).

Applying *Bosch* and viewing the facts and reasonable inferences in the light most favorable to him, John has presented more than sufficient evidence from which a reasonable jury could conclude that Loyola acted arbitrarily, capriciously or in bad faith in expelling him. At the threshold, John has provided sufficient evidence that his gender was "a motivating factor" in Loyola's decision to expel him. This alone satisfies the arbitrary, capricious or bad faith test necessary to establish a breach of contract claim. *Dordt*, 2022 WL 2833987, at *28-31 (denying university motion for summary judgment on due process claim analyzed under "arbitrary, unreasonable or in bad faith" standard based on same facts that supported Title IX claim); *Grinnell College*, 556 F.Supp.3d at 933-35 (2021) (denial of university's summary judgment motion for breach of contract based on deviations from Title IX process).

John also provided evidence that Loyola sought to expel him to placate Jane and ease the campus pressure on Love. As discussed above, in June 2016, assistant

50

athletic director Malcolm barred John from the varsity weight room merely because Jane complained about seeing him there. [Dkt. 164-28 at 50:8-53:1, 59:6-61:9, 65:7-21; Dkt. 171 ¶¶7-8, 10.] Then, in October 2016, after seeing John again on campus, Jane threatened to transfer due to "anxiety" about running into John. [Dkt. 171 ¶10.] Malcolm enlisted Love for "help and guidance" to determine whether they could remove John from his position with the athletic department. [Dkt. 171 ¶¶9-10.]

As shown above, Malcolm and Love then set in motion the case against John, which Love declared would "add another tool in our belt." [Dkt. 158 ¶26 at ECF4143.] Thereafter, Love took actions that lacked any discernable rational basis that made it more likely that John would lose his case and be expelled. Love failed to disclose exculpatory evidence; disclosed to two board members the existence of another gender-based misconduct case against John; suggested that the appeals officer not review declarations favorable to John; drafted the section of the appeal decision incorrectly stating that the board and appeals officer were not permitted to review the recording of John's interview; and failed to ensure that the recording of John's interview was preserved. In addition, a reasonable juror could conclude that Love influenced the investigators not to interview witnesses potentially helpful to John.[10]

---

[10]     Each of these actions also violated Loyola's Community Standards. The failure to disclose exculpatory evidence violated §§ 401.4-.5 and 409.6.b. (requiring a thorough and impartial investigation in which witnesses with firsthand information are interviewed and "all relevant information" is collected; requiring a fair investigation and resolution, where both parties' needs and perspectives are considered); the failure to interview witness violated §409.6.b; the failure to listen to the recording of John's interview violated of §§ 409.6.b, 409.6.c, 409; and the failure to consider the recording and the witness on appeal violated § 411 (providing an appeal process where new substantive information is considered, substantive

Love's failure to disclose Khan Harvey's exculpatory report that Jane did not believe that she was "forced or coerced," juxtaposed with his inclusion of Jane's coach's inculpatory report, is instructive. While Love claimed in his deposition that he did not consciously choose to omit Jane's prior and materially inconsistent statement from the FIR (*see* p. 29, *supra*), his inability to provide "'any discernable rational basis'" for his failure is the very definition of arbitrary. *Bosch*, 155 N.E.3d at 496-97 (citation omitted); *see also* Meriam-Webster's Dictionary (online), www.merriam-webster.com/dictionary/arbitrary (Arbitrary: "existing or coming about seemingly at random or by chance or as a capricious and unreasonable act of will").

From these facts and drawing all inferences in John's favor, a jury could reasonably conclude that Loyola misused its disciplinary process to remove John from campus to placate Jane and other students who were pressuring Loyola. *See, e.g.*, *Bosch*, 155 N.E.3d at 499 (plaintiff stated a claim when school dismissed him based on "wholly invented" reasons made by persons that disliked him); *DeMarco v. Univ. of Health Scis./Chicago Med. Sch.*, 352 N.E.2d 356, 362-63 (Ill. App. Ct. 1976) (affirming injunction in favor of student who completed degree requirements but was dismissed because he did not make donation to school).

As it did in connection with John's Title IX claim, the court disregarded the evidence showing why Loyola was motivated to railroad John. For example, while the

---

procedural errors are considered, and findings "manifestly contrary to the evidence" are reversed.) [Dkt. 136-2 at ECF 2757, 2783, 2793-2797; Dkt. 158 at ECF4117-4122.) These breaches are a "substantial deviation from published procedures" and are further evidence of the "capricious nature of" Loyola's decision. *Bosch*, 156 N.E. 3d at 498.

district court acknowledged that Love's omission of Khan Harvey's report was "lousy" [SA63], it impermissibly substituted its own fact-finding and decided that the omission was not in bad faith. [SA71.]

Similarly, the district court's decision that "there is no evidence that the university destroyed the recording of John's interview in bad faith" disregards the evidence identified above (at pp. 35-36 *supra*), from which a reasonable juror could fairly conclude that Loyola destroyed the recording after receiving John's litigation hold letter.

In sum, the district court erred by disregarding evidence from which a reasonable jury could conclude that Loyola's decision to expel John was "arbitrary, capricious or in bad faith."

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that the judgment of the district court be reversed and the case remanded for trial.

Dated: January 20, 2023

Respectfully submitted,

JOHN DOE

By:     /s/Jonathan M. Cyrluk
    *One of John Doe's Attorneys*

Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: *cyrluk@carpenterlipps.com*

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: *phamill@conradobrien.com*
    *ldakessian@conradobrien.com*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 13,882 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook style font.

Dated: January 20, 2023

*/s/Jonathan M. Cyrluk*
Jonathan M. Cyrluk
One of the Attorneys for Appellant

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required

by Circuit Rule 30(a) and (b) are included in the Appendix.


                */s/Jonathan M. Cyrluk*        

                Jonathan M. Cyrluk

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2023, the Brief and Appendix of Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/Jonathan M. Cyrluk*
Jonathan M. Cyrluk

# APPENDIX

## TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order, Doc. 181, filed Sep. 28, 2022 ........................... SA1

Judgment in a Civil Case, Doc. 182, filed Sep. 30, 2022 ...................................... SA75

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-7335 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| LOYOLA UNIVERSITY CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about sexual encounters that took place between two college students, and the university's response. Defendant Loyola University Chicago received a complaint from a student, Jane Roe. She alleged multiple instances of sexual misconduct by another student, Plaintiff John Doe.

Loyola investigated the claims. The university collected evidence from Doe and Roe, including interviews of each of them. It also interviewed a witness for Roe. The investigation culminated in a hearing before a disciplinary board. After reviewing the evidence, Loyola expelled John Doe. Doe appealed the decision, but Loyola affirmed.

Doe responded by filing suit, alleging that Loyola violated his statutory and contractual rights. He claims that the university discriminated against him because of his sex in violation of Title IX. He also claims that Loyola breached its contract by failing to comply with the university's procedures for disciplinary proceedings. In the alternative, Doe contends that he detrimentally relied on the university's non-contractual promises.

After discovery, the parties filed cross motions for summary judgment.  John Doe moved for partial summary judgment on his breach of contract claim.  Loyola moved for summary judgment on all three claims.

For the following reasons, the Court denies Doe's motion for partial summary judgment and grants Loyola's motion for summary judgment.

## Background

This case is about the expulsion of John Doe from Loyola University Chicago after it found that he had engaged in sexual misconduct.  Before diving in, it is important to keep a few points in mind.

The issue before this Court is not whether Doe actually did what Roe accused him of doing.  No one should read this opinion and draw any inferences about what happened during the encounters in question.  And the issue is not whether Loyola has acceptable procedures, or handled things the right way, or presided over a fair disciplinary process writ large (at least, that's not *exactly* the issue).

The issue is whether Loyola violated John Doe's statutory and contractual rights during the process that culminated in his expulsion.  More specifically, the issue is whether the record could support a finding that Loyola treated Doe adversely because he is a man.  And the issue is whether Loyola broke its contract with Doe through the disciplinary process.  Whether Loyola handled things appropriately is beside the point, unless any deficiencies could support a finding of discrimination or breach of contract.

Telling the story is a bit of challenge, given the bounty of material in the record.  The submissions are quite voluminous, to put it mildly.  For example, Doe's response to Loyola's

statement of facts (Dckt. No. 158) is 149 pages, and Loyola's response to Doe's statement of facts is (a more manageable) 43 pages.  Suffice it to say that the Court went through it.

The backstory that led to the expulsion is rather long, and it includes a number of twists and turns.  The key events include the underlying interaction between the students, the initial comments by Roe, the investigation, and the eventual hearing and decision.  Each chapter is important to the overall story.

Before embarking, the Court offers one final disclaimer, and forewarning for the reader.  The background section is quite long – roughly 30 pages.  And the Opinion is lengthy, weighing in at over 70 pages.  There is a lot of material, and then some.  The length of the Opinion reflects the volume and the granularity of the arguments put forward by the parties, and the girth of their submissions.  Standing on end, the Opinion is almost 70 feet tall, for a simple reason:  there was a lot of ground to cover.

## I.        John Doe and Jane Roe's Three Encounters

John Doe and Jane Roe were undergraduate students at Loyola during the 2015–2016 and 2016–2017 academic terms.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 158).[1]

---

[1]  When responding to an opposing party's statement of facts or statement of additional facts, the Local Rules require a party to "cite *specific evidentiary material* that controverts the fact and must *concisely explain* how the cited material controverts the asserted fact."  *See* L.R. 56.1(e)(3) (emphasis added).  Additionally, "a response may not set forth any new facts."  *See* L.R. 56.1(e)(2).  Nevertheless, Doe submitted responses that often spanned several pages, and introduced new facts as supposedly contradicting evidence.  At times, Doe's response made things difficult to review.  *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 158) (providing a seven-page response to a two-sentence fact); *id.* at ¶ 44 (providing a three-and-a-half-page response to a one-sentence fact); *id.* at ¶ 71 (providing a five-page response to a two-sentence fact).  All told, Doe converted Loyola's 42-page statement of facts into a 149-page response.  "A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."  *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).  Nevertheless, that is exactly what happened here.  The Court carefully poured over the record.

They met on a shuttle bus in late 2015. *Id.* at ¶ 3. They had three encounters, and at least two of them involved sexual activity.

***The First Encounter.*** On January 13, 2016, Doe and Roe went on a date. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 4 (Dckt. No. 161). That night, they had their first sexual encounter. It took place in Doe's apartment. *Id.* Doe and Roe describe the events differently, but not entirely. It is undisputed that the two students kissed, touched each other sexually, and engaged in oral sex. *Id.*

***The Second Encounter.*** A few days later, Roe returned to Doe's apartment to talk about their first date. *Id.* at ¶ 5. The parties agree that Roe told Doe that she wanted to "take things slower" and "pump the brakes" on physical activity. *Id.* So, in their submissions, the parties agree on what Roe said about *prospective* sexual conduct, meaning future sexual activity.

But the parties disagree about what Doe said in response, and about what Roe said about *retrospective* sexual conduct, meaning past sexual activity.

According to John Doe, both of them "agreed they had rushed into things and 'regretted moving so fast.'" *Id.* So, Doe contends that they both expressed regret about their *retrospective* sexual conduct. That is, each of them expressed regret about what had happened already.

According to Loyola, the evidence does not support the notion that Roe told the investigators that she "regretted" anything. *Id.* In other words, as Loyola sees it, Doe is citing evidence about what he told investigators, not what both Doe and Roe told investigators. Loyola offers the following summary of the record: "It is undisputed that Jane went to John's apartment several days after January 13, 2016, that Jane told Loyola's investigators that she told John things were 'moving too fast' and that she wanted to 'take things slower' and 'pump the brakes'

4

SA4

on physical activity, and that John told Loyola's investigators that he and Jane agreed to various

points." *Id.* (citing Final Investigation Report, at 6:187–96, 10:360–69 (Dckt. No. 128-4)).

The parties disagree about whether Doe and Roe engaged in sexual activity during that

second encounter, meaning the follow-up get together when they talked about the first date.

Loyola asserts that Doe initiated sexual contact with Roe during this second meeting.  *See* Def.'s

Statement of Facts, at ¶ 3 (Dckt. No. 132).

The university cites the Final Investigation Report, which adopted Roe's version of

events.  According to Roe, Doe "pushed her against the door, began kissing her, used his hand

to" initiate sexual contact, "and stated, 'see what you do to me.'"  *See* Final Investigation Report,

at 6:202–03 (Dckt. No. 128-4).

Doe disputes that he did any such thing.  Doe points out that the summary of his

interview in the Final Investigation Report includes no mention of any sexual activity during that

second meeting.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 158) (citing Final

Investigation Report, at 10:360–69).  So Doe basically points to what he said before.  And in that

interview, he never said anything about any sexual contact during that second meeting.

***The Third Encounter.***  On January 17, 2016, Roe returned to Doe's apartment for a third

time.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 161).  She again performed

oral sex on Doe.  *Id.*

A few days later, Roe and Doe separately attended the same party, where they argued

with each other.  *Id.* at ¶ 7.  The next day, they exchanged angry text messages.  *Id.*; *see also*

Final Investigation Report, at 16:641 – 17:648 (Dckt. No. 128-4, at 36–37 of 41).

SA5

## II.     Jane Roe's Informal Complaint

Roe felt uncomfortable with the series of events with Doe, so she told her athletic coach, Jackie Kropp.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 158).  On January 21, 2016, Kropp used Loyola's Title IX reporting system (EthicsLine) to report "that [Roe] was encouraged to have physical contact with a male Loyola student past a point in which she was comfortable."  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 8 (Dckt. No. 161).[2]

At that point, Loyola's Deputy Title IX Coordinator was Rabia Khan Harvey.  *Id.* at ¶ 9. She was responsible for overseeing sexual misconduct cases involving students.  *Id.*  She also made sure that all employees were well trained, and she indirectly supervised Title IX investigators and hearing board officers.  *Id.*

Khan Harvey called Roe in for a meeting.  Khan Harvey wanted to discuss Roe's reporting options, describe the formal disciplinary process, offer supportive resources, and ask questions.  *Id.* at ¶ 10.

They met on January 26, 2016.  *Id.*  In her testimony, Khan Harvey described Roe as shy. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 158).  She testified that Roe did not discuss in detail her encounters with Doe.  *Id.*  Roe shared very little about the encounters generally, and told Khan Harvey that she did not want to proceed with a formal investigation.  *Id.*

Khan Harvey asked about Roe's safety and whether she was feeling threatened.  *Id.* Khan Harvey also asked if Doe ever held her down or gave her orders.  *Id.*  And she asked whether Doe had ever pressured Roe or intimidated her.  *Id.*

---

[2] Doe disputes that the report represents statements made by Roe herself.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 158).  But it does not dispute that Kropp entered this comment into EthicsLine.  *Id.*  All that matters is that Loyola's Title IX office saw this comment (and, more generally, the report).

Khan Harvey entered her notes from the meeting into EthicsLine. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 161). Khan Harvey wrote: "[Roe] shared that on two separate occasions, [Doe] 'moved too quickly sexually' which made the student uncomfortable. While she doesn't believe she was forced or coerced, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her." *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 158).

The phrase in the middle of that passage – "she doesn't believe she was forced or coerced" – looms large in the case at hand.

In the end, Roe decided not to make a formal complaint at that time. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 161).

Loyola took action, despite the lack of a formal complaint. On February 2, 2016, Loyola's Title IX Coordinator for Athletics, Jay Malcolm, told Doe that Doe had to attend a training session because someone had filed a complaint.[3] *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 171).

In response, Doe emailed Khan Harvey on February 3. *Id.* at ¶ 5. Doe said that he was "blindsided, dumbfounded, and frankly sick to [his] stomach over all of this, so some help would be great." *Id.*; *see* 2/3/16 Email (Dckt. No. 164-29, at 2–3 of 3).

---

[3] Doe argues that Roe had asked the university to require Doe take the training, based on Khan Harvey's testimony that Roe "told [her] that she felt satisfied about the training, that in the immediate moment, she was okay with that outcome or that resolution, preventative measure, whatever you want to call it, as opposed to going forward with the formal process." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 171); Khan Harvey Dep., at 119:17-22 (Dckt. No. 164-1). Loyola argues that this testimony does not prove that Roe personally requested the training. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 3. But all that matters is that the Title IX office decided to ask Doe to go through training.

The next day, Khan Harvey responded that the university was "taking a pro-active response to report by mandating [Doe], and all student-athletes and staff, to participate in the two-hour training" in April. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 171); 2/4/16 Email (Dckt. No. 164-29, at 2 of 3). But the email also noted that Khan Harvey's "hunch [was] that they won't be filing a formal complaint because they are satisfied with alerting [her] office of this incident." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 5; 2/4/16 Email.

Doe attended the required training in April 2016. *Id.* at ¶ 6. Around the same time, he learned that his mother, who suffered from cancer, had about one week to live. *Id.*; BCT/CARE Internal Report (Dckt. No. 164-30). So, Doe emailed the Assistant Dean of Students, Kimberly Moore, asking for support and saying that "in [his] current state [he is] a bit of [a] disaster and attempting to focus on [his] studies has been extremely difficult." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 6 (Dckt. No. 171); BCT/CARE Internal Report.

Sometime in the spring of 2016, Roe met with Malcolm (again, the Title IX Coordinator for Athletics). *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 171). She told Malcolm that she had seen Doe in the varsity weight room, and that his presence made her upset. *Id.* Roe didn't say anything about having any communications with Doe. *See* Malcolm Dep., at 50:14-24 (Dckt. No. 164-28). And Roe did not reveal why it was so upsetting to see Doe in the weight room. *Id.*; *see also* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7.

Malcolm was concerned, too, but for a different reason. "My concern was, we had [position] using our varsity weight room." *See* Malcolm Dep., at 51:2-11 (Dckt. No. 164-28).

SA8

In any event, Malcolm told Roe that the university couldn't take any further action unless

Roe filed a formal complaint.  *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7

(Dckt. No. 171).

### III.    Jane Roe's Formal Complaint

Summer came and went, and old concerns resurfaced in the new school year.  In October

2016, Roe told Malcolm that she saw Doe on campus, and that she felt unsafe.  *Id.* at ¶ 9.

That same month, Roe met with Loyola's Associate Dean of Students and Interim Deputy

Title IX Coordinator, Tim Love.[4]  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt.

No. 161).  Love's office handled the day-to-day operations of Title IX matters that involved

students.  *Id.*  Roe met with Love at least twice, and also met with the Assistant Dean of

Students, Amber Miller.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 171).

Malcolm also met with Love.  He could not remember exactly how many times they

discussed Roe, but he agreed that it was somewhere between 2 and 50 times.  (That's quite a

wide range.)  *Id.* at ¶ 10.

On November 1, 2016, Malcolm sent an email to Love and another official (Daniella

Hanson) about Roe's case.  *Id.*; 11/1/16 Email (Dckt. No. 135-17, at 2–3 of 3).  The email

summarized the backstory about what had happened up to that point.

Malcolm wrote that "Athletics has received limited information regarding an incident

between these individuals."  *See* 11/1/16 Email (Dckt. No. 135-17, at 2 of 3).  The email shared

that Roe originally "communicated that she did not want to make a formal complaint, but wanted

the [position] to attend a Title IX training (which he did in Spring 2016)."  *Id.*

---

[4]  The parties dispute the date of the meeting.  Love downloaded and reviewed Roe's EthicsLine file on
October 13.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 161).  Neither party provided
evidence of the date of Love's and Roe's meeting, but the exact date doesn't matter for the purposes of
this decision.

Malcolm then went back to the point about who could use the weight room.  He recalled that in the spring of 2016, Roe "communicated to Athletics that she felt uncomfortable seeing [Doe] in the weight-room," and that "Athletics made a policy that our [positions] were not to use the varsity weight room."  *Id.*

Malcolm's email then continued to summarize the events that followed.  Roe "communicated that she was still having issues knowing [that Doe] was in Norville and would 'be on the bench at the [sport] matches.'"  *Id.*  She "expressed an interest in transferring due the anxiety she feels knowing she may run into" Doe.  *Id.*

After that summary, Malcolm offered his two cents about the overall situation.  Malcolm acknowledged that "this is a complicated scenario."  *Id.*  The university "want[s] to ensure our student-athletes are safe, feel safe and supported."  *Id.*  But at the same time, the university "understand[s] there hasn't been any decision against [Doe] (e.g., due process)."  *Id.*

Love responded by email with an important update.  Roe "has recently informed me that she wishes to proceed with the conduct process, so that will add another tool in our belt."  *See* 11/1/16 Email (Dckt. No. 135-17, at 1 of 3).  That update was accurate.  Around that time, Roe did, in fact, make a formal complaint against Doe to Loyola's Title IX office.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 161).

Love suggested that the university "issue a temporary restriction on [Doe's] activities in [the athletics department] (i.e. temporarily suspend his role as a [position], pending the outcome of investigation/hearing)."  *See* 11/1/16 Email (Dckt. No. 135-17, at 1 of 3).

Around the same time, another female student who had previously had sexual interactions with Doe also filed a formal complaint.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 161).  That student, whose pseudonym is Elizabeth, dated Doe in early 2015.

*See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 15 (Dckt. No. 171). She transferred

from Loyola in 2015, and had no intention of returning. *Id.* According to an email from Miller

to Love, Elizabeth was "willing to support [Roe] however [Roe] would like through the conduct

process," and had connected with her, too. *Id.* at ¶ 14.

## IV.    The Community Standards

The two complaints against Doe triggered Loyola's formal "Gender-Based

Discrimination and Misconduct" process. *See* Pl.'s Resp. to Def.'s Statement of Additional

Facts, at ¶ 16 (Dckt. No. 169). The university published "Community Standards" to govern this

process.[5] *Id.*

The Court takes a break from the timeline of events to summarize the requirements of

Loyola's Community Standards. They form the basis for the contract that Loyola allegedly

breached. The parties agree that these policies and procedures govern complaints about sexual

assault. *Id.* at ¶ 9. A key issue in the case is whether Loyola *followed* those standards. *Id.*

The Community Standards create a procedure for how the university handles complaints

of misconduct. The Community Standards call for an investigation, and then a hearing to

respond to the complaint. *Id.* The investigation includes interviewing parties and witnesses,

---

[5] Loyola asserts that, because Roe's complaint stemmed from actions in January 2016, the university
applied the policies from Community Standards in effect in January 2016 (meaning the 2015–2016
Community Standards), and the procedure from the Community Standards in effect at the start of the
investigation (meaning the 2016–2017 Community Standards). *See* Pl.'s Resp. to Def.'s Statement of
Facts, at ¶ 10 (Dckt. No. 158). Loyola cited Love's declaration for support. *Id.* Doe disputes this claim,
arguing that there are several reasons to not believe Love's declaration. *Id.* Doe kicks up a considerable
amount of dust, but it doesn't really undermine Love's testimony. Doe points out that Love didn't know
*how* the university selected which Community Standards to use, and that the university did not notify Doe
of the specific policy provisions that would apply, and so on. Fair enough. But that's beside the point.
None of his evidence *contradicts* Love, who unambiguously states that the university used 2015–2016
Community Standards for "the Policy definitions" and the 2016–2017 Community Standards for "the
procedures." *See* Love Dec., at ¶ 6 (Dckt. No. 135-24). Instead, he asks the Court to question Love's
credibility, which the Court cannot do at this stage.

creating audio recordings of interviews, and gathering evidence. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 158).

The investigation usually "takes between two and four weeks." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16, at 15 of 32). From beginning to end, the investigation, hearing, and decision should "take no longer than sixty (60) days unless extenuating circumstances cause unavoidable delay." *Id.* at § 409.6(a).

The investigation begins as soon as the "complainant notifies the Deputy Coordinator of their desire to pursue the formal conduct process." *Id.* at § 409.6(b). The Deputy Coordinator appoints two investigators, a Hearing Board chair, and two Hearing Board officers. *Id.* The investigators may request meetings to interview parties and witnesses and collect any relevant information. *Id.*

Both parties have procedural rights. The parties receive notice of (1) any required meetings, (2) the preliminary potential policy violations, and (3) the names of investigators. *Id.* The parties can present evidence, and they can select an advisor of their choice to accompany them. *Id.*

The parties themselves have some input over the evidence gathered during the investigation. They can present evidence, including proposing witnesses for the investigators to interview. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158). The Community Standards expressly allow the parties to propose witnesses: "Both parties may present evidence throughout the investigation, including *proposing* witnesses to be considered for interviewing." *See* 2016–2017 Community Standards § 409.6(a)(vii) (Dckt. No. 128-16, at 14 of 32) (emphasis added).

The parties agree that "the interviewers will interview relevant witnesses." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158) (quoting the parties, not the Community Standards). "The Title IX Investigators will . . . [r]equest meetings and separately interview . . . relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16, at 15 of 32).

The investigators create audio recordings of the interviews of the parties and the witnesses. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 158). What the investigators then *do* with those recordings is an important issue in this case.

For now, the key point is that the university can record each interview, and the recordings can't leave the possession of the investigators. "The University reserves the right to audio record each individual interview collected during meetings for the sole purpose of preparing the Final Investigation Report. These audio recordings will not be shared beyond the Investigators. The recordings are not retained as part of an educational record. Audio recordings may be retained as needed at the discretion of the University." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16).

Notice that the purpose of the recordings is to help the investigators prepare the Final Investigation Report. The Community Standards do not suggest that the recording will be played as substantive evidence at the hearing.

Eventually, the investigators submit a Final Investigation Report to the Deputy Coordinator. *Id.* The parties and the Hearing Board each receive the Final Investigation Report and any other relevant information that will be considered by the Board, at least two days before the hearing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 158). The

SA13

investigators attend and participate in the hearing (but not the deliberation and decision).  *See*

2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16); Pl.'s Resp. to Def.'s Statement

of Facts, at ¶ 14.  The Hearing Board has discretion to invite witnesses if need be.  *See* Pl.'s

Resp. to Def.'s Statement of Facts, at ¶ 14.

The Community Standards also provide guidance on when and how a party may appeal.

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 158).  They list three potential

grounds for appeal.  *Id.*

First, a student can appeal because of new substantive information that could not have

been discovered at the time of the hearing and that would have likely changed the outcome.  *Id.*

Second, a student can appeal because of a "substantive procedural error," or because of an error

in interpretation of the university policy that prevented a fair hearing and decision.  *Id.*  Third, a

student can appeal any "finding (as to responsibility or sanctions or both) [that] was manifestly

contrary to the information presented at the hearing or to the established Community Standards

(i.e., the decision was clearly unreasonable and unsupported by the great weight of

information)."  *Id.* (quoting 2016–2017 Community Standards § 411.1 (Dckt. No. 128-16)).

The Dean of Students or a designee hears the appeals, unless the Dean of Students is the

conduct administrator who made the original decision.  *Id.* at ¶ 16.  In that case, the Vice

President for Student Development hears the case.  *Id.*  The decisionmaker ultimately issues a

written decision and delivers it to each party.  *Id.*

## V.    **The Investigation**

The Community Standards provided the framework for what happened next.

On November 4, Love (again, the Associate Dean of Students and Interim Deputy Title

IX Coordinator) assigned Ray Tennison and Leslie Watland to investigate the complaints of Roe

14

and Elizabeth.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 161); Pl.'s Resp.

to Def.'s Statement of Facts, at ¶¶ 23, 30 (Dckt. No. 158).

The investigators worked together on the two complaints.  But they prepared a separate

Final Investigation Report for each woman's complaint.  *See* Pl.'s Resp. to Def.'s Statement of

Facts, at ¶ 23.  So there was a report about Roe's complaint, and a report about Elizabeth's

complaint.

After the investigations were complete, two separate Hearing Boards heard the two

women's complaints.  *Id.*  In other words, Tennison and Watland prepared a Final Investigation

Report for Roe's allegations, and a Hearing Board considered Roe's complaint.  Separately,

Tennison and Watland prepared another Final Investigation Report for Elizabeth's allegations,

and a different Hearing Board considered Elizabeth's complaint.

Also on November 4, Doe received two letters from Love.  *Id.* at ¶¶ 24–25; First 11/4/16

Letter (Dckt. No. 135-4); Second 11/4/16 Letter (Dckt. No. 135-6, at 60–61 of 81).  The first

letter notified Doe that Roe had accused him of sexual misconduct.  *See* Pl.'s Resp. to Def.'s

Statement of Facts, at ¶ 24 (Dckt. No. 158); First 11/4/16 Letter.

The letter did not offer many details.  It simply stated:  "The Office of Student Conduct

and Conflict Resolution (OSCCR) has received information about your alleged conduct in

January of 2016 at the following location:  A private residence near the LSC.  Specifically, it is

alleged that you sexually assaulted fellow student [Jane Roe]."  *See* First 11/4/16 Letter (Dckt.

No. 135-4).  The letter didn't contain any other details about the allegations, but it did inform

Doe of his rights under the Community Standards, such as his right to an advisor in any meeting

during the process.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 158).

The second letter informed Doe of restrictions from accessing certain athletic buildings and his suspension from his role on a sports team. *Id.* at ¶ 25; Second 11/4/16 Letter.

On November 8, Love met with Doe. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 158); Pl.'s Resp. to Def.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 169). At deposition, Doe testified that Love told him at that meeting that there were two complaints against him. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28.

Doe also testified about what Love had told him about the process. Love told Doe that the same two investigators would look into both complaints, in keeping with the standard practice. Love also explained that there would be two separate Hearing Boards. *Id.* Each Hearing Board would know that there was a separate case against Doe, but would not know the details. *Id.*

Doe did not object to anything that Love told him about the procedure. *Id.* At deposition, Doe explained that he "trusted Tim Love, that that was standard practice." *Id.* (quoting Doe Dep., at 88:24 – 89:15 (Dckt. No. 136-42)).

Love also testified that he told Doe that "these cases to me tended to hinge on a question of whether there was pressure, unreasonable pressure, coercion, et cetera." *See* Pl.'s Resp. to Def.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 169) (quoting Love Dep., at 154:1-3 (Dckt. No. 136-46)). For a definition of coercion, Love referred Doe to the 2016–2017 Community Standards (rather than the 2015–2016 Community Standards, which provided the substantive standard of conduct governing the year of the conduct). *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171).

The 2016–2017 Community Standards defined "coercion" differently than the 2015–2016 Community Standards. Again, bear in mind that the conduct took place during the 2015–2016 school year, but the hearing took place during the 2016–2017 school year.[6]

The 2016–2017 Community Standards defined "coercion" as "the use of force, threats, or intimidation to elicit an action from another person." *Id.*; *see also* 2016–2017 Community Standards § 201(1)(f) (Dckt. No. 128-15). And they defined "consent" as "freely given, mutually understandable permission to engage in a specific activity," and referred readers to the sexual misconduct section for more details. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171); 2016–2017 Community Standards § 201(1)(i); *see also* 2016–2017 Community Standards § 202(21).

The 2015–2016 Community Standards had a different definition of "coercion." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171). They defined "coercion" as "unreasonable pressure for any activity." *Id.* They gave an example: "when an individual makes clear that the individual does not want sex, wants to stop, or does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercion." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 158).

The definition of "consent" in the 2015–2016 Community Standards was largely the same as the definition in the 2016–2017 Community Standards. But there were a few differences. The definition in the 2015–2016 Community Standards stated that submission to

---

[6] The parties consume space parsing the different definitions of "coercion" in the 2015–2016 Community Standards and the 2016–2017 Community Standards. At the end of the day, the difference does not appear material to this motion, but the Court surveys the field for the sake of completeness. As the Court understands it, the 2015–2016 Community Standards provided the *substantive* standard, and the 2016–2017 Community Standards provided the *procedure* for the hearing. That is, the 2015–2016 Community Standards provided the substantive rule for the standard of conduct, because those standards were in place at the time of the sexual conduct in early 2016. And the 2016–2017 governed the procedure for the hearing, because the hearing took place in late 2016.

SA17

sexual activity based on "the use of force or the threat of force is not consent." *Id.*; Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22. The 2015–2016 Community Standards defined "force" to include "coercion." *Id.* "Coercion," in turn, meant "unreasonable pressure for any activity." *Id.*

On November 22, Watland (the investigator) emailed Doe to confirm that they would interview Doe on December 2 at 3:00 p.m. *Id.* at ¶ 24. He said that the interview would be about Roe's complaint, and there would be a separate meeting about Elizabeth. *Id.*

On November 29, Love emailed Watland and Tennison (the two investigators). *Id.* at ¶ 23; 11/29/16 Email (Dckt. No. 135-19, at 3–4 of 5). He gave some guidance on how to interview Doe about both complainants at one time. He ended by asking about the schedule: "do you think it might be possible to wrap up the investigation (with writing the FIRs) next week, such that we could have the hearing on the Finals Study Day, Wednesday December 14?" *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171); 11/29/16 Email. He then clarified that "if that seems unreasonable, please let [him] know – and be honest. I don't mean to rush/pressure anything, and I know this is a busy time for all." *See* 11/29/16 Email.

Watland and Tennison interviewed Roe first. The interview took place on December 1. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 161). They audiotaped her interview. *Id.*

On December 2, the investigators emailed Doe to say that they would interview him about both Roe and Elizabeth later that day. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 171). That decision contradicted the investigators' original email to Doe, which said that they would conduct separate interviews about Roe and Elizabeth. *Id.* Regardless, later that day, Watland and Tennison interviewed Doe. *Id.*

18

SA18

Right before the interview, Watland and Tennison informed Doe of his right to an advisor. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 158). Doe testified that he chose to proceed without one, and signed a form acknowledging that they had informed him of his rights. *Id.*

During the interview, Doe had the opportunity to provide his account of what happened between him and Roe. *Id.* at ¶ 33. He told the investigators that Roe had initiated the sexual activity and that "[n]o one was coerced, no one was forced." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 161).

Watland summarized what he heard, writing: "In person, when [Doe] next saw [Roe], they shared that they had both rushed into things. They mutually agreed that they had moved fast physically and 'that no one was coerced.'" *Id.* at ¶ 25.

Watland took notes, and the investigators audiotaped the interview. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 158); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 171). They gave Doe a copy of a document titled "Title IX Interview: Overview and Expectations," which included a note about the recording of the interview: "Audio Recording. This interview WILL be recorded. The purpose of the audio recording is to assist the investigation team with capturing precise language that was shared during your interview for the purposes of the final investigation report." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161). Doe and the investigators signed the document.[7] *Id.*

The Doe and Roe interviews were not the only evidence. The investigators also interviewed Roe's roommate, Witness #1. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40 (Dckt. No. 158); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 69 (Dckt. No. 171).

---

[7] Roe received and signed the same document during her interview, too. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161).

Witness #1 had a chance to review and make changes to her interview summary.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40.  The investigators included her summary as an appendix to the Final Investigation Report.  *Id.*  Additionally, the investigators received text messages as evidence from Doe and Roe.  *Id.* at ¶ 41.

During his interview, Doe gave the investigators the names of two potential witnesses, C.R. and W.T.  C.R. was Doe's roommate, and was in the apartment before and during the first encounter.  W.T. was a friend, and Doe and Roe visited him in his dorm room after the first encounter.  So, C.R. saw Doe and Roe before the first encounter, and W.T. saw them after the first encounter.

The investigators did not interview either of Doe's two witnesses.

## VI.    The Final Investigation Report

After collecting the evidence, Love, Watland, and Tennison prepared the Final Investigation Report.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 27 (Dckt. No. 161).  Watland drafted a three-page, 140-line summary of Doe's interview for inclusion in the Final Investigation Report.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161).

Recall that Love told Doe that these cases tended to hinge on coercion.  To that end, the following passage appeared in the summary:

> In person, when Respondent next saw Complainant, they shared that they had both rushed into things.  *They mutually agreed that they had moved fast physically and "that no one was coerced."*  Both independently said they had regretted moving so fast.  The Respondent shared that he believed that being physical so early in the relationship could jeopardize he and the Complainant not having a serious dating relationship.  Respondent acknowledged it was Complainant's first time doing most of those things, and that he knew that they had moved quickly.  She had described to him that it was her first time in many of those activities and that they should have taken their time with things.  He wanted to have a relationship with her, and they agreed to "pump the brakes" on the

> physical activity so that they could develop a relationship outside of being
> physical.

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 158) (emphasis added); *see also*

Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41); Final Investigation Report, at 10

(Dckt. No. 135-6, at 30 of 81).

Love drafted the section of the Final Investigatory Report entitled "History of the Case."

*See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 27–28 (Dckt. No. 161).  In that section, Love

included a reference to the January 2016 EthicsLine report by Roe's athletic coach (Krop).  *Id.* at

¶ 27 (Dckt. No. 161).

For present purposes, the most important part of the "History of the Case" section

involved the description of Roe's meeting with Khan Harvey (again, the Deputy Title IX

Coordinator) on January 26, 2016.  *Id.* at ¶ 28.  Love mentioned that interview, but he failed to

mention anything about what happened at that interview.

Love did not give any description about the substance of the conversation between Roe

and Khan Harvey.  *Id.*  Recall, Khan Harvey's write-up included a statement about whether Roe

felt coerced.  As a reminder, Khan Harvey wrote:  "Student [Jane Roe] shared that on two

separate occasions, the Respondent [John Doe] 'moved too quickly sexually' which made the

student uncomfortable. *While she doesn't believe she was forced or coerced*, she performed oral

sex on the accused student and now feels that he is trying to manipulate the situation by accusing

her that she'll report that he raped her."  *Id.* (emphasis added).

Love's write-up did not reveal the substance of that conversation at all.  He merely shared

that the meeting took place, without covering what was said.  Love did not attach a copy of Khan

Harvey's write-up, either.  *Id.* at ¶ 29.

The punchline is that the investigators and the Board never knew about what Roe had

said to Khan Harvey during the meeting on January 26, 2016. *Id.* at ¶ 30. They did not have

access to the summary by Khan Harvey unless someone gave it to them. *Id.* But here, Love did

not give the investigators and the Board a copy of the Khan Harvey report. *Id.* And Love did

not write a description of what was said, either.

So, Khan Harvey wrote that Roe "doesn't believe she was forced or coerced," and did so

less than two weeks after the first encounter. But the investigators and the Board heard nothing

about it. The investigators and the Board explored the case without knowing anything about

what Roe discussed with Khan Harvey. They did not know that, according to Khan Harvey, Roe

"doesn't believe she was forced or coerced."

To doublecheck that point, this Court ordered supplemental submissions from the parties.

*See* 9/1/22 Order (Dckt. No. 177). And sure enough, the parties agreed that the Board never

heard anything about what Roe had said to Khan Harvey, and whether Roe felt coerced. *See*

Def.'s Supplement Summary Judgment Submission, at 1 (Dckt. No. 178) ("It is factually correct

that the Board never knew about Rabia Khan Harvey's ('Khan Harvey') impressions about what

Jane Roe ('Jane') said to Khan Harvey and that the Board did not receive or review Khan

Harvey's notes from the January 26, 2016 meeting with Jane."); Pl.'s Supplemental Summary

Judgment Submission in Response to Court's Questions, at 1 (Dckt. No. 179) ("Yes, it is

factually correct that the Board never knew about Jane's statement or Khan Harvey's summary

of Jane's statement that 'she did not believe she was forced or coerced' into certain sexual

activity.").

One of the hotly contested issues in the case is whether Roe *herself* ever said that she did not feel coerced. Doe points to the report prepared by Khan Harvey, and reads it to mean that Roe *personally* said that she did not feel coerced.

But at deposition, Khan Harvey offered a different take on what she had written. Khan Harvey could not recall the exact words that Roe used during her conversation. But Khan Harvey confirmed that the report accurately depicted her "impressions" of how Roe felt, based on Roe's answers to her questions. *See* Khan Harvey Dep., at 103:3 – 104:18, 242:20-24 (Dckt. No. 164-1); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 158).

Doe received a draft of the Final Investigation Report for the first time on December 8. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/8/16 Email (Dckt. No. 135-6, at 69 of 81). He didn't receive the audio recording of his interview. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 23 (Dckt. No. 161). Watland asked Doe to review the report and confirm that it accurately portrayed his perspective. *See* 12/8/16 Email.

Doe responded the next day. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158). He offered one correction but otherwise "confirm[ed] that these accurately represent my perspective from the interviews." *Id.*; *see also* 12/9/16 Email (Dckt. No. 135-6, at 69 of 81).

Specifically, Doe proposed the following change: "[L]ines 9-14, I want to clarify that she informed me that she was nervous because she was on a date with someone 'as attractive as you (me)' and then I proceeded to tell her that there is nothing to be nervous about, etc. That is the only change I would somehow incorporate. Thank you very much!" *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (quoting 12/9/16 Email).

Watland implemented that change, and then emailed an updated draft to Doe the same day. *Id.* at ¶ 37. He asked Doe to review the draft and return it that same day. *Id.*; *see also*

23

SA23

12/9/16 Emails (Dckt. No. 135-6, at 68 of 81). Doe made a few other changes, but he did not

change the paragraph with his statement "that no one was coerced." *See* Pl.'s Resp. to Def.'s

Statement of Facts, at ¶ 36 (Dckt. No. 158).

Doe received the Final Investigation Report on December 12 for his review. *Id.* at ¶¶ 31,

48. The university set his hearing for December 14, so he had two days to read and review the

report. *Id.*

The Hearing Board consisted of Jessica Landis (Hearing Board Chair, Office of Student

Conduct and Conflict Resolution), Brian Houze (Hearing Board Officer, Office of Student

Activities & Greek Affairs), and Angela King Taylor (Hearing Board Officer Office of Student

Activities & Greek Affairs). *Id.* at ¶ 33. The Board received a copy of the report. *Id.*

Doe noticed that the report did not mention two witnesses that he described in his

interview (called Witness A and Witness B). *Id.* at ¶ 49.

Love emailed Doe an updated copy of the Final Investigation Report the same day,

noting that Roe had made a few minor adjustments. *Id.* at ¶ 50. Doe testified that he did not see

or read that email until late the next night, when Love mentioned it over the phone. *Id.* Doe

never reviewed the Final Investigation Report because his hearing was scheduled for the next

day at 9:00 a.m. *Id.* at ¶ 51.

## VII. The Hearing

The hearing on Roe's complaint took place on December 14. *Id.* at ¶ 52; Def.'s Resp. to

Pl.'s Statement of Facts, at ¶ 34 (Dckt. No. 161). The record includes a transcript of the hearing.

*See* Hearing Transcript (Dckt. No. 135-1). Doe, Roe, and the investigators appeared in person

before the Hearing Board. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 34.

Doe and Roe each brought an advisor to the hearing.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 158).  So Doe did not have an advisor during his interview, but he did have advisor by the time that the hearing rolled around.

At the hearing, Doe had the chance to provide his own account of the "allegations against him," which the Court understands to mean his version of what had taken place.  *Id.* at ¶ 55.  At deposition, Doe did not recall if the investigators raised any alleged violations that he didn't have a chance to refute.  *Id.*

In this suit, Doe takes issue with several aspects of the hearing.  The hearing transcript spans 163 pages.  The Court focuses on the highlights below.  Doe's complaints fall into a few buckets.  Doe believes that the Hearing Board gave too much credit to Roe's story, and too little credit to his story.  He objects to how the Board treated his advisor.  And he believes that the Board responded to his questions dismissively.

So, the Court reviews the facts of the hearing in that order.

### A.      The Exploration of What Transpired between Doe and Roe

At the hearing, the Board asked a number of follow-up questions based on information in the Final Investigation Report.  Some facts were undisputed, but many were hotly contested.  *Id.* at ¶ 56.

For the first encounter, Doe and Roe both said that they went to dinner, returned to Doe's apartment, and engaged in sexual activity.  *Id.*  They agreed that Roe removed her sweater and bra, and Doe kissed Roe's bare chest.  *Id.*  And they agreed that Roe touched Doe's penis with her hand and performed oral sex on him, and that Doe performed oral sex on her.  *Id.*

For the second encounter, Doe and Roe agreed that they met on January 15 or 16 in Doe's apartment.  *Id.* at ¶ 59.  They agreed that they talked about how things were "moving too fast" and agreed to slow down on sexual activity.  *Id.*

For the third encounter, Doe and Roe agreed that they met on January 17 in Doe's apartment.  *Id.* at ¶ 61.  They also agreed that they kissed, and that Roe performed oral sex on Doe.  *Id.*

But the parties disagreed on many facts, too.  *Id.* at ¶¶ 57, 60, 62.  In the end, these disagreements were key, because the Hearing Board ended up deciding that Roe's story was more reliable.

The parties described the details of their first encounter quite differently.  *Id.* at ¶ 57.  Roe recounted facts about her declining his request to see her breasts and to kiss her.  *Id.*  She also said that he took off his own pants, requested oral sex and simultaneous oral sex, digitally penetrated her, removed her pants, and rubbed his penis on her clitoris without penetrating.  *Id.*  And Roe said that she initially said "no" to engaging in simultaneous oral sex, taking off her pants, and having sex.  *Id.*  But she described the "no" to penetrative sex as "the only thing he ever listened to."  *Id.*

Doe, in contrast, said that Roe helped him undo his pants, took off her own pants before she ever removed her shirt, touched his penis without his asking, requested oral sex from him, and took off her own shirt and bra.  *Id.* at ¶ 58.

For the second encounter, Doe and Roe disagreed about how Doe left the apartment.  *Id.* at ¶ 60.  Roe said that Doe pushed her against the door, hugged and kissed her, and used his hand to place her hand on his penis, saying, "See what you do to me."  *Id.*  Doe, however, said that he simply walked to the door, gave her a hug and kiss, and left.  *Id.*

For the third encounter, Doe said that the sexual activity occurred on the couch, but Roe said that it occurred in the bedroom. *Id.* at ¶¶ 62–63. Doe also said that they were kissing and then Roe touched his groin areas with her hand, and he asked, "Are you sure?" *Id.* at ¶ 62. According to Doe, Roe responded, "Yeah," and performed oral sex. *Id.* But according to Roe, Doe took off his own pants, and asked "Are you sure?" *Id.* at ¶ 63. Roe could not recall what she said, but also did not deny Doe's story that she said, "Yeah." *Id.*

The hearing eventually turned to Doe's interview summary. *Id.* at ¶ 64. The Hearing Board drew attention to the sentence about coercion, meaning the sentence stating that Doe had said that he agreed with Roe that "no one was coerced." *Id.*; *see also* Hearing Transcript, at 94:21-24 (Dckt. No. 135-1); Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41) ("They mutually agreed that they had moved fast physically and 'that no one was coerced.'") (summarizing Doe's statement to the investigators); Final Investigation Report, at 10 (Dckt. No. 135-6, at 30 of 81).

That statement caught the attention of the Hearing Board. The Board asked Doe how coercion came up in that conversation. *Id.* The Hearing Board seemed to think that a denial of coercion was *itself* evidence of coercion.

Doe told the Hearing Board that the summary "was a misrepresentation of what I said," and that coercion never came up. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 65 (Dckt. No. 158) (quoting Hearing Transcript, at 94:25 – 95:1 (Dckt. No. 135-1)). So, the Hearing Board turned to the investigators to ask how that line made it into the summary. *Id.*

Watland stated that Doe "kept saying they had mutually agreed that they had moved too quickly and he had said that they mutually agreed that no one was coerced and that was intentionally put in quotations just because, to me, the phrasing – it seems more formal than I

27

SA27

think I anticipate people usually talking to each other.  So that was what was said." *Id.* (quoting Hearing Transcript, at 95:7-14 (Dckt. No. 135-1)).  But Watland didn't recall following up with Doe to ask whether he used those exact words (meaning "no one was coerced"). *Id.*

The Board also asked Doe about some of his texts. *Id.* at ¶ 66.  Roe had texted Doe: "I'm not stupid [Doe] I'm not falling for this anymore, I can only hope that the next girl you decide to use is smarter than me and doesn't fall for your shit." *Id.*  Doe responded in a series of texts, with the final one saying, "I feel like you want me to be the guy who takes your virginity . . . and then you will proceed to claim I raped you." *Id.*

Doe said that he sent that text because "everything seemed perfectly fine and then she leaves and just changes like that freak[ed] [him] out." *Id.* at ¶ 67.  He "decided to say that . . . because it seems like [Roe] just want[ed] attention." *Id.*  He went on to state his story that Roe initiated the sexual conduct:  "I'm now sitting in front of a board of people try to judge my character on something that someone clearly regrets doing and pushing the blame on me." *Id.*

### B.    The Treatment of the Advisors

Doe also takes issue with how the Board dealt with the advisors at the hearing.

According to Doe, Houze (again, a Hearing Board officer) threatened to remove Doe's advisor at some point during the hearing. *Id.* at ¶ 68.  Meanwhile, he allowed Roe to talk to her advisor repeatedly without consequence. *Id.*

The parties disagree on what, exactly, happened.  Loyola claims that Houze made one brief comment to the advisors:  "I want to take a minute and just remind both advisors of their role and remind that there should not be any coaching going on.  So just a stern reminder.  Thank you." *See* Def.'s Statement of Facts, at ¶ 68 (Dckt. No. 136) (quoting Hearing Transcript, at 78:17-20 (Dckt. No. 136-1)).

Doe, however, argues that the Hearing Board addressed the advisors more often than that. He provided evidence that Landis (again, the Hearing Board Chair) addressed the advisors at the beginning of the hearing, to say that they are to "serve[] as a silent support person" and are not "really to speak at all" during the hearing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 158) (quoting Hearing Transcript, at 12:3-8 (Dckt. No. 135-1)).

Doe testified that the Board didn't enforce that rule when it came to Roe. Doe testified that the Board allowed Roe to speak with her advisor four or five times. *Id.* (citing Doe Dep., at 80:17 – 81:3 (Dckt. No. 135-42)). Doe also said that, when Houze issued the "stern reminder" to the advisors, "he was staring directly at [Doe] and [his] advisor." *Id.* (quoting Doe Dep., at 84:11-12). According to Doe, that stare suggested the warning was only directed at him and his advisor. *Id.*

### C.    The Response to Doe's Questions

At deposition, Doe testified that the Hearing Board belittled him when he raised questions. *Id.* at ¶ 69. Specifically, he posed a few questions for the Board to ask Roe, and he thinks that the Board mocked him. *Id.*

For example, Roe apparently said that she could not picture them having simultaneous oral sex, but knew that it happened. *Id.* That statement befuddled Doe, and he wanted the Board to drill down and get clarification.

Doe asked the Board to ask follow-up questions. He responded: "Can we get clarification on what, I can't picture it, but I know it happened, means? Because if you can't picture an act that you're claiming happened, how do you – like how do you know that that's what happened? Like do you understand what I'm trying to say?" *Id.* (quoting Hearing Transcript, at 77:10-16 (Dckt. No. 135-1)).

Houze did not ask Roe those follow-up questions. Instead, Houze responded: "I can think of a number of instances where I'm sure that something happened, but I can't picture it, to be straightforward with you." *Id.* (quoting Hearing Transcript, at 77:17-19).

Doe testified that "the manner in which he looked at me and my advisor, but more specifically me, it came across in an extremely hostile manner." *See* Doe Dep., at 122:17-19 (Dckt. No. 135-42).

\* \* \*

In total, the hearing lasted about three hours. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 158). The next day (December 15), Doe requested to meet with Love, and he told him that the meeting was unfair and that the Board refused to ask his questions. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 67 (Dckt. No. 171). Love told Doe to trust the process, and that he could raise any concerns in an appeal. *Id.*

## VIII. The Decision

After the hearing, the Hearing Board deliberated. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 71 (Dckt. No. 158). Landis (the Chair) testified that she recalled that the Board had two sessions. *Id.* The Hearing Board had to weigh the evidence and reached a decision based on the preponderance of the evidence. *Id.*

After deliberation, the Hearing Board determined that Roe's account was more credible than Doe's account. *Id.* at ¶ 72. The Board decided that Doe was responsible for "non-consensual sexual penetration" and "non-consensual sexual contact" based on his first and second encounters with Roe. *Id.*

On December 20, the Hearing Board issued a decision letter. *Id.* at ¶ 73; *see also* 12/20/16 Decision Letter (Dckt. No. 135-11). It purported to "summarize the outcome" of Doe's hearing. In bold letters, right at the beginning, the letter announced the decision:

> **After reviewing all available information related to this incident and discussing it with you, I have found that you are <u>RESPONSIBLE</u> for engaging in non-consensual sexual contact and non-consensual sexual penetration.**

*See* 12/20/16 Decision Letter (bold and underline in original).

The Decision Letter addressed the credibility of Doe and Roe. The Board stated that Roe had offered a consistent version of the events in the 11 months since the first encounter:

> The Board noted that Complainant has consistently shared her account of the alleged events over the course of the last 11 months: she reported a consistent account to Witness 1 the night of the incident, to her Coach a few days after the incident, to the Investigators months later, and to the Board during the hearing.

*See* 12/20/16 Decision Letter, at 2 (Dckt. No. 135-11, at 3 of 10).

The Board declared that Roe was consistent all long. But the Board never heard anything about Khan Harvey's write-up from January 26, 2016, stating that Roe "doesn't believe she was forced or coerced." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 30 (Dckt. No. 161). The Board declared that Roe was consistent, without hearing about a potential inconsistency.

On the other hand, the Board concluded that Doe was inconsistent, albeit only once. *See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10). The Decision Letter pointed to the statement in the Final Investigation Report that Doe and Roe "mutually agreed that they had moved fast physically and 'that no one was coerced.'"

The Letter recounted how Doe had taken issue with that phraseology at the hearing, and how the Board had asked for clarification from the investigators. The investigators confirmed that the report accurately captured what Doe had said. *See* 12/20/16 Decision Letter, at 2–3

(Dckt. No. 135-11, at 3–4 of 10) ("The Investigators stated that during the interview Respondent stated that the topics of conversation between himself and Complainant included both the agreement that they had moved too fast physically and that no one was coerced.  They also shared that the Respondent repeated the phrase 'mutually agreed that no one was coerced' multiple times during his interview which is why they included the phrase in quotation marks in the FIR.").

In the end, the Board gave weight to the fact that Doe was trying to walk-back a statement in the Final Investigation Report, especially after having opportunities to review and change the summary before the hearing.  *Id.*  The Board wrote:

> All things considered, Respondent's inconsistency regarding the discussion of coercion, while a singular instance, is noteworthy to the Board.  The presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction.  As such, Respondent's inconsistency around this topic in particular holds significant weight.

*See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10).

The letter listed six discrete acts of sexual misconduct.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74 (Dckt. No. 158); 12/20/16 Decision Letter (Dckt. No. 135-11).  The first five acts took place during the first encounter on January 13.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74; 12/20/16 Decision Letter.  The last instance took place during the second encounter.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74; 12/20/16 Decision Letter.

As a result of these findings, Loyola expelled Doe.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74 (Dckt. No. 158); 12/20/16 Decision Letter (Dckt. No. 134-11).

## IX.    The Second Hearing

Doe's hearing on Elizabeth's complaint took place in front of a different hearing board on December 14, 2016.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 52 (Dckt. No. 158).  That hearing board issued a decision six days later, finding Doe not responsible for any policy violation.  *Id.* at ¶ 53.

## X.    The Appeal

The decision letter ended by noting that Doe had 120 hours to appeal the decision, and giving him a link.  *See* 12/20/16 Decision Letter (Dckt. No. 134-11).  He needed to appeal before Christmas.

On December 24, Doe filed an appeal.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 99 (Dckt. No. 158); Appeal (Dckt. No. 135-13).  Loyola stayed his expulsion pending the result.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 110.  An Assistant Vice President, Jack McLean, received the appeal as the Dean's designee.  *Id.* at ¶ 100.

Doe raised three grounds for appeal:  (1) new substantive information, (2) substantive procedural error, and (3) a finding manifestly contrary to the evidence.  *Id.* at ¶ 99.

First, Doe appealed based on new substantive information from two witnesses.  Doe sought the admission of two witness statements, from individuals known as "C.R." and "W.T." *Id.* at ¶ 101.

C.R. was Doe's roommate, and was in the next room on the first night in question.  *Id.* Doe says that he would have "refuted the Complainant's testimony regarding her demeanor due to him seeing her after the sexual encounters occurred."  *Id.* (quoting Appeal (Dckt. No. 135-13)).

<div align="center">33</div>

<div align="center">SA33</div>

The other potential witness was W.T. The parties don't reveal the nature of their relationship with that person. But Doe argued that W.T. "could have refuted the [Roe's] claims of lack of consent and the testimony with the witness based on conversations with the Complainant during the relationship." *Id.* (quoting Appeal).

Before the hearing, Doe gave the names of C.R. and W.T. to the investigators. *Id.* at ¶ 102. He assumed that the investigators would interview them, but there's no record that they did so. *Id.*

Second, Doe appealed based on substantive procedural errors. That argument included three subparts. Again, Doe thought that the investigators should have interviewed C.R. and W.T. *See* Appeal (Dckt. No. 135-13). He thought the Hearing Board lacked impartiality because the Board knew that Doe was subject to a second hearing. *Id.* And he thought that the Board received materially false information from the investigators about whether Doe ever used the word "coerced" when talking with Roe. *Id.*

Third, Doe appealed based on the notion that the Board's finding was manifestly contrary to the record. He argued that the Hearing Board's credibility determination (*i.e.*, its decision to believe Roe's story over his story) was without merit. *Id.* And he argued that there was nothing in the record suggesting that Roe did not give consent. *Id.*

After Doe submitted his appeal, McLean received a letter from Doe's attorney and declarations by W.T. and C.R. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 105 (Dckt. No. 158). McLean testified that he skimmed these documents, but did not consider them for the appeal, because Doe submitted them after the 120-hour appeal window. *Id.*

On January 20, 2017, McLean issued his decision denying Doe's appeal. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 60 (Dckt. No. 171); *see also* Appeal Decision Letter (Dckt.

No. 135-14) ("**I have decided to uphold the original decision of responsibility as well as any/all sanction(s)**.") (bold in original).  The Appeal Decision responded to each of Doe's claims, dismissing them all.  *See* Appeal Decision Letter.

For the failure to interview C.R. and W.T., McLean observed that any claim based on new substantive information must show that the new information was not available or discoverable "at the time of the hearing and that it would have likely changed the outcome of the case." *Id.*  He then explained that Doe "fail[ed] to address why this information was not discoverable at the time of the hearing, or how it would have likely changed the outcome of the case." *Id.*

McLean also found no merit in Doe's three substantive procedural error claims.  He noted that Doe offered "other additional evidence the night before the hearing, [but] did not ask to have [C.R.] and [W.T.] testify at the hearing." *Id.* at 3 (Dckt. No. 135-14, at 4 of 7).  McLean noted that Doe did not provide any explanation about "how a Hearing Board member(s) seeing the Respondent/Appellant, with or without his attorney, in the OSCCR offices would lead the hearing board members to conclude a second complaint had been filed against" him. *Id.*

For the third substantive procedural error claim, McLean found no reason to believe the investigators gave materially false information to the Hearing Board about Doe's use of the word "coerced." *Id.*  McLean observed that investigators do not pass along their reports until after final verification by the interviewees, and Doe "ultimately certified that the written statement as drafted by the investigators was accurate, never taking issue with the language about 'no one was coerced.'" *Id.*  McLean also reviewed the audio tapes and determined it was "clear" that the "the Investigators were in consensus about what they heard." *Id.*  So, he deferred to the findings of the Hearing Board on the credibility issue. *Id.*

Finally, for the manifestly contrary to evidence claims, McLean deferred to the Hearing

Board.  *Id.*  For the issue about credibility, McLean wrote:  "The Appeals Officer cannot reverse

a finding a credibility if there is any supporting evidence for the Hearing Board's finding in the

record and audio recording of the hearing.  There is supporting evidence in both the Final

Investigation Report and audio tape, so the Respondent/Appellant's argument regarding

credibility must fail."  *Id.*  For the consent claim, McLean reviewed Doe's instances that he

alleged were evidence of consent, and concluded that "[e]ach of these examples fails to

appreciate what 'consent' is, as defined by the Community Standards."  *Id.*

The Decision Letter ended as it began, affirming the Hearing Board's finding:  "**For the**

**reasons cited above, the Hearing Board decision is affirmed and upheld in full.**"  *Id.* (bold in

original).  It then restated the charges, the finding of the Hearing Board, and the sanction of

expulsion.  *Id.*

## XI.    The Lawsuit

After Loyola denied Doe's appeal, Doe filed a complaint against Loyola.  *See* Cplt.

(Dckt. No. 1).  He soon amended the complaint.  *See* Am. Cplt. (Dckt. No. 19).

Doe's amended complaint included four counts:  (1) Title IX, (2) breach of contract,

(3) estoppel and reliance, and (4) negligent infliction of emotional distress.  *Id.*  In August 2019,

Judge Feinerman (this Court's predecessor before reassignment) dismissed the claim of negligent

infliction of emotional distress.  *See* 8/13/19 Order (Dckt. No. 47); Mem. Opin. & Order (Dckt.

No. 48).  The other three counts remain.

After discovery, the parties each moved for summary judgment.  Doe moved for partial

summary judgment on the breach of contract claim.  *See* Pl.'s Mtn. for Partial Summ. J. (Dckt.

No. 126); Pl.'s Mem. in Support of Mtn. for Partial Summ. J. (Dckt. No. 127).  Loyola moved

for summary judgment on all three remaining claims.  *See* Def.'s Mtn. for Summ. J. (Dckt.

No. 130); Def.'s Mem. in Support of Mtn. for Summ. J. (Dckt. No. 131).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no

genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive summary judgment, the opposing party must go beyond the pleadings and identify

specific facts showing the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving

him the benefit of all reasonable inferences.  *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th

Cir. 2016).  The Court does not weigh the evidence, judge credibility, or determine the truth of

the matter, but rather determines only whether a genuine issue of triable fact exists.  *See Nat'l*

*Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  Summary

judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in

favor of the non-movant.  *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*,

674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The parties filed cross motions for summary judgment.  Doe moved for summary

judgment on the breach of contract claim (Count II).  Loyola moved for summary judgment on

all three counts: sex discrimination under Title IX (Count I), breach of contract (Count II), and estoppel and reliance (Count III).

During the briefing, the promissory estoppel claim (Count III) fell by the wayside. Promissory estoppel is a cause of action in "the absence of any mutual agreement by the parties on all the essential terms of a contract." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 329 Ill. Dec. 322, 906 N.E.2d 520, 526 (2009) (cleaned up). That is, it applies when the parties don't have a contract.

In its summary judgment brief, Loyola conceded that "the Community Standards created a contract between the parties." *See* Def.'s Mem. in Support of Summ. J., at 29 (Dckt. No. 131). In response, Doe agreed to drop the promissory estoppel claim "[b]ecause Loyola does not contest that the parties have a binding contract." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 36 n.21 (Dckt. No. 157). Loyola's motion for summary judgment on Count III is granted.

Only two counts remain: the Title IX claim, and the breach of contract claim. The Court will analyze each claim in turn.

## I.    Title IX

Doe argues that Loyola violated Title IX because it expelled him through a process that intentionally favored women over men (and specifically favored his female accuser over him). *See* Am. Cplt., at ¶ 173 (Dckt. No. 19); Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 23–36 (Dckt. No. 157).

Before diving into the argument, one salient point stands out. Doe faced two disciplinary proceedings, based on accusations by two women: Roe and Elizabeth. Doe won one, and lost one. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 53 (Dckt. No. 158). Doe has a hard time arguing that the deck is stacked against him, because he won one of the two hands.

## SA38

And even then, the Board did not side with Roe on everything.  Roe's complaint involved

three encounters.  The Board sided with Roe on two of them, and sided with Doe on one of them.

*Id.* at ¶ 95.  He won some, he lost some.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."  *See* 20 U.S.C.

§ 1681(a).  "The Supreme Court has interpreted Title IX to provide individual plaintiffs with an

implied private right of action to pursue claims of gender discrimination in federal court and has

recognized a number of claims that constitute discrimination."  *Doe v. Columbia Coll. Chicago*,

933 F.3d 849, 854 (7th Cir. 2019).

To prove a Title IX violation, a plaintiff must show that "(1) the educational institution

received federal funding, (2) the plaintiff was excluded from participation in or denied the

benefits of an educational program, and (3) the educational institution in question discriminated

against the plaintiff based on gender."  *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir.

2020) (citing *Columbia Coll. Chicago*, 933 F.3d at 854).

Only the third element is at issue here.  When it comes to evidence of discrimination in

this area, the Seventh Circuit has steered clear of overly complicated formulas for getting to the

bottom line.  The question is simple.  The "test" is simply "whether [the university]

discriminated against [the student] 'on the basis of his sex.'"  *Id.* (citation omitted).

Doe offered a few different types of evidence that Loyola discriminated against him.

Some of the evidence is about Loyola's handling of sexual assault cases in general.  And some of

the evidence is about how Loyola handled his particular case.

39

**SA39**

Doe's evidence about sexual assault cases in general comes in two varieties. Doe provided evidence of outside pressure on Loyola to discriminate against men in sexual assault cases. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 23–25 (Dckt. No. 157). He also presented data from Loyola's other sexual misconduct cases, arguing that Loyola's handling of other cases supports an inference of gender bias in this case. *Id.* at 35–36.

Evidence about the handling of sexual misconduct cases in general "can be relevant" when deciding whether a university mistreated someone on the basis of sex. *See Johnson*, 829 F. App'x at 732. A track record of mistreating a group can inform whether a university mistreated a member of the group.

Relevancy is one thing; sufficiency is another. To prove a claim, a plaintiff needs to offer something more than evidence about the handling of sexual misconduct cases generally. That is, "a plaintiff cannot rely on such generalized information alone; he must combine it with facts creating an inference that, in *his specific case*, the institution treated him differently because of his sex." *Id.* (emphasis in original).

Evidence about Loyola's handling of Doe's specific case matters most. *Id.* He needs evidence of mistreatment in his particular case to get over the summary judgment hump and land at trial.

To that end, Doe offered evidence about how Loyola treated him in this particular case. He makes quite a few arguments about his investigation, hearing, and appeal. *Id.* at 25–35.

Doe focuses on four categories of evidence. First, he argues that the Hearing Board made an inexplicable and unsupportable credibility determination. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 25–30 (Dckt. No. 157). Second, he argues that Loyola discriminated against him by interviewing Roe's female witness, but failing to interview his male witnesses. *Id.* at 30–31.

Third, he contends that the Board displayed hostility toward him at the hearing, which suggests bias. *Id.* at 31–32. Fourth, he argues that Loyola ignored substantive procedural errors that skewed the process against him. *Id.* at 32–35.

There's a lot there. But at the end of the day, there isn't much there.

## A.      The Credibility Determination

Doe devotes most of his argument to challenging the Board's credibility determination. *Id.* at 25–30. He tries to fit this case within *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), which involved a disciplinary proceeding where the university accepted the accuser's story without even talking with her. *See Purdue*, 928 F.3d at 669.

That's a difficult starting point for Doe, to put it mildly. Loyola talked with both Doe and Roe, repeatedly. The university gave each of them an opportunity to be heard, and then heard again. Each of them talked with the investigators. Each of them attended the hearing. Each of them got to speak their piece, and had a chance to hear what the other person had to say.

Even so, Doe tries to shoehorn this case into that framework, arguing that the Hearing Board's decision was "just as perplexing." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 25 (Dckt. No. 157).

At bottom, Doe takes issue with the Board's conclusion that Roe was more believable. He runs through six reasons why Loyola's determination made no sense. In his view, the decision was so nonsensical that it must be a sign of sex discrimination. *Id.* at 26–30.

### 1.      The Interview Summary

Doe opens with a weak argument. Doe takes issue with the suggestion in Loyola's summary judgment brief that he "certified" the interview summary prepared by the investigator. *Id.* at 26.

The argument is flavored with semantics, quibbling about what "certified" means. According to Doe, the investigator asked him to review and comment on the interview summary, but Doe never "certified" it. *Id.* ("John was not asked to and did not 'certify' Watland's interview summary; Watland only asked him to confirm that it 'accurately reflects your perspective from the interview.'").

Fair enough. Nothing rests on whether the interview summary was certified, as opposed to "confirm[ed]." Nothing rides on the difference between certifying something and confirming something.

Putting semantics aside, the record cannot support a finding of discrimination when it came to the interview summaries. The investigators talked with both Doe and Roe, and gave each of them an opportunity to review and comment on the summaries before sending the final report to the Hearing Board.

If anything, the treatment of Doe and Roe was remarkably similar. The investigators asked nearly identical questions to each of them.

In his email to Doe about the summary, Watland asked Doe to "[p]lease review the attached summaries and confirm with us by l:00pm on Friday, December 9, 2016, that this accurately represents your perspective from the interview." *See* 12/8/16 Email (Dckt. No. 135-6, at 69 of 81). After Doe responded with one edit, Watland responded that he made the change and asked Doe to "review and return to [him] today." *See* 12/9/16 Email (Dckt. No. 135-6, at 68 of 81).

The exchange with Roe was almost a carbon copy. In her email to Roe about her summary, Tennison asked Roe to "[p]lease review the attached summary and confirm with us by 9:00am on Friday, December 9, 2016, that this accurately represents your perspective from the

interview." *See* 12/7/16 Email (Dckt. No. 135-6, at 65 of 81). After Roe responded with a list of

corrections, Tennison emailed that she had made the changes and asked her to "[p]lease review

again and provide your feedback or certify that the summary is accurate as written." *See* 12/8/16

Email (Dckt. No. 135-6, at 63 of 81).

     The Court fails to see any material difference in how the investigators treated Doe and

Roe on this point. The investigators provided a copy of the summaries to Doe and Roe,

respectively, and asked each of them to "review" and "confirm" the contents. Then, after each

provided feedback, Doe and Roe were offered a second review. The words weren't identical

(*i.e.*, "review and return" versus "review again and provide your feedback or certify"), but they

didn't need to be. And in any event, they were pretty close.

     The simple reality is that the investigators afforded both Doe and Roe a chance to review

and comment on the summaries. And then they gave both Doe and Roe a chance to view it

again, one last time.

     There is no discernible material difference, in style or substance, between the two emails.

And even if there was, the record includes no reason to think that the difference had anything to

do with the sex of the two participants. If anything, it looks even handed.

### 2.    The Destruction of the Recordings

     Doe next argues that Loyola failed to preserve the audio recording of his interview. *See*

Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 157). He views the lack of preservation

as a sign of discrimination.

     The Community Standards offer some guidance on how to deal with the interview

recordings. Basically, the recordings did not *need* to be retained, but the university *could* retain

them. "The University reserves the right to audio record each individual interview collected

during meetings for the sole purpose of preparing the Final Investigation Report.  These audio

recordings will not be shared beyond the Investigators.  The recordings are not retained as part of

an educational record.  Audio recordings may be retained as needed at the discretion of the

University."  *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16).

Doe's theory of discrimination does not get very far before he hits a roadblock.  Loyola

did not keep *any* of the recordings at issue.  That is, Loyola didn't preserve the recordings for

Doe, Roe, or Witness #1.  *See* Audio Recordings Table (Dckt. No. 135-24, at 13 of 30) (listing

"None" under "Recordings Preserved" for case no. 1162-2016).  It is not as if Loyola destroyed

Doe's recording but kept Roe's recording.  Loyola got rid of them all.

By all appearances, Loyola took an even-handed approach, and treated both Doe and Roe

the same.  It is hard to see how Loyola could have treated Doe differently on the basis of sex if it

treated Doe and Roe the same.

In theory, it is possible that the university could have destroyed all of the recordings in an

effort to help Roe.  Imagine, for the sake of argument, a world in which Doe was the world's best

witness, and Roe was the world's worst witness.  Imagine if Roe had said a bunch of

incriminating statements that undermined her story.  And imagine if the university wanted to

sweep it all under the rug to help Roe and hurt Doe.  In that scenario, destroying all of the

recordings could help Roe, and hurt Doe, because the recordings could have shed light on who

was telling the truth.

But here, there is no such evidence.  Nothing in the record supports the notion that the

destruction of the recordings was anything other than a neutral, even-handed practice.  One can

imagine a different scenario, but on this record, it is only a creature of one's imagination.  There

is no evidence of any shenanigans when it comes to the recordings.

Doe contends that Loyola's destruction of the recordings was out of the ordinary. Doe writes that "of the eight cases (including John's cases) in 2016 and 2017 where Loyola preserved audio recordings of interviews, *Loyola preserved the respondent's interview audio recording in every case except one: John's interview*." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26–27 (Dckt. No. 157) (emphasis in original).

The record does not support those numbers. Based on the record, Loyola did not preserve interviews in 11 of 19 cases between 2016–2017. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 120 (Dckt. No. 158). So, Doe's case was well within the mainstream. And even if this case departed from the fold, there is no reason to think that any departure had anything to do with discrimination.

Even if Loyola should have saved Doe's recording, there is no evidence to suggest that Loyola deleted it because of his sex. There is no evidence that Doe's sex had anything to do with the destruction of the recordings.

Doe argues that the recording "would have confirmed [Doe's] account." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 27 (Dckt. No. 157). Maybe so. Maybe the recording would have supported Doe's position. But the loss of potentially helpful evidence is not evidence of discrimination unless there is some reason to think that the loss was motivated by the sex of Doe and Roe. And here, there is no such evidence.

One other point deserves mention. At the hearing, the Board gave both Doe and Roe "uninterrupted time for anything you'd like to say." *See* Hearing Transcript, at 7:16-17 (Dckt. No. 135-1); *see also id.* at 9:25 – 10:3 ("[T]oday is a chance for you to share your perspective, to respond to questions and give us any other additional information you would like the Board to consider.").

And in fact, at the hearing, Doe addressed the most hotly contested part of the Final Investigation Report – the statement that Doe and Roe agreed that no one was coerced. *Id.* at 93:12 – 95:1. He told the Board that the investigators misunderstood him, and the Board then asked the investigators for clarification. *Id.* at 95:2-5. Doe received another chance to explain himself. *Id.* at 96:6-16.

In sum, maybe the recording no longer existed. But Doe could, and did, speak for himself. It is hard to see how Doe was railroaded when he had the opportunity to speak and be heard.

True, it is possible that the recordings may have helped Doe's cause. The Board made a credibility determination against Doe, based on an inconsistency between what Doe had told the investigators and what Doe was saying at the hearing. Basically, according to the investigators, Doe said that he and Roe "mutually agreed that no one was coerced." But Doe denied saying any such thing. And the Board held that inconsistency against him. *See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10) ("As such, Respondent's inconsistency around this topic in particular holds significant weight.").

If the recordings still existed, maybe the Board could have listened to them to determine whether Doe was, in fact, consistent. *But see* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16) (stating that the purpose of the recordings is to help the investigators prepare the Final Investigation Report, without suggesting that the Board can or will hear them). It is possible that the recordings could have helped Doe. But again, the question is not whether the recordings might have helped Doe. The question is whether there is evidence that Loyola failed to preserve them for discriminatory reasons. And here, there isn't.

### 3.    Investigator's Summary

Doe argues that Loyola expelled him "based solely on a rushed and inexperienced investigator's erroneous summary." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 157). Specifically, Doe faults Loyola for his failure to notice a supposed error in the Final Investigation Report.

The alleged error involves the following statement in the Final Investigation Report: "They mutually agreed that they had moved fast physically and 'that no one was coerced.'" *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 158) (emphasis added); *see also* Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41); Final Investigation Report, at 10 (Dckt. No. 135-6, at 30 of 81).

That statement has some ambiguity. The question is whether the agreement applies to both parts, or only the first one. According to Doe, it reads like Doe and Roe (1) *agreed* that they went too fast; *and* (2) *agreed* that no one was coerced. In reality, according to Doe, the agreement covered only the first part. Doe claims that he said that (1) Doe and Roe agreed that they went too fast, and (2) no one was coerced.

According to Doe, he told the investigators that no one was coerced, and that both Doe and Roe had expressed regret about going so fast. But Doe says that he never told the investigators that Doe and Roe discussed coercion. According to him, coercion wasn't a topic of conversation with Roe at all. Doe simply told the investigators that no one was coerced, *not* that Doe and Roe *talked* about coercion and agreed that there was none.

Doe doesn't have much of a leg to stand on when it comes to any error in the investigator's summary. Doe had not one, not two, but three chances to review the summary of his interview in the Final Investigation Report before the hearing.

SA47

An investigator emailed Doe on December 2. *See* Def.'s Resp. to Pl.'s Statement of

Additional Facts, at ¶ 24 (Dckt. No. 171). The investigator sent Doe a draft of the Final

Investigation Report on December 8, and invited any comments or corrections. *See* Pl.'s Resp.

to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/8/16 Email (Dckt. No. 135-6, at

69 of 81).

Doe responded on December 9 and made one correction. *See* Pl.'s Resp. to Def.'s

Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/9/16 Email (Dckt. No. 135-6, at 69 of

81). He otherwise "confirm[ed] that these accurately represent my perspective from the

interviews." *Id.*

The investigator changed the draft and sent the updated version to Doe later that day. *See*

Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (quoting 12/9/16 Email). He invited any

additional changes or corrections. *Id.*; *see also* 12/9/16 Emails (Dckt. No. 135-6, at 68 of 81).

Doe made a few other changes, but he did not change the paragraph with his statement "that no

one was coerced." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158).

Doe received the Final Investigation Report on December 12 for his review. *Id.* at ¶¶ 31, 48.

The hearing took place on December 14, two days later. *Id.*

Doe did not correct that sentence, despite repeated opportunities. Doe now explains that

the "investigator's error was not obvious to John on his initial review." *See* Pl.'s Resp. to Def.'s

Mtn. for Summ. J., at 27 (Dckt. No. 157). Fair enough. If there was a mistake, Doe didn't catch

it either.

The phraseology in the summary cannot give rise to an inference of discrimination. The

record shows that the investigator reached out to Doe repeatedly, and gave him every

opportunity to get things right.  Maybe the language was not perfect, but it wasn't discriminatory, either.

More generally, the pace of the investigation cannot support a finding of discrimination. The investigators gave Doe and Roe the same amount of time to respond.  There is no evidence that Doe received less of an opportunity to review the summary than Roe.  Once again, things look even handed.

### 4.    More Lenient Standards for Roe

Doe argues that "Loyola did not hold [Roe] to the same exacting standards as" him.  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 27 (Dckt. No. 157).  That is, he contends that the Hearing Board ignored inconsistencies in Roe's story, but zeroed in on one supposed inconsistency in his story.

Doe offers a few examples.  First, he notes that Roe changed a detail in Witness #1's statement, and the Hearing Board assumed that the witness, not Roe, was mistaken.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 71 (Dckt. No. 158); 12/16/20 Decision Letter (Dckt. No. 135-11).  But when the Board perceived an inconsistency in Doe's story, the Board assumed that he was wrong.  *See* 12/16/20 Decision Letter, at 2–3 (Dckt. No. 135-11, at 3–4).  So, Doe basically thinks that the Board was predisposed to believe Roe and disbelieve Doe.

Those examples aren't exactly the same.  The Hearing Board discredited Doe because (in their view) he contradicted himself, but, in this instance, Roe contradicted a witness.  One is a self-contradiction, and the other is an inconsistency between two witnesses.  A factfinder could conclude that a witness who does not contradict herself is more credible than a witness who does contradict himself.

More generally, the Board was not compelled to find Doe more believable than Roe, even if she had contradicted herself. *Cf. McFlower v. Jaimet*, 349 F.3d 436, 454 (7th Cir. 2003) ("Inconsistencies in a witness's testimony are not unusual either, and normally these are left for the factfinder to assess."). The Board could have found Roe more credible that Doe, even if Roe hypothetically was not perfectly consistent.

Maybe, for the sake of argument, the Hearing Board botched the credibility determination. Maybe, just maybe, Doe was more credible than Roe, but the Hearing Board reached the opposite conclusion. Fact finders sometimes do that – it comes with the territory. The record does not support the conclusion that there was anything nefarious about the Board's credibility determination. A mistaken credibility determination, without more, is not evidence of discrimination.

Needless to say, this Court does not sit in judgment over the Board when it comes to credibility determinations. *See Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99 (D. Mass. 2021) ("[W]hether a different factfinder would assess [Roe's] credibility differently is not a relevant line of inquiry."). The Board had a front row seat at that hearing, and this Court didn't even have a seat at the table. This Court's role is simply to survey the record and decide whether there is any evidence of discrimination. And when it comes to the credibility determinations, there isn't. On this record, the credibility determinations were within the field of play.

Second, Doe points out that Roe consistently called the first and third encounters with Doe "the same," but the Board determined the first encounter was nonconsensual and the third was consensual. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 10, 95 (Dckt. No. 158).

It is true that Roe called the first and third encounters with Doe "the same," but the Board only decided that only the first one was nonconsensual. *Id.* That reality does not get Doe very far when it comes to discrimination.

Again, this Court's job is not to second guess the findings of the Hearing Board. The fact that the Board disagreed with Roe in one part of her story is not evidence of discrimination against Doe.

If anything, it cuts the other way. The Board was listening, thinking critically, and weighing the evidence. Sometimes the scales tilted in Roe's direction, but not always.

### 5.    New Justifications

Doe argues that Loyola is now trying to "bolster the Board's credibility determination with new justifications, arguing that the Board's 'rationale' did not need to include all of the Board's grounds, or even all the significant ones." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 29 (Dckt. No. 157). The argument seems to be that Loyola is coming up with after-the-fact justifications for the Board's decision. Doe then offers a long paragraph and turns on a firehose of reasons.

Doe calls into question a statement by Landis (the Chair), and a statement by Houze (another Board member). Suffice it to say that neither statement is evidence of general bias.

Imagine if Doe is right, and Loyola is now trying to bolster the Board's decision with new justifications. That's not a reason to conclude that the Board's decision was discriminatory. To get to a jury, Doe needs to come forward with evidence that the Board discriminated against him. Taking aim at new arguments by Loyola is taking one's eye off the ball.

### 6.    Not Weighing the Evidence

Finally, Doe argues that Loyola did not actually weigh the evidence.  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 29 (Dckt. No. 157).  The argument is conclusory.  In the end, the argument is little more than an expression of disagreement with the Board's decision.

### B.    The Failure to Interview Doe's Witnesses

The next category is about the witnesses.  Doe argues that Loyola failed to interview his two witnesses, even though he disclosed them to the investigators.  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 30–31 (Dckt. No. 157).  He views the failure to interview those witnesses as evidence of discrimination.  *Id.* at 31.

A refusal to hear evidence from one side can support an inference of discrimination.  *See Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) ("[Purdue] refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false."); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 56 n.10 (2d Cir. 2016) ("[W]hile a factfinder might ultimately determine that [an alternate explanation] was the true reason for not seeking out and interviewing these witnesses, it is also plausible that the failure to seek them out was attributable to discrimination . . . .").  An even-handed approach requires listening to both sides.

But a failure to talk to particular witnesses is not necessarily discriminatory.  It depends on the facts.  And here, this Court directed supplemental submissions from the parties to tighten the record about why the investigators talked to some witnesses but not others.  *See* 9/1/22 Order (Dckt. No. 177).  The parties submitted additional briefs, and gave helpful answers.  *See* Def.'s Supplement Summary Judgment Submission, at 3 (Dckt. No. 178); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 3 (Dckt. No. 179).

The starting point is Loyola's Community Standards, which require interviews with relevant witnesses. "Investigators will . . . interview complainant(s), respondent(s), and relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 158).

The investigators did interview Roe's roommate and best friend, Witness #1, who is a woman. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40. The interview took place on December 7, 2016, a few days after the interviews of Roe and Doe. *See* Final Investigation Report, at 3 (Dckt. No. 135-6).

The Final Investigation Report includes a detailed summary of statements by Witness #1. On the night of the first sexual encounter, Roe told Witness #1 what had happened. *See* Final Investigation Report, at 13–14 (Dckt. No. 135-6). The summary was granular and graphic, including details about the removal of clothing and the acts that followed. *Id.* She had detailed knowledge about later interactions, too, including Roe crying after the third encounter. *Id.* at 7.

Doe offered the names of two potential male witnesses, his roommate (C.R.) and a friend (W.T.). *Id.* at ¶ 42. But the investigators never interviewed them. *Id.* at ¶ 43. According to Doe, Loyola's decision to interview Roe's female witness but not his two male witnesses is proof of sex discrimination.

The record confirms that Doe gave the investigators the names of the two witnesses. But as it turns out, there is no evidence that he asked the investigators to interview them. Doe testified: "I provided the interviewers with names of witnesses. I do not recall if I definitively asked them to interview them." *See* Doe Dep., at 224:22-24 (Dckt. No. 136-43); *see also id.* at 224:3-4 ("I didn't know I would have to ask them if I presented them with witnesses."). He did

not submit written statements from them at the hearing because he assumed that the investigators would talk with his witnesses. *Id.* at 225:6 – 226:4; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 102 (Dckt. No. 158).

At deposition, Doe initially testified that he gave the investigators the names of "crucial" witnesses. *See* Doe Dep., at 224:7-10 (Dckt. No. 136-43). But he soon walked it back, explaining that he isn't sure that he ever characterized the witnesses as crucial when talking with the investigators. *Id.* at 224:14-15.

The record includes testimony from the investigators about why they did not interview Doe's two witnesses. Watland could not recall why they did not interview W.T. "I don't recall a specific thought process around that. I mean, I know we didn't interview W.T., but I don't remember the thought process behind that." *See* Watland Dep., at 108:6-8 (Dckt. No. 136-47); *see also id.* at 109:3-5 ("I don't recall any requests for him to be a witness. And I don't – I don't recall believing that he had any direct information about what had occurred.").

Watland offered more details in a declaration. "John mentioned two roommates during his interview but did not state during his interview that either of the roommates observed his sexual encounters with Jane. Instead, he reported that Jane met both of his roommates in John's room *before* Jane and John went into John's bedroom on January 13, 2016. John told us that W.T. observed John and Jane in Jane's residence hall the night after the January 13, 2016 sexual encounter. John did not report that he told his roommates or W.T. about what happened during John's sexual encounter with Jane on January 13, 2016 or any other day." *See* Watland Dec., at ¶ 4 (Dckt. No. 136-40) (emphasis added).

Tennison also testified about the decision not to interview W.T. Apparently, Doe and Roe walked to campus after their first sexual encounter and went to W.T.'s dorm room. *See*

Tennison Dep., at 163:15 – 164:10 (Dckt. No. 136-46).  Before long, Roe said that she was tired

and wanted to go back to her room.  (And Doe kept asking her – in front of W.T. – *why* she was

tired.)

When asked why he didn't interview W.T., Tennison testified:  "I don't think – as I

described witnesses earlier, I don't think there is discrepancy here that WT would help animate."

*Id.* at 165:15-17; *see also id.* at 166:12-14 ("[I]t did not appear that WT would have anything to

add to the story that we didn't already know.  There was no point in discrepancy here.").

Tennison testified that they "interviewed everybody that we deemed necessary to produce

the report."  *Id.* at 176:13-14.  But he could not recall any conversations about the possibility of

interviewing W.T.  *Id.* at 177:5-7.

The record sheds a little bit more light about why they did not do any more interviews.

On November 30, 2016, before interviewing Doe and Roe, Tennison sent an email to Love about

their time pressures, including possible delays if they had to schedule witness interviews.  "I

should also mention that our working assumption is that we will not have to schedule additional

interviews with witnesses, which would obviously delay our timeline and completion of the FIRs

[Final Investigation Reports]."  *See* 11/30/16 Email (Dckt. No. 135-19).

On December 2, 2016, Watland left a voicemail for Love, asking for his two cents about

whether it made sense to interview anyone else.  "[W]e had met with our on-campus complainant

yesterday.  And I wanted to talk through whether or not you thought some of the other students

that were somewhat aware of some of the issues would be appropriate to contact as witnesses, to

get some insight from you."  *See* Voicemail (Dckt. No. 164-91, at 3 of 5).

In his appeal, Doe submitted declarations from C.R. and W.T.  *See* C.R. Dec. (Dckt. No.

135-22, at 5 of 9); W.T. Dec. (Dckt. No. 135-22, at 6 of 9).  C.R. shared an apartment with Doe,

and he was there when Doe brought Roe to the apartment on the night of the first sexual encounter. *See* C.R. Dec., at ¶ 4. He stated that Doe and Roe went into a bedroom, and stayed there for about an hour. *Id.* at ¶¶ 5–6. He never heard anything like "no," "stop," or anything along those lines. *Id.* at ¶ 7.

W.T. saw Doe and Roe after their first sexual encounter, when Doe brought Roe to W.T.'s dorm room. *See* W.T. Dec. (Dckt. No. 135-22, at 6 of 9). Both Doe and Roe "seemed happy, were friendly with each other and talkative." *Id.* at ¶ 6. The next few times he saw Roe, she "had only positive and affectionate things to say" about Doe. *Id.* at ¶ 7. But she was angry with Doe a few weeks later. *Id.* at ¶ 8.

Overall, W.T. and C.R. seem like "relevant witnesses" as defined by Loyola's Community Standards. Relevant witnesses are people who "can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16). C.R. saw Doe and Roe before the first encounter, and was in the next room during that encounter. W.T. saw Doe and Roe after the first encounter, when they came to his dorm room.

The demeanor of a person after a critical event can shed light on what happened. In fact, Witness #1 gave a statement that Roe was crying after the third encounter. If the demeanor of Roe after the third encounter is relevant, then the demeanor of Roe after the first encounter seems relevant, too.

Doe also is right that, under the Community Standards, he didn't have to *ask* the investigators to interview witnesses. That was their job. The parties agree that, according to Loyola's procedures, "the interviewers will interview relevant witnesses." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158).

56

SA56

Even so, the question is not whether the investigators should have interviewed the witnesses. The question is whether the failure to do so could give rise to an inference that the university discriminated against Doe.

On this record, the Court holds that no reasonable jury could conclude that the failure to interview the witnesses had anything to do with the fact that Doe was a man. The record shows that the investigators were under time pressure, and they reached out to Love about whether it would make sense to interview any other witnesses. That's not consistent with a discriminatory intent.

Watland and Tennison did not give the world's most illuminating explanation of why they decided not to interview W.T. and C.R. The investigators seemingly believed that those two witnesses would not shed any light. But it is hard to know whether witnesses are important without talking to the witnesses.

Maybe the investigators concluded that the witnesses were unimportant, even without talking to them, because Doe did not give them the sense that they were important. Again, Doe could not remember ever telling the investigators that the witnesses were crucial.

The question is not whether their explanation was fully satisfying. It wasn't. The question is not whether the investigators should have interviewed those witnesses. Or, at the very least, the question is not *simply* that. The question is whether a reasonable jury could find that the investigators decided not to interview Doe's witnesses for discriminatory reasons. And here, the Court concludes that that bridge is a bridge too far.

**C. Hostility by the Board**

Doe's third category is about the tone of the hearing. Doe argues that the Board displayed hostility toward him, and he views the hostility as evidence of bias. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 31–32 (Dckt. No. 157).

Doe offers two examples of hostility. First, Doe points out that the Board failed to ask some of his questions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 69–70 (Dckt. No. 158). At the hearing, Doe spoke up and asked to clarify the record. He asked: "Can we get clarification on what, I can't picture it, but I know it happened, means? Because if you can't picture an act that you're claiming happened, how do you – like how do you know that that's what happened? Like do you understand what I'm trying to say?" *Id.* (quoting Hearing Transcript, at 77:10-16 (Dckt. No. 135-1)).

Houze responded: "I can think of a number of instances where I'm sure that something happened, but I can't picture it, to be straightforward with you." *Id.* (quoting Hearing Transcript, at 77:17-19).

Doe takes umbrage at that response. At deposition, Doe testified that he felt that Houze was scowling at him, and chastising him. *See* Doe Dep., at 122:1 – 123:17 (Dckt. No. 136-42). Houze had a "furrowed brow, a very I guess cocky attitude." *Id.* at 123:7-8. Houze looked at Doe, and at Doe's advisor, "in an extremely hostile manner." *Id.* at 122:17-19.

Second, Doe offered evidence about the handling of advisors at the hearing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 158). The Board allowed Roe to speak with her advisor four or five times. *Id.* (citing Doe Dep., at 80:17 – 81:3 (Dckt. No. 135-42)). But Doe testified that, when Houze issued a "stern reminder" that advisors should not help the parties, "he was staring directly at [Doe] and [his] advisor." *Id.* (quoting Doe Dep., at 84:11-12).

According to Doe, that stare suggested that the warning was only directed at him and his advisor. *Id.*

It was important for the Board to handle the hearing in an even-handed way, with fair and respectful treatment of each side. Everyone wants to be treated that way. The Board could not have its thumb on the scale for either side before the process got underway.

Still, even when viewed in a light favorable to Doe, the evidence cannot support the inference that the Board displayed hostility to Doe at the hearing. On this record, a failure to ask Doe's questions cannot support an inference of sex discrimination. Doe points to only one example, and the Board member responded that clarification wasn't necessary.

To be frank, it wasn't the greatest of questions. (In that setting, this Court wouldn't have asked those follow-up questions, either.) Even when viewing the evidence in favor of Doe, there isn't much there.

The atmospherics and tone of the hearing are more difficult to evaluate. A cold written record never conveys the human dynamics of a hearing. People communicate in all sorts of ways that a transcript cannot capture. Anyone who has ever appeared in court, or attended a deposition, knows the limits of a transcript. Written words imperfectly capture humanity.

A speaker's volume, speed, and tone of voice send signals, not to mention the speaker's facial expressions and body language. People say a lot when they are speaking, above and beyond the words that they use. So much happens, and so much is felt, that isn't written down.

Still, the transcript is all there is. After reviewing the transcript, the Court concludes that the Hearing Board conducted the hearing in a professional manner. And more importantly for present purposes, the content of the hearing simply cannot support a finding of hostility toward Doe because of his sex.

### D.    Substantive Procedural Errors

Doe's final category is about substantive procedural errors.  Once again, Doe unleashes an avalanche of arguments, which carries the risk of burying good ones.

One argument deserves special mention.  Khan Harvey met with Roe on January 26, 2016, less than two weeks after the first sexual encounter on January 13.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 161).  Khan Harvey wrote a summary of what she heard:  "[Roe] shared that on two separate occasions, [Doe] 'moved too quickly sexually' which made the student uncomfortable.  While *she doesn't believe she was forced or coerced*, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her."  *Id.* (emphasis added).

The parties agree that the investigators and the Hearing Board never heard anything about that statement.  *See* Def.'s Supplement Summary Judgment Submission, at 1 (Dckt. No. 178) ("It is factually correct that the Board never knew about Rabia Khan Harvey's ('Khan Harvey') impressions about what Jane Roe ('Jane') said to Khan Harvey and that the Board did not receive or review Khan Harvey's notes from the January 26, 2016 meeting with Jane."); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 1 (Dckt. No. 179); *see also* Love Dep., at 255:14-20 (Dckt. No. 136-46).

It is difficult to understand why the university did not give the investigators and the Board that witness summary.  True, maybe Khan Harvey was simply capturing her impressions of what Roe said, not memorializing her exact words.  For the sake of argument, take that assumption as a given.  Even so, it is hard to understand why Loyola neglected to tell the investigators and the Board about what Khan Harvey had written down about Roe.

After all, Khan Harvey spoke with Roe less than two weeks after the incident.  So it was relatively fresh in Roe's memory.  And Khan Harvey was one of the first people at the university to talk with Roe about what happened.  (Roe talked with her athletic coach first.)

Khan Harvey was not your Average Joe when it came to misconduct of this nature. She was the Deputy Title IX Coordinator, and was responsible for overseeing sexual misconduct cases involving students.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 161). She indirectly supervised Title IX investigators and hearing board officers.  *Id.*  She was an important person in Loyola's Title IX ecosystem.

So, even if Khan Harvey merely gave her impressions, those impressions had value. That's why she had the job.  It was within her wheelhouse, to put it mildly.  If her impressions weren't important, one wonders why Loyola put her there.

Still, Loyola's Community Standards didn't entitle Doe to discovery.  The standards only required Doe to receive evidence that the Hearing Board considered.  *See* 2016–2017 Community Standards § 409.6(c) (Dckt. No. 128-16) ("The complainant(s) and respondent(s) will have at least two (2) days to review the Final Investigation Report and any other relevant information *that will be considered by the board*.") (emphasis added).  So, the fact that Doe didn't see the summary did not violate Doe's rights under those standards, because the Board didn't see it either.

Again, when it comes to the Title IX claim, the question is not whether Loyola violated its standards.  The question is not whether Loyola should have given the Board more information.  And the question is not whether Loyola treated Doe fairly overall.  The question is whether sex discrimination was the driving force behind Loyola's failure to share this witness summary with the Board.

Here, there is no such evidence.  Maybe, for a witness statement like this, it wouldn't take

much.  But there needs to be something more than a failure to provide evidence – even if the

underlying evidence is as powerful as the witness statement here.

Tim Love, Loyola's Associate Dean of Students and Interim Deputy Title IX

Coordinator, prepared this section of the Final Investigation Report.  He made the decision to

mention Roe's meeting with Khan Harvey, and the decision not to include the substance of that

conversation.  *See* Def.'s Supplement Summary Judgment Submission, at 1–2 (Dckt. No. 178);

Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 1–2

(Dckt. No. 179).

When asked why he didn't tell the investigators or the Board about the summary, Love

testified:  "So procedurally, I was just talking about the steps that were taken, not necessarily the

substance."  *See* Love Dep., at 251:9-10 (Dckt. No. 136-46).  He couldn't offer any explanation:

> Q:    Why didn't you put in the final investigation report that Jane had
>       previously said that she didn't believe that she was forced or coerced?
>
> A:    I don't recall.
>
> Q:    Is that a mistake?
>
> A:    I don't – I don't recall.
>
> Q:    Do you agree with me that it would be relevant for the hearing officers to
>       hear that Jane, on a previous occasion, said that she didn't believe she was
>       forced and coerced in connection with the same encounters that are at
>       issue in Jane's claim in this case?
>
> A:    Again, it really depends on the details of the case.  The investigation did
>       explore her feelings of being uncertain on how – what to make – how to
>       make sense of the incident that she experienced that was I believe
>       referenced in other materials.

*Id.* at 254:6-22.  Importantly, Love testified that he did not make a conscious decision to

withhold that information from the investigators and the Board:

> Q:    Sir, did you make a conscious choice not to include the statement that Jane
>       made to Rabia Kahn Harvey, as Rabia Khan Harvey reports, that:  Jane
>       doesn't believe she was forced or coerced?  Did you make a conscious
>       choice not to put that in the FIR?
>
> A:    No.

*Id.* at 254:24 – 255:6.

Love couldn't give much of an explanation for his failure to share potentially explosive evidence about a statement from the accuser.  The question, then, is what to do about the lack of an explanation.  There is something to be said for the argument that this evidence is so powerful that withholding it seems difficult to explain in a good way.

But at the end of the day, the burden rests on Doe.  It isn't enough for him to show that the investigators and the Board lacked evidence that they should have received.  He needed to come forward with evidence that they did not have Khan Harvey's write-up because of a discriminatory animus.

That inferential leap isn't far away.  But here, it is beyond the reach of the evidence.  Doe needed more to bridge the gap, and he didn't quite get there.

Love's failure to share Doe's statement with the investigators, the Board, and Doe seems, well, lousy.  If accused of something, any of us would want to know what the accuser had said early on, especially if it seemed inconsistent with what he or she said when it counted at a later hearing.  Everyone recognizes the value of a prior inconsistent statement.  Withholding that information seems unfair.

But fairness, writ large, is not the yardstick.  The question is not whether the university followed fair procedures, or gave Doe a fair chance to challenge the veracity of Roe's account. The standard is whether the failure to share that information was intentionally discriminatory, not whether it was unfair.  *See Hayden ex rel. A.H. v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569,

## SA63

583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."); *Doe v. Marian Univ.*, 2019 WL 7370404, at *9 (E.D. Wis. 2019) ("Merely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent."). Something can be unfair, but not discriminatory. Doe needed to come forward with evidence of discrimination, and he didn't quite get there.

True, at some point, the unfairness of a hearing could become so great that it gives rise to an inference of discrimination. At some point, if an accused is getting railroaded, it could support an inference that an illicit purpose drove the unfairness. Repeatedly getting the short end of the stick can give rise to an inference of discrimination. A jury could connect the dots if there are enough dots to form a picture of discrimination. But that's not this case.

Doe piles on with a few more arguments, suggesting that Loyola provided him with deficient and misleading information about the charges and his rights, and gave him an incorrect version of the Final Investigation Report for him to review two days before the hearing. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 33–34 (Dckt. No. 157). After surveying the record, the Court sees no support for a potential finding of discriminatory animus.

<p style="text-align:center">*     *     *</p>

Doe provided the Court pages and pages of arguments and documents. But he failed to come forward with enough evidence to support a finding of sex discrimination by a reasonable jury. His evidence might show mistakes by Loyola, or misjudgment by the Board. But it did not paint a picture of discrimination on the basis of sex.

Accordingly, the Court doesn't need to consider the more general evidence Doe provides (meaning, the evidence about outside influences and Loyola's sexual assault case statistics). Those buckets only become relevant when he has "combine[d] [them] with facts creating an

<p style="text-align:center">64</p>

<p style="text-align:center">**SA64**</p>

inference that, in *his specific case*, the institution treated him differently because of his sex." *See Johnson*, 829 F. App'x at 732.

In the end, Doe failed to provide evidence that Loyola treated him differently because of his sex. Loyola's motion for summary judgment on the Title IX claim (Count I) is granted.

## II.    Breach of Contract

The second claim is breach of contract. The parties agreed that "the Community Standards created a contract between the parties." *See* Def.'s Mem. in Support of Summ. J., at 29 (Dckt. No. 131). Doe argues that Loyola breached the contract by failing to comply with its policies about disciplinary proceedings. *See* Am. Cplt., at ¶¶ 215–18 (Dckt. No. 19); Def.'s Mem. in Support of Partial Summ. J., at 9–15 (Dckt. No. 160); Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 36 (Dckt. No. 157).

Both parties moved for summary judgment on this claim. The parties devote a significant portion of the real estate in their briefs to the standard for a breach of contract claim in the context of a student disciplinary proceeding. The Court will pin down the applicable standard, and then will apply it to the facts. In the end, there is no evidence of a breach.

### A.    The Standard

The parties agree that Loyola can expel students for violating the Community Standards. But they disagree about the amount of deference that Loyola should receive when it expels a student.

Loyola argues that it deserves deference when it makes decisions about student discipline. *See* Def.'s Resp. to Pl.'s Mtn. for Partial Summ. J., at 2 (Dckt. No. 160). And because of that deference, Doe should face a heightened burden to prove a breach of contract. That is, according to Loyola, Doe must "show that Loyola's dismissal decision was 'without any

discernable rational basis.'" *Id.* (quoting *DiPerna v. Chicago Sch. of Prof. Psych.*, 893 F.3d 1001, 1007 (7th Cir. 2018)).

In contrast, Doe argues that a heightened burden does not apply. *See* Pl.'s Mem. in Support of Partial Summ. J., at 14 (Dckt. No. 127); Pl.'s Reply in Support of Mtn. for Partial Summ. J., at 3 (Dckt. No. 168). According to Doe, "courts typically defer to a university's academic judgments, but that deference does not apply when 'academic judgment had nothing to do with [plaintiff's] dismissal.'" *See* Pl.'s Mem. in Support of Partial Summ. J., at 14 n.11 (quoting *Bosch v. NorthShore Univ. Health Sys.*, 2019 IL App (1st) 190070, 440 Ill. Dec. 486, 155 N.E.3d 486, 499 (2019)).

Ordinarily, in a breach of contract case, one side does not receive deference (unless the contract says it does) when it comes to a breach. If parties make a deal, and one side allegedly breaks it, a court usually does not put a thumb on the scale in favor of either side.

But when it comes to disciplinary decisions, a deferential standard of review makes sense because the underlying decision is a judgment call. If discretion is baked into the decision, it is hard not to apply a deferential standard, because discretion is an inherent part of the deal. That is, the parties know, going into the contract, that the school would have some discretionary powers.

That rationale might break down when it comes to express procedural rights – say, the right to know the charges, or the right to appear at a hearing and present evidence, and so on. The parties wouldn't expect the university to have discretion to take away procedural protections (unless the school's policy says so).

In the disciplinary setting, universities have to make judgment calls about what to do with particular students. The exercise of judgment in academic affairs comes with a measure of

deference.  "Illinois courts have expressed a reluctance to interfere with academic affairs and

have held that a student's breach of contract claim must involve decisions that were arbitrary,

capricious, or made in bad faith." *Columbia Coll. Chicago*, 933 F.3d at 858.

In *Columbia College*, the Seventh Circuit addressed a Title IX claim brought by a male

student.  There, as here, the student received disciplinary action from the school based on a

finding of sexual misconduct.  *Id.* at 854.  And there, as here, the student claimed that the

university "violated its own policies and procedures by failing to provide him with an impartial

investigation and adjudication."  *Id.* at 858.  He argued that he "was not provided with access to

the documents related to his hearing," and that the decision was against the weight of the

evidence.  *Id.*

The Seventh Circuit applied a deferential standard to the school's disciplinary decision.

"Columbia would not be liable even if we find it exercised its academic judgment unwisely;

rather it must have disciplined a student without any rational basis."  *Id.*  In other words, "[t]he

burden on Doe is high.  To find in his favor we must find that Columbia 'did not exercise its

academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of plaintiff.'"

*Id.*

The Seventh Circuit followed the same thread in *DiPerna v. Chicago School of

Professional Psychology*, 893 F.3d 1001 (7th Cir. 2018).  There, the Seventh Circuit reviewed

the expulsion of a student accused of plagiarism.  *Id.* at 1003.  The Court of Appeals reiterated

that Illinois "'courts are reluctant to interfere with the academic affairs *and regulation of student

conduct* in a private university setting,'" so "breach of contract claims brought by a student

against a private college or university are subject to a distinct standard."  *Id.* at 1007 (emphasis

added) (quoting *Raethz*, 805 N.E.2d at 699).  Notice that the discretion extends beyond academic

decisions – it covers the "regulation of student conduct," too.  *Id.*

Other courts have applied the same approach, affording deference to schools in the

disciplinary setting when the claim involves breach of contract.  *See Liu v. Nw. Univ.*, 78 F.

Supp. 3d 839, 848 (N.D. Ill. 2015) ("[A] student's breach of contract claim against a private

university is treated somewhat differently from a typical breach of contract claim, with Liu

required to allege not only a breach but also that Northwestern's conduct was arbitrary,

capricious, or in bad faith."); *Raethz v. Aurora Univ.*, 346 Ill. App. 3d 728, 282 Ill. Dec. 77, 805

N.E.2d 696, 700 ("[I]n the student-university context, a student may have a remedy for breach of

contract when it is alleged that an adverse academic decision has been made concerning the

student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*.") (emphasis

in original).

Doe leans on an Illinois Appellate Court decision, but it offers no support.  *See Bosch v.

NorthShore University Health System*, 2019 IL App (1st) 190070, 440 Ill. Dec. 486, 155 N.E.3d

486, 499 (2019).  The court in *Bosch* evaluated a breach of contract claim involving the

expulsion of a student.  *Id.* at 491.  The plaintiff said that the university fabricated reasons to

expel him because they didn't like him.  *Id.*

The Illinois court acknowledged the heightened standard for school-expulsion cases:

"[S]chool-expulsion cases involving academic decisions stand on a very different footing than

garden-variety breach-of-contract actions.  That's because courts have long expressed their

reluctance to second-guess the decisions of educators on questions of academic performance."

*Id.* at 496; *see also id.* ("[W]e will only reverse an educational institution's academic decision if

we find it to be arbitrary and capricious or the product of bad faith or malice.").

The court then clarified that "'wholly invented' criticisms" are precisely the sort of evidence that satisfies the heightened standard. *Id.* at 499. "If those claims are not allegations of bad faith, malice, and the absence of any valid professional judgment, it's hard to imagine what allegations *would* suffice." *Id.* (emphasis in original).

*Bosch* doesn't help Doe's cause. If anything, *Bosch* recognized that universities receive deference, and that a higher standard applies when bringing a breach of contract claim about disciplinary proceedings. The language about fabricated evidence did not change the standard. Instead, it applied the standard.

Doe then points to the Seventh Circuit's decision in *Purdue*. But that case involved due process, not breach of contract. *See Purdue Univ.*, 928 F.3d at 663 ("When a right is protected by the Due Process Clause, a state 'may not withdraw [it] on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct has occurred.' Determining what is fundamentally fair is always a context-specific inquiry. Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct.") (citations omitted).

This Court holds that Loyola is entitled to deference on its decision to expel Doe. The question is whether Loyola made the decision to expel Doe "without any discernable rational basis." *DiPerna*, 893 F.3d at 1007. "Or, put another way, the student must show the decision was 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Id.* (citation omitted). In sum, to bring a breach of contract claim under Illinois law, Doe must show that Loyola acted arbitrarily, capriciously, or in bad faith.

69

## SA69

**B.    The Facts**

Doe has a heavy burden, and on this record, he can't carry it.  He makes three arguments, but cannot show a breach.  *See* Pl.'s Mem. in Support of Mtn. for Partial Summ. J., at 9–15 (Dckt. No. 127).

**1.    Roe's Statement to Khan Harvey**

First, Doe argues that Loyola violated the Community Standards by failing to obtain Khan Harvey's write-up saying that Roe "didn't believe she was forced or coerced."  *Id.* at 11. As Doe sees it, the investigators had a duty to get their hands on all relevant evidence.  And by failing to obtain that write-up and share it with him, they dropped the ball.

Doe relies on a few procedural rights that students have in disciplinary proceedings.  *See* 2016–2017 Community Standards § 401.4 (Dckt. No. 128-16).  Students have the right to "review all documentation concerning the potential policy violations," and to "refute information provided by witnesses."  *Id.*  The investigators also must "[c]oordinate the collection of all relevant information, which may include written statements by the complainant(s), respondent(s), and/or witnesses."  *Id.* at § 409.6(b).

Doe argues that Khan Harvey's report contained "relevant information" because it reflected information from Roe about the incidents.  Again (as any reader who has made it this far undoubtedly remembers), Khan Harvey met with Roe in January 2016, and later wrote: "[Roe] shared that on two separate occasions, the [Doe] 'moved too quickly sexually' which made the student uncomfortable.  While *she doesn't believe she was forced or coerced*, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her."  *See* Def.'s Resp. to Pl.'s Statement

of Facts, at ¶ 11 (Dckt. No. 161) (emphasis added); *see also* Pl.'s Resp. to Def.'s Statement of

Facts, at ¶ 7 (Dckt. No. 158).

Love knew about that summary when he wrote the "History of the Case" section of the

Final Investigation Report.  He wrote that Roe had met with Khan Harvey on January 26, 2016.

*See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 28 (Dckt. No. 161).  But he didn't write

anything about the substance of their conversation, including whether Roe felt forced or coerced.

*Id.*  He didn't attach Khan Harvey's summary, either.  *Id.* at ¶ 28.

As a result, the investigators and the Board never saw the summary.  They never knew

what Roe had said to Khan Harvey, and they never heard anything about Khan Harvey's

impressions of Roe's statements.[8]  *Id.* at ¶ 30.

That omission is not enough to prove a claim.  At best, Doe has pointed to important

evidence that the investigators and the Board should have received.  Doe basically argues that the

record was incomplete, and failed to include key information from the accuser.

Fair enough.  Even so, that omission is not enough to show that the university's decision

was "arbitrary, capricious, or made in bad faith."  *Columbia Coll. Chicago*, 933 F.3d at 858.  It is

a far cry from the situation in *Bosch*, where the university fabricated evidence.  *See Bosch*, 2019

155 N.E.3d at 499.  The record here cannot support a finding by a reasonable jury that Loyola

failed to investigate in good faith.

---

[8]  The parties view the write-up differently.  Doe believes that Khan Harvey wrote down what Roe said.
Loyola believes that Khan Harvey merely wrote down her impressions of what Roe had said.  The parties
filed cross motions for summary judgment, and for each motion, the Court has to view the evidence in a
light favorable to the non-movant.  So, for purposes of Doe's motion, the Court has to view the record in
a light favorable to Loyola, and vice versa.  In the end, whether Khan Harvey captured what Roe had said,
or merely wrote down her impressions form the interview, is not material.

### 2.  The Recordings

Next, Doe makes an argument about the recordings.  As before, part of the argument involves the failure to preserve the recordings.  (The university apparently destroyed them at some point after the hearing, but the parties don't say exactly when that happened.)

Doe also argues that the Board should have listened to the recordings before making its decision.  And the Board should have given Doe that opportunity, too.  *See* Pl.'s Mem. in Support of Mtn. for Partial Summ. J., at 10 (Dckt. No. 127) (arguing that Loyola breached the contract "by (a) failing [to] give John [Doe] access to the audio recording of his interview, and (b) relying on the written summary of John's interview without reviewing the best evidence (*i.e.,* the audio recording) of what John actually said during the interview before concluding that John's statement at the hearing contradicted an 'implied' statement in the FIR").  According to Doe, the recording would have confirmed his side of the story.

But again, there is no evidence that the university destroyed the recordings in bad faith.  And at the hearing, the Board did look into whether Doe was inconsistent.  The Board requested clarification from the investigators about what Doe had said, and the investigators confirmed the accuracy of their summary.

The Community Standards did not require the Board to go back to the recordings and figure out what, exactly, Doe said.  The Community Standards did not impose a "best evidence" rule.  In effect, the Board decided that it could rely on the statements from the investigators, without relying on the recordings.

There is no evidence that the Board made that decision in bad faith.  In sum, it was not arbitrary and capricious for the Board to rely on the statements of the investigators.

SA72

If anything, the Community Standards undercut Doe's clam.  The standards do not suggest that the Board can hear the recordings if it wants to.  Instead, they do the opposite.  The standards say that the record recordings are "collected . . . for the sole purpose of *preparing* the Final Investigation Report."  *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16).  And only the investigators will hear the recordings:  "The University reserves the right to audio record each individual interview collected during meetings for the sole purpose of preparing the Final Investigation Report.  These audio recordings will not be shared beyond the Investigators."  *Id.*

Doe relies on a general provision about access to evidence.  But there is a more specific provision that addresses the handling of the recordings.  The specific wins over the general.  "The more specific provision of a contract governs where it arguably conflicts with a more general provision."  *See Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 813 (7th Cir. 2013); *Grevas v. U.S. Fidelity & Guar. Co.*, 152 Ill. 2d 407, 178 Ill. Dec. 419, 604 N.E.2d 942, 944 (1992) ("Courts and legal scholars have long recognized that, where both a general and a specific provision in a contract address the same subject, the more specific clause controls.").

In sum, Doe lacks evidence that the university breached the contract when it came to the recordings.

### 3.    The Appeal

Doe ends with a bootstrap argument.  He argues that Loyola breached the Community Standards during the investigation and the hearing (as explained above), and therefore should have granted his appeal.  The bootstrap works when the shoe is on the other foot, too.  No underlying breach, no wrongful denial of his appeal.

###### 4.       **Implied Contractual Obligations**

Finally, Doe makes a few arguments about implied contractual obligations.  But they cover the same ground – the recordings, the write-up by Khan Harvey, and so on.  There is nothing new, so the Court will not replow old ground.

### Conclusion

For the reasons stated, the Court denies Doe's motion for partial summary judgment and grants Loyola's motion for summary judgment.

Date:  September 28, 2022

Steven C. Seeger
United States District Judge

SA74

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

Case: 1:18-cv-07335 Document #: 182 Filed: 09/30/22 Page 1 of 1 PageID #:8314
Case: 22-2925    Document: 18    Filed: 01/20/2023    Pages: 143

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| John Doe, | |
| Plaintiff, | |
| v. | Case No.  1:18-cv-7335 |
| | Judge Steven C. Seeger |
| Loyola University Chicago, | |
| Defendant. | |

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff
and against defendants
in the amount of $         ,

which ☐ includes         pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒ in favor of defendant(s) Loyola University Chicago
and against plaintiff(s) John Doe

---

☐ other:

---

This action was *(check one)*:

☐ tried by a jury with Judge         presiding, and the jury has rendered a verdict.
☐ tried by Judge         without a jury and the above decision was reached.
☒ decided by Judge Steven C. Seeger on defendant's motion for summary judgment (Dckt. No. [130]).
Civil case terminated.

Date:  9/30/2022                    Thomas G. Bruton, Clerk of Court

                                   Jessica J. Ramos, Deputy Clerk