## No. 22-2925

# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE,

*Plaintiff-Appellant,*

v.

LOYOLA UNIVERSITY CHICAGO,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:18-cv-07335.
The Honorable **Steven Charles Seeger**, Judge Presiding.

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

ABIGAIL E. SMITH
  *Counsel of Record*
RYAN ANSLOAN
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street
Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
abby.smith@thefire.org
ryan.ansloan@thefire.org

ROBERT L. SHIBLEY
ALLEN HARRIS PLLC
920 U.S. Hwy. 64 West #1045
Apex, NC 27523
Tel: (610) 634-8258
rshibley@allenharrislaw.com

*Attorneys for Amicus Curiae Foundation for Individual Rights and Expression*




Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2925

Short Caption: Doe v. Loyola University of Chicago

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  Foundation for Individual Rights and Expression

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  Allen Harris PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s/ Abigail Smith    Date: January 27, 2023

Attorney's Printed Name: Abigail Smith

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 510 Walnut St., Ste. 1250

     Philadelphia, PA 19106

Phone Number: 215-717-3473    Fax Number: 267-573-3073

E-Mail Address: abby.smith@thefire.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2925

Short Caption: Doe v. Loyola University of Chicago

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Foundation for Individual Rights and Expression

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Allen Harris PLLC

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Ryan Ansloan     Date: January 27, 2023

Attorney's Printed Name: Ryan Ansloan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✔]

Address: 510 Walnut St., Ste. 1250

Philadelphia, PA 19106

Phone Number: 215-717-3473     Fax Number: 267-573-3073

E-Mail Address: ryan.ansloan@thefire.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2925

Short Caption: Doe v. Loyola University of Chicago

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Foundation for Individual Rights and Expression

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Allen Harris PLLC

(3)     If the party, amicus or intervenor is a corporation:

i)          Identify all its parent corporations, if any; and

   None

ii)          list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Robert L. Shibley          Date: January 27, 2023

Attorney's Printed Name:  Robert L. Shibley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address:  920 U.S. Hwy. 64 West #1045

 Apex, NC 27523

Phone Number: 610-634-8258          Fax Number:

E-Mail Address: rshibley@allenharrislaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... v

INTEREST OF *AMICUS CURIAE* ...................................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT .......................................................................................... 7

    I.    The District Court's Decision Violated This Court's Precedent in *Purdue* ............................................................ 7

        A.    In *Purdue*, this Court recognized the relevance of background pressures and patterns of misconduct to Title IX claims. ................. 7

        B.    Without *Purdue*'s holistic pleading standard, colleges and universities escape accountability for Title IX discrimination. ................. 12

    II.    Other Circuits Have Recognized the Importance the *Purdue* Standard ............................................................ 15

        A.    Summary Judgment: Tenth Circuit. ......................... 16

        B.    Motion to Dismiss: Second, Sixth, and Ninth Circuits. .................................................................... 19

    III.    FIRE's Work Demonstrates Frequent Abuse of Title IX Procedures by Colleges and Universities. ............... 23

        A.    Schools regularly adopt Title IX procedures that deny students a fair process. ............................... 24

        B.    Schools regularly employ procedurally defective Title IX procedures to punish disfavored students and student groups. ................. 27

CONCLUSION ...................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Doe v. Oberlin Coll.*,
   963 F.3d 580 (6th Cir. 2020) ................................................ 5, 19, 20, 21

*Doe v. Purdue Univ.*,
   928 F.3d 652 (7th Cir. 2019) ...................................................... passim

*Doe v. Regents of the Univ. of Cal.*,
   23 F.4th 930 (9th Cir. 2022) ............................................................ 4, 22

*Doe v. Univ. of Denver*,
   1 F.4th 822 (10th Cir. 2021) ..................................................... 16, 17, 18

*Doe v. Univ. of S. Ind.*,
   43 F.4th 784 (7th Cir. 2022) ........................................................ 12, 15

*Fraternity of Alpha Chi Rho, Inc. v. Syracuse Univ.*,
   70 Misc. 3d 1223 (N.Y. Sup. Ct. 2021) ................................................ 29

*Menaker v. Hofstra Univ.*,
   935 F.3d 20 (2d Cir. 2019) ....................................................... 5, 19, 20

*Schwake v. Ariz. Bd. of Regents*,
   967 F.3d 940 (9th Cir. 2020) .............................................. 5, 19, 21, 22

## Other Authorities

Ari Cohn, *FIRE's Second Letter to Syracuse University*, FIRE
   (June 13, 2018) .................................................................................. 28

Brian Stokes Mitchell, *Through Heaven's Eyes, on The Prince
   of Egypt* (Universal Music Group 1998) ............................................. 15

College of William and Mary, Compliance & Equity Office,
   *Student Discrimination and Title IX Complaint Procedure* .............. 27

FIRE, *Spotlight on Due Process 2017* .......................................... 5, 24, 25

FIRE, *Spotlight on Due Process 2021–2022*.........................................6, 24

FIRE, *Syracuse University threatens to expel students for satirical fraternity 'roast'; fires professor who defended free speech* (May 7, 2018)...............................................................28

Jacob Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 Calif. L. Rev. 881 (2016) .................................................8

Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) ........................................8

Madeleine Ngo, *Biden's Pick for Education Dept.'s Civil Rights Chief Squeaks Through Senate,* New York Times (Oct. 20, 2021)............................................................9

Massachusetts Institute of Technology, Committee on Discipline Rules, *Hearing Rules* ...................................26

Zachary Greenberg, *Letter to E. Gordon Gee, President, W.V. Univ.*, FIRE (Dec. 7, 2018) ...........................................29, 30

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Because colleges and universities play an essential role in preserving free thought, FIRE places a special emphasis on defending these rights on our nation's campuses. Since 1999, FIRE has successfully defended the rights of individuals through public advocacy, litigation, and participation as *amicus curiae* in cases that implicate civil liberties, including the due process rights of accused students in campus misconduct proceedings. *See, e.g.*, Brief of FIRE as *Amicus Curiae* in Support of Appellant and Reversal, *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858 (8th Cir. 2020); Brief of FIRE as *Amicus Curiae* in Support of Applicants, *Thien v. Bd. of Supervisors of La. State Univ.*, 271 So. 3d 195 (La. 2019); Brief of FIRE as *Amicus Curiae* in

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. Plaintiff-Appellant has consented to the filing of this brief. At the time of filing Amicus FIRE had not received a response from counsel for Defendants-Appellees and has accordingly filed a concurrent motion for leave.

Support of Plaintiff-Appellant, *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019).

FIRE has a direct interest in this case because the district court's decision, if allowed to stand, could gut the Title IX standards established by this Circuit in *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), that have subsequently been adopted in several other circuits across the country. FIRE has seen firsthand the willingness of university administrators to abandon due process requirements for students accused of sexual harassment or assault when faced with federal investigation and campus pressure. FIRE files this brief in support of Plaintiff-Appellant to urge this Court to stand by its precedent in *Purdue* and reaffirm that Title IX's promises of nondiscrimination apply to all students regardless of gender.

## SUMMARY OF ARGUMENT

Colleges and universities nationwide are under enormous regulatory, legislative, and public pressure to address the problem of sexual misconduct on campus through many means, including Title IX disciplinary proceedings. Too often, these proceedings involve serious substantive and procedural errors that consistently favor one side, often

that of female accusers. There's a clear reason for these mistakes: When it comes to incentives, the deck is stacked against accused males. Title IX administrators may face federal investigation or calls for their firing if they fail to expel enough males accused of sexual assault—which is exactly what happened at Loyola University in the instant case. But those same administrators know to deny any sex-based animus in their decisions, even when doing so makes their decisions appear incompetent or unfair on other grounds.

As a result, a pattern of such errors is often the only concrete indicator an accused student has that unlawful sex discrimination has affected his or her own Title IX proceeding. That is true even if each individual error could be dismissed as a one-off "mistake" when considered in isolation. Insisting that a sex discrimination plaintiff prove at summary judgment that each and every individual abuse *separately* demonstrates sex-based animus, as did the district court below, leaves accused students with no realistic prospect of vindicating their rights following a biased disciplinary process except when the institution actually admits to having an unlawful motive for its decision—a rare situation indeed.

This Circuit wisely recognized this trap in *Purdue University*, 928 F.3d 652 (7th Cir. 2019). Declining to adopt "formal doctrinal tests" to determine whether a university disciplinary proceeding was unlawfully biased under Title IX, this Court instead asked, "do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex?'" *Id.* at 667–68. In that case, the Court found that "taken together"—even if not on an individual basis—Doe's allegations both of the significant pressure on Purdue's Title IX office to increase punishments *and* of a pattern of procedural irregularities by Purdue's Title IX office were sufficient to plausibly allege sex discrimination. *Id.* at 670.

This Circuit's decision in *Purdue* has been highly influential among its sister circuits. Since its issuance, at least the Second, Sixth, Ninth, and Tenth Circuits have adopted similar standards, recognizing that, as the Ninth Circuit astutely put it, "at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the [institution's] protests otherwise." *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022). *See also Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021) (same, at the

summary judgment stage); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020) (same, at motion to dismiss stage); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 950 (9th Cir. 2020) (same); *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) (applying identical analysis to a similarly pled Title VII claim).

For more than two decades, *amicus* FIRE has advocated for the due process rights of students and faculty facing university discipline on campus, in the press, in the courts, and in the halls of Congress and state legislatures. As a result, FIRE has had a front-row seat to the discrimination and procedural violations that too often take place at our nation's colleges and universities. Indeed, FIRE's 2017 research into policies at 53 top U.S. universities revealed a nationwide campus environment so hostile to basic procedural protections that nearly three-quarters did not guarantee students a presumption of innocence in all campus proceedings, and fewer than half even required impartial factfinders. FIRE, *Spotlight on Due Process 2017*, at https://www.thefire.org/research-learn/spotlight-due-process-2017

[https://perma.cc/LXL8-JH5N].[2] Against this backdrop, denying John Doe and similar plaintiffs the ability to ask a factfinder to even *consider* whether a highly suggestive pattern of abuses against them resulted from sex discrimination makes a mockery of Title IX's promises.

Under *Purdue* and its successor, *Doe v. University of Southern Indiana,* 43 F.4th 784 (7th Cir. 2022), Title IX's promise that "[n]o individual," regardless of sex, shall be subjected to sex discrimination in federally funded education programs has actual meaning for all students accused of sexual misconduct in this Circuit. The district court's decision, if adopted, would deny students subjected to biased proceedings any real chance to challenge these abuses—and thus compromise the reliability and reputation of campus tribunals. To once again protect fundamental fairness in campus disciplinary proceedings, this Court should reverse the decision below and reaffirm its holding that evidence of sex-related pressure or bias must be considered holistically with evidence of significant procedural or substantive errors when evaluating claims of sex discrimination in Title IX proceedings.

---

[2] As FIRE's most recent due process Spotlight Report explains, today's results are no better. *See* FIRE, *Spotlight on Due Process 2021-2022,* at https://www.thefire.org/research-learn/spotlight-due-process-2021-2022 [https://perma.cc/G38T-8NAX].

# ARGUMENT

## I. The District Court's Decision Violated This Court's Precedent in *Purdue*.

The district court's opinion was not only wrong, it also violated binding Seventh Circuit precedent. Had the district court applied the mode of Title IX analysis endorsed by this Court, it would have sent Doe's Title IX claim to trial.

### A. In *Purdue*, this Court recognized the relevance of background pressures and patterns of misconduct to Title IX claims.

The leading Seventh Circuit case on Title IX sex discrimination claims by accused male students is *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019). In that case, this Court addressed a similar fact pattern to the one at issue here: A male student filed a Title IX discrimination lawsuit against Purdue University after he was found "guilty of sexual violence" against a fellow student, resulting in a year-long expulsion and the loss of his Navy ROTC scholarship.[3] *Id.* at 656. This Court rejected the use of "formal doctrinal tests to identify general bias in the context of university discipline" that some other courts employ and accurately observed that "these categories simply describe ways in

---

[3] The case also involved several other claims not relevant to this brief.

which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Id.* at 667. In *Purdue*, this Court instead held that "[w]e prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex'?" *Id.* at 667–68.

Fleshing out what this test might mean in practice, the opinion noted two important types of evidence that can, when properly pled, "raise a plausible inference" of sex discrimination against males. The first was general pressure on the university from both on- and off-campus sources to more aggressively go after males accused of sexual assault. In particular, the Court discussed the newly aggressive stance of the U.S. Department of Education's Office for Civil Rights (OCR) in the early 2010s and the influence of its 2011 "Dear Colleague" letter[4] on Title IX disciplinary procedures:

> The Department of Education made clear that it took the letter and its enforcement very seriously. *See* Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health,

---

[4] Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011), at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [https://perma.cc/UHP7-RB9L] *See also* Jacob Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 Calif. L. Rev. 881, 931–45 (2016) (discussing "a growing perception that the post-[Dear Colleague letter] pressure that OCR exerted has caused schools to adopt procedures and practices that deny fairness to accused students" and offering examples).

Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.) ("[S]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over.").

*Purdue*, 928 F.3d at 668.[5] This Court opinion further noted that "[o]ther circuits have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim." *Id.* And while it wrote that "the letter, standing alone, is obviously not enough to get John over the plausibility line," the Court considered this "backdrop" as factually relevant to the plausibility of sex discrimination when viewed in conjunction with other "facts raising the inference that Purdue acted at least partly on the basis of sex in his particular case." *Id.* at 669.

The *Purdue* court also recognized evidence of repeated procedural misconduct toward the male accused student as a second type of relevant evidence for Title IX claims. In that case, the factual allegations of due process violations were similar in nature to those Doe has provided

---

[5] The same Assistant Secretary Lhamon whose hostile statements were relied upon by this court in *Purdue* was in charge of OCR while John Doe in this case was undergoing investigation at Loyola in the fall of 2016, and has resumed her post as of October 2021 under President Biden. *See* Madeleine Ngo, *Biden's Pick for Education Dept.'s Civil Rights Chief Squeaks Through Senate,* New York Times, at https://www.nytimes.com/2021/10/20/us/politics/lhamon-biden-education-senate.html [https://perma.cc/2RFZ-QESR].

evidence of in this case. For example, the *Purdue* opinion noted "that [Purdue Dean of Students] Sermersheim chose to credit [accuser] Jane's account without hearing directly from her." *Id*. Similarly, "the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account." *Id*. The panel members also appeared to show "hostility toward John from the start of the brief meeting." *Id*.

As then-Judge Barrett wrote for a unanimous panel of this Court, given the panel's decision to favor Jane's account despite the total lack of indicators of credibility, "[i]t is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man." *Id*. This Court also noted that in the same month as the hearing, Purdue Title IX administrators shared a *Washington Post* article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Id*.

Perhaps the most important element of the *Purdue* standard is that this Court considered allegations of outside pressure and procedural misconduct *holistically*, rather than dissecting each alleged fact in isolation, as the district court did in this case. The case held that, "*[t]aken*

*together*, John's allegations raise a plausible inference that he was denied an educational benefit on the basis of his sex." *Id.* at 670 (emphasis added). The opinion did not examine each of these factual allegations, devoid of context, to determine whether each could best be explained individually as a result of sex discrimination. Rather, it looked at the case presented by all the facts in context. This approach is far more suited to the reality of how invidious discrimination manifests itself today in all but the most extreme or outrageous cases: not through individual instances of open and aggravated hostility, but through the aggregate impact of accrued mistreatment and unfairness over time.

In a follow-up case, *Doe v. Southern Indiana*, this Court reaffirmed *Purdue*'s holistic approach, even while finding against the plaintiff's claims of discrimination:

> To put the point in arguably circular terms, procedural irregularities may support a finding of sex bias under Title IX if, in light of all the circumstances, a fact-finder is convinced that the defendant deviated from proper procedures not because of human error but by design, to achieve covertly what it could not do openly: discriminate against the plaintiff on the basis of his sex. "[A]s the number of irregularities increases, or the irregularities become more serious," it begins to look less likely that the errors were due to benign reasons. *Samford University*, 29 F.4th at 697–98 (Jordan, J., concurring) (collecting cases).

11

*Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022). The opinion further pointed out that considering discrimination in this fashion this is hardly novel: "We have often made essentially this point about departures from regular procedure in employment discrimination cases. The same reasoning can apply under Title IX." *Id.* at 793–94 (citations omitted).

**B.    Without *Purdue*'s holistic pleading standard, colleges and universities escape accountability for Title IX discrimination.**

The district court's opinion in this case is a perfect example of how easily colleges and universities can evade Title IX liability if this Court's holistic pleading standard from *Purdue* and *Southern Indiana* is not applied. Even the district court, which ultimately accepted Loyola's defense of gross (but not sex-motivated) incompetence, could barely contain its incredulousness at Loyola's behavior towards Doe. For example, the district court characterized Interim Deputy Title IX Coordinator Tim Love's decision not to tell the hearing board about "potentially explosive evidence," Appellant's Br. & App., Dkt. 18 at SA63 (D. Ct. Op.)—namely, that another Title IX administrator had initially recorded that Doe's accuser "[didn't] believe she was forced or coerced"—

as "difficult to understand," *id.* at SA60, "hard to understand," *id*., and "difficult to explain in a good way," *id.* at SA63, adding that that it seemed both "lousy" and "unfair," *id*. Yet because the district court considered this decision in artificial isolation from all of its other indefensible decisions, it refused to acknowledge that a genuine dispute of material fact existed as to the motivation behind this action, and blocked a jury from considering it.

The district court made similar observations of inexplicable incompetence when discussing Loyola's decision not to interview any of Doe's witnesses, despite interviewing his accuser's. The court noted that Loyola's Title IX investigators "did not give the world's most illuminating explanation of why they decided not to interview" the witnesses, and that "[t]he investigators seemingly believed that [Doe's] two witnesses would not shed any light. But it is hard to know whether witnesses are important without talking to the witnesses." *Id.* at SA57. Even while visibly laboring to give Loyola the benefit of the doubt, the court could not help but admit that "[t]he question is not whether their explanation was fully satisfying. It wasn't." *Id.*

But the district court was wrong: Loyola's lack of a satisfying explanation *is* at issue, when Doe's case is properly considered under this Court's standard in *Purdue*. Because while the lack of a satisfying explanation for one procedural error may not create a dispute of material fact on its own, it certainly opens a Pandora's box of questions when viewed in the context of the long litany of other procedural offenses against Doe and the pressures on Loyola at the time. Those included enforcement threats latent in the 2011 Dear Colleague letter; the Title IX pressure campaign taking place on Loyola's campus at the time, including demands that Love be fired, *see* Dkt. 18 at 23–25 (Appellant's Br.); and Loyola Deputy Title IX Coordinator Rabia Khan Harvey's avowal that "it was Loyola's goal to stay off" OCR's list of universities under investigation in 2016, when the investigation into Doe occurred. *Id.* at 23.

Checking this kind of inherent bias is what makes the *Purdue* standard so essential. Just as a single thread in a tapestry can never see its purpose in the pattern of the grand design, neither can a single act prove a pattern of discrimination except in the most egregious of cases. Brian Stokes Mitchell, *Through Heaven's Eyes, on The Prince of Egypt*

(Universal Music Group 1998). But when several acts and background pressures are "[t]aken together," *Purdue*, 928 F.3d at 670, and viewed "in light of all the circumstances," *Southern Indiana*, 43 F.4th at 793, "it begins to look less likely that the errors were due to benign reasons." *Id.* And here there is at least a very open question as to whether those less-than-benign reasons involved sex discrimination against Doe. An open question like that is for a jury to resolve at trial, not the district court to ignore at summary judgment.

## II.    Other Circuits Have Recognized the Importance the *Purdue* Standard.

The wisdom of this Court's reaffirmation of its own precedent in *Purdue* is buttressed by the vast array of other federal circuits that have adopted it. At least four other circuits have applied the same holistic pleading standard employed in *Purdue*. In so doing, they all found that similar facts, whether substantiated at summary judgment or alleged in the complaint, could plausibly demonstrate gender-based discrimination under Title IX (or Title VII, under similar framing). This independently counsels in favor of reversing the district court.

## A.     Summary Judgment: Tenth Circuit.

Most instructive is the Tenth Circuit's decision to vacate summary judgment in favor of a university in *Doe v. University of Denver*, 1 F.4th 822 (10th Cir. 2021).[6] First, the court expressly adopted this Court's *Purdue* framework of holistically asking whether "the facts alleged, if true, raise a plausible inference that the university discriminated against [the student] 'on the basis of sex'?" *Id.* at 830 (quoting *Purdue*, 928 F.3d at 667–68).

The court next turned to the specific facts at issue, which bear a striking resemblance to those the district court considered here. As in this case, the investigators in *Denver* interviewed all of Jane Roe's witnesses but "initially refused to interview all five witnesses proffered by John [Doe]." *Id.* at 832. Just as the district court in this case determined that Doe's witnesses were not interviewed because "[t]he investigators seemingly believed that those two witnesses would not shed any light," Dkt. 18 at SA57 (D. Ct. Opinion), the investigators in *Denver* declined to interview Doe's witnesses because of "the duplicative nature of the information that [these] individuals were expected to provide."

---

[6] As in this case, all cases discussed in this section refer to the female complainant as Jane Roe and the accused male student as John Doe.

*Denver*, 1 F.4th at 832. The *Denver* court noted that "the same could be said for Jane's eleven witnesses that investigators opted to interview." *Id.* Put differently, Doe's witnesses could only be seen as "duplicative" because the investigators had already formed their opinion of events based solely on accounts from Roe's witnesses—the exact chain of events that transpired in this case.

The *Denver* court was also concerned by another procedural issue: "[W]hen viewed in the light most favorable to John," the Final Report reviewed by the disciplinary committee "can be construed as ignoring, downplaying, and misrepresenting inconsistencies in Jane's account of the alleged assault." *Id.* The court was careful to note that because of this, the Final Report itself "does not mention any of [Roe's] inconsistencies." *Id.* at 833. As such, the actual disciplinary body that decided to expel Doe was completely unaware of his accuser's inconsistencies. But that didn't matter in the eyes of the *Denver* court: the Report drafters' decision to omit it during the investigative process was sufficient to leave an open question of fact as to gender bias.

Ironically, the Tenth Circuit in *Denver* showed greater fidelity to Seventh Circuit precedent than did the district court in this case, which

17

viewed extremely similar actions by Loyola, considered them in isolation, and professed itself unable to believe that anyone could discern a sex-discriminatory pattern to them. The court conceded that during the investigation, Loyola possessed a conflicting account Roe gave to Deputy Title IX Coordinator Khan Harvey "less than two weeks after the incident" that stated Roe "doesn't believe she was forced or coerced," Dkt. 18 at SA60 (D. Ct. Opinion)—a whopping inconsistency from a very credible source. But Loyola "did not give the investigators and the [disciplinary review] Board that witness summary." *Id.* Loyola provided no explanation for that omission, and the court noted that "this evidence is so powerful that withholding it seems difficult to explain in a good way." *Id.* at SA63. Despite all this, the district court *still* held that no reasonable jury could construe it as evidence of "discriminatory animus." *Id.*

In *Denver*, these procedural deficiencies in the "investigation and treatment" of John Doe were sufficient to raise "a plausible inference that [the university] discriminated against John on the basis of his sex." *Denver*, 1 F.4th at 834. That is consistent with this Court's holdings in

*Purdue.* Here, however, the district court in this case dismissed near-identical evidence out of hand—a reversible error.

### B.    Motion to Dismiss: Second, Sixth, and Ninth Circuits.

At least three other circuits have held that similar facts to those undisputed at summary judgment in this case have been sufficient to survive a motion to dismiss when alleged in a complaint. In *Menaker v. Hofstra University*, the Second Circuit considered whether a complaint adequately alleged discriminatory intent.[7] 935 F.3d 20 (2d Cir. 2019). Among other procedural deficiencies, the court held that the University's "fail[ure] to interview relevant witnesses whom [the plaintiff] brought to the University's attention" and its "termination [of the plaintiff] despite the fact that [a University official] *knew* that at least one of the accusations against him was false" were sufficient to "reflect a clearly irregular investigative and adjudicative process." *Id.* at 34. In ruling against Hofstra's motion to dismiss, the court held that "[w]here a university (a) takes an adverse . . . action against [the plaintiff], (b) in

---

[7] Though a Title VII case, not Title IX, the *Menaker* court noted that "we apply similar principles in both Title VII and Title IX when seeking to identify discriminatory intent." 935 F.3d at 32. Other circuits have relied upon *Menaker* in Title IX cases. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 950 (9th Cir. 2020).

response to allegations of sexual misconduct, (c) following a clearly irregular investigative or adjudicative process, (d) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances support a prima facie case of sex discrimination." *Id.* at 39. In the case of John Doe at Loyola, all these circumstances were not only alleged but substantiated.

The Sixth Circuit took a similar approach to similar procedural irregularities in *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020). It noted that, in addition to allegations of several "procedural irregularities," such as the hearing panel's failure to comment on inconsistencies with Roe's story and the decision to disregard Doe's impeachment evidence, the "strongest evidence is perhaps the merits of the decision itself." *Id.* at 587. Whereas the district court in this case refused to consider exculpatory evidence, such as Roe's contradicting statement to Khan Harvey, *see* Dkt. 18 at SA70–71 (D. Ct. Opinion), as evidence of Loyola's gender bias, the Sixth Circuit in *Oberlin* took the opposite view, holding that "when the degree of doubt [about the merits of the decision] passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of

sex bias." *Oberlin College,* 963 F.3. at 588 (citing *Purdue*, 928 F.3d at 669, for the proposition that "a 'perplexing' basis of decision can support an inference of sex bias"). Again, a sister Circuit followed *Purdue* where the district court (though obligated to do so) did not, by considering procedural irregularities together with "grave doubt" about the merits of the decision to support an inference of sex bias.

The Ninth Circuit has also repeatedly held that allegations of investigations with "one-sided" procedural irregularities suffice to plausibly allege sex-based discrimination under Title IX, particularly when combined with allegations of external pressures on the university to railroad men accused of sexual assault.[8]

In *Schwake v. Arizona Board of Regents*, 967 F.3d 940 (9th Cir. 2020), the court reversed the district court's dismissal of a complaint from a graduate student who was subject to university discipline at Arizona State University (ASU) after being accused of sexual misconduct. Citing *Purdue*, the court reasoned that the university's investigation was "one-

---

[8] Similar external pressures were alleged here, and Plaintiff Doe submitted evidence of them to the district court on summary judgment. However, the district court refused to consider them, because in its view Doe did not "provide evidence that Loyola treated *him* differently because of his sex." *See* Dkt. 18 at SA65 (D. Ct. Opinion) (emphasis added). But as this *amicus* articulates, Doe's evidence of specific gender bias against him by Loyola was more than sufficient to cross the threshold where evidence of external pressures becomes relevant.

sided," in part because ASU "failed to consider [the plaintiff's] version of the alleged assault or to follow up with the witnesses and evidence he offered in his defense," and "ultimately found him responsible for the charges without any access to evidence or considering his exculpatory evidence." *Id.* at 951. When viewed in tandem with the plaintiff's "allegations of a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings" generally at ASU at the time, *id.* at 949, the court held that "sex discrimination is a plausible explanation for the University's handling of the sexual misconduct disciplinary case" against him. *Id.* at 951.

Subsequent Ninth Circuit cases have reaffirmed the necessity this approach. *See, e.g.*, *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 940 (9th Cir. 2022) (denying motion to dismiss when several procedural irregularities were present, including "fact witness testimony supporting Doe's account of the events [being] discounted, while witness testimony supporting Roe's account was accepted," along with evidence of external pressures on the school and a pattern of bias at the school).

In sum, in granting summary judgment against John Doe on his Title IX claim, the district court violated not only this Court's precedent

in *Purdue* but similar, persuasive precedent in at least four other circuits. The virtual unanimity of these courts on this issue provides additional support for a reversal here.

### III.   FIRE's Work Demonstrates Frequent Abuse of Title IX Procedures by Colleges and Universities.

FIRE's research shows that where not explicitly required by state or federal regulations, colleges and universities around the country consistently fail to provide their students with traditional due process protections that Americans often take for granted. The primary purpose of having protections for due process and procedural fairness in *any* setting involving a hearing—not just in courts of law, but in civic, religious, political, and educational institutions of any kind—is precisely to avoid prejudice (and its result, discrimination) from affecting the outcome. Yet colleges and universities throughout our nation, including Loyola, often oppose even the most basic restraints on their discretion to determine hugely consequential and potentially criminal matters. That there is so little standing in the way of unjust and discriminatory outcomes in Title IX cases only serves to highlight the importance of the issues presented in this case.

**A.     Schools regularly adopt Title IX procedures that deny students a fair process.**

Since 2017, FIRE has surveyed the conduct policies at 53 of the country's top universities to determine the extent to which those policies provide students with 10 fundamental procedural protections. Surveyed procedures and policies were limited to those affecting offenses that could result in suspension or expulsion, whether sexual or non-sexual offenses. FIRE, *Spotlight on Due Process 2021–2022*, at https://www. thefire.org/research-learn/spotlight-due-process-2021-2022 [https://perma.cc/G38T-8NAX].

In 2017,[9] FIRE's research found that 79% of surveyed institutions had sexual assault disciplinary policies that provided no more than four of ten "fundamental protections." Those "fundamental protections" included things like "a clearly stated presumption of innocence," "[t]he right to impartial fact-finders," and "[a]dequate written notice of the allegations." *See* FIRE, *Spotlight on Due Process 2017*. Sexual misconduct processes were usually less protective of students' rights than non-sexual misconduct processes. *Id.* Indeed, one university, Washington

---

[9] FIRE's 2017 Report surveyed policies in effect during the 2016 investigation of Doe at Loyola.

University in St. Louis, stunningly managed to provide none of those ten protections, and no school provided them all. *Id.*

One key protection surveyed is the right to receive active assistance from an advisor of the student's choice. Alarmingly, in 2017, only three of the 53 schools surveyed (5.7%) allowed attorneys to participate in sexual misconduct cases with only minor limitations. Most of the institutions surveyed (44 out of 53), if they allowed advisors at all, allowed them only to accompany students to meetings with investigators and hearings, refusing to allow the advisor to actively participate or even speak aloud.

As courts of law have long recognized, the ability to receive active assistance from an advisor is critical to a fair proceeding. Leaving it to a student, presumably with no legal training, to defend themselves in a complicated, high-stakes administrative proceeding that may result in suspension or expulsion is a challenge that can hinder efforts to get to the truth of the matter at issue. And that effect was on display in this case: Doe argues that Loyola's hearing board allowed Roe to speak with her advisor four or five times during the hearing, but when he tried to speak with his own advisor, a board member issued a "stern reminder"

that advisors were not to speak at all during the hearing. Dkt. 18 at SA58 (D. Ct. Opinion).

Another flaw common to college and university disciplinary policies is that they vest broad discretion over the entire process, from the initial complaint to the investigation to the hearing and appeal, to campus administrators. For example, at the Massachusetts Institute of Technology, the chair of disciplinary hearings is granted broad discretion to alter hearing procedures and reject witnesses. Massachusetts Institute of Technology, Committee on Discipline Rules, *Hearing Rules*, Section IX(f)(iv), at http://cod.mit.edu/rules/section9 [https://perma.cc/SXU4-GTR6] ("At any time, the Chair determines whether certain witnesses should appear and decides whether any particular question, statement, or information will be allowed during a hearing. Formal rules of evidence that apply to civil or criminal judicial processes are not applicable."). While the policy provides an outline for the hearing process to students, the policy notes: "The hearing usually proceeds as follows, although the Chair may vary the procedure at their discretion." *Id.* at Section IX(D).

Similarly, the College of William and Mary maintains a policy that allows investigators to "exercise their professional judgment" to "exclude evidence that is . . . confusing." College of William and Mary, Compliance & Equity Office, *Student Discrimination and Title IX Complaint Procedure*, at https://www.wm.edu/offices/compliance/policies/sexual_misconduct/procedure/index.php [https://perma.cc/UC8R-A3GX]. The investigators in charge of Doe's case at Loyola employed similarly unfettered discretion to refuse to interview Doe's witnesses, solely because they were under time pressure and felt the witnesses would not "have anything to add to the story." Dkt. 18 at SA55 (D. Ct. Opinion).

## B.    Schools regularly employ procedurally defective Title IX procedures to punish disfavored students and student groups.

FIRE's case archives demonstrate that institutions across the country frequently take serious disciplinary action against students in ways that leave those students with little meaningful opportunity to defend themselves.

For example, in 2018, Syracuse University punished an engineering fraternity after videos of a private satirical "roast"—performed solely for members of the fraternity—leaked from a private

27

Facebook page without the fraternity's permission. FIRE, *Syracuse University threatens to expel students for satirical fraternity 'roast'; fires professor who defended free speech*, at https://www.thefire.org/news /syracuse-university-threatens-expel-students-satirical-fraternity-roast-fires-professor-who [https://perma.cc/9HF4-4WPD. Syracuse charged the students with a wide variety of disciplinary infractions based solely on the effect their private expression had on the university community, even though the statements were not directed at anyone outside the fraternity. The subsequent hearing was tainted by serious concerns about the hearing board's impartiality and the board's refusal to permit the students to present certain evidence in their defense, including live expert testimony. Ari Cohn, *FIRE Second Letter to Syracuse University*, FIRE, June 13, 2018, at https://www.thefire.org/research-learn/fire-second-letter-syracuse-university-june-13-2018 [https://perma.cc/B8PK-4SG6].

In 2020, Syracuse suspended a different fraternity for a year after an individual—who did not attend Syracuse, was not a member of the fraternity, and was not even on campus at the time of the incident— allegedly shouted derogatory and racially offensive statements at a

Syracuse student. *Fraternity of Alpha Chi Rho, Inc. v. Syracuse Univ.*, 70 Misc. 3d 1223 at *1 (N.Y. Sup. Ct. 2021). Since the individual had been drinking at the fraternity house earlier that day, the fraternity was charged with harassment and suspended for one year. *Id.* at *2. The fraternity appealed, arguing that "the University had made allegations of sexual harassment during the hearing without giving the fraternity any advance notice or allowing it to be represented by an attorney during the hearing." *Id.* The appeals board overturned the ruling, but a school administrator overruled the board and reinstated the suspension. *Id.* The process and result were so extreme that a trial court judge overturned it, holding the entire affair was "arbitrary" and "troubling, particularly in light of claims that the charge against the fraternity was motivated by factors other than its merits." *Id.* at *2, *4.

In another egregious example, in 2018 five fraternities were sanctioned by West Virginia University without receiving notice of the alleged misconduct or of the hearings, thus preventing them from providing any defense to the allegations. Zachary Greenberg, *Letter to E. Gordon Gee, President, W.V. Univ.*, FIRE, Dec. 7, 2018, at https://www.thefire.org/sites/default/files/2018/12/11154304/FIRE-

letter-to-WVU-12-7-18.pdf [https://perma.cc/5GTR-QH2Z]. This action stemmed from a university committee that reviewed the "judicial history" of each chapter, with the goal of imposing changes to Greek organizations. *Id.* This meant that long-resolved incidents from as far back as 2014, as well as charges for which the groups had previously been cleared, were used as the basis of the groups' punishment. *Id.* When questioned about the process for appealing the determinations, the leader of the committee said, "student organizations do not have due process rights; they don't." *Id.*

These three situations demonstrate that what happened at Loyola is not an outlier. Failing to hold universities accountable for the wanton violation of due process will result in further and greater discrimination, more lawsuits seeking redress, and an erosion of civil liberties on campus more generally—to the detriment of students and the educational institutions they attend. While these procedural flaws are hardly restricted to the Title IX context, preserving the ability of Title IX plaintiffs to take their cases to trial will address one part of a much larger problem.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand for trial.

Dated: January 27, 2023

Respectfully submitted,

*/s/ Abigail Smith*
_____

ABIGAIL SMITH
 *Counsel of Record*
FOUNDATION FOR INDIVIDUAL RIGHTS
 AND EXPRESSION
510 Walnut Street
Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
abby.smith@thefire.org

*Counsel for* Amicus Curiae *Foundation for Individual Rights and Expression*

31

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,061 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: January 27, 2023              */s/ Abigail Smith*
                                    Abigail Smith
                                    FOUNDATION FOR INDIVIDUAL
                                      RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 27, 2023, an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: January 27, 2023                    */s/ Abigail Smith*

ABIGAIL SMITH
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut Street
Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
abby.smith@thefire.org

*Counsel for* Amicus Curiae
*Foundation for Individual Rights and Expression*