## No. 22-2925

# In the
# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE,

*Plaintiff-Appellant,*

v.

LOYOLA UNIVERSITY OF
CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:18-cv-07335.
The Honorable **Steven Charles Seeger**, Judge Presiding.

## BRIEF OF DEFENDANT- APPELLEE

Peter G. Land (*Counsel of Record*)
  Peter.Land@huschblackwell.com
Gwendolyn B. Morales
  Gwendolyn.Morales@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Telephone: (312) 655-1500
*Attorneys for Defendant-Appellee Loyola
University of Chicago*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>No. 22-2925</u>

Short Caption: <u>John Doe v. Loyola University Chicago</u>

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  ☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  <u>Loyola University Chicago</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  <u>Husch Blackwell LLP</u>

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and

   <u>N/A</u>

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>N/A</u>

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  <u>N/A</u>

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  <u>N/A</u>

Attorney's Signature: <u>/s/ Peter G. Land</u>    Date: <u>November 3, 2022</u>

Attorney's Printed Name: <u>Peter G. Land</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address: <u>120 South Riverside Plaza, Suite 2200</u>

  <u>Chicago, Illinois 60606</u>

Phone Number: <u>312-526-1631</u>    Fax Number: <u>312-655-1501</u>

E-Mail Address: <u>Peter.Land@Huschblackwell.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 22-2925

Short Caption: John Doe v. Loyola University Chicago

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
     Loyola University Chicago

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
     Husch Blackwell LLP

(3)  If the party, amicus or intervenor is a corporation:

     i)    Identify all its parent corporations, if any; and
           N/A

     ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
           N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
     N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
     N/A

---

Attorney's Signature: /s/ Gwendolyn Morales          Date: November 3, 2022

Attorney's Printed Name: Gwendolyn Morales

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 120 South Riverside Plaza, Suite 2200

          Chicago, Illinois 60606

Phone Number: 312-526-1637                    Fax Number: 312-655-1501

E-Mail Address: Gwendolyn.Morales@huschblackwell.com

                                                                          rev. 12/19 AK

ii

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS....................................i

TABLE OF CONTENTS..........................................................................iii

TABLE OF AUTHORITIES .....................................................................v

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE CASE...................................................................1

    I.    Statement of Facts.................................................................1

        A.    Two Internal Disciplinary Complaints. .............................1

        B.    Loyola's Adjudication of Other Student Gender-Based
               Misconduct Cases ...............................................................6

    II.    The District Court's Decision ....................................................7

SUMMARY OF THE ARGUMENT .........................................................8

ARGUMENT ...........................................................................................9

    III.    Loyola is Entitled to Summary Judgment on John's Title IX Claim. .........9

        A.    The District Court Correctly Applied the Seventh Circuit
               Summary Judgment Standards, Aspects of which John
               Ignores. ...............................................................................9

               1.    The decision below properly followed Johnson v.
                      Marian University......................................................10

               2.    John's arguments avoid applicable law and misstate
                      the district court's analysis....................................11

        B.    Loyola Thoroughly Weighed Consent Evidence in a
               Reasonable Manner. .........................................................14

        C.    John's Attacks on Loyola's Substantive Decisions and His
               Procedural Irregularity Arguments Lack Factual or Legal
               Support. .............................................................................18

               1.    John cannot create any triable issue by claiming this
                      case was about force or coercion. ...........................19

a.   Jane said John lacked permission, not that he engaged in force or coercion. ....................................... 19

b.   The Board did not decide whether there was force or coercion. ......................................................... 20

c.   John relies on evidence separate from Jane's own statements in attempts to conjure "inconsistency" that does not exist............................. 22

d.   Exculpatory evidence cases John cites are inapposite.................................................................. 25

2.   The University's preparation of John's interview summary and use of related audio recording followed procedures.................................................................. 26

a.   Loyola followed Community Standards for interview audio recordings.......................................... 27

b.   Loyola followed procedures for interview summary preparation..................................................... 28

c.   Loyola's deletion of all interview audio recordings in Jane's case followed applicable procedures. ................................................................ 30

D.   John's Other Purported Procedural Irregularities Lack Evidentiary Support. ........................................................ 31

1.   No evidence suggests any Board member had gender bias....................................................................... 31

2.   Love's involvement was minor, and John's effort to amplify it lacks support. ...................................... 34

E.   Even if Considered, Evidence Regarding Purported Bias Outside of Jane's Specific Case Against John Does Not Reflect any Gender Bias. .................................................... 38

IV.   The District Court Properly Granted Summary Judgment in Favor of Loyola on Doe's Breach of Contract Claim. ............................................ 43

CONCLUSION.................................................................................. 47

CERTIFICATE OF COMPLIANCE.......................................................... 48

## TABLE OF AUTHORITIES

**Cases**

*Bosch v. NorthShore Univ. Health Sys.,*
    155 N.E.3d 486 (Ill. App. Ct. 2019) ........................................................ 46

*Cephus v. Blank*
    No. 21-CV-125-WMC, 2022 WL 17668793 (W.D. Wisc. Dec. 14, 2022) .......... 25, 26

*DiPerna v. Chicago Sch. of Prof'l Psychology,*
    893 F.3d 1001 (7th Cir. 2018) ......................................................... 44, 45

*Doe v. Columbia Coll. Chicago,*
    933 F.3d 849 (7th Cir. 2019) ............................... 9, 10, 12, 13, 17, 18, 46

*Doe v. Columbia Univ.,*
    831 F.3d 46 (2d Cir. 2016) .................................................................. 36

*Doe v. Dordt Univ.,*
    19-CV-4082 CJW-KEM, -- F. Supp. 3d ---, 2022 WL 2833987
    (N.D. Iowa 2022) ..................................................................... 25, 44

*Doe v. Grinnell Coll.,*
    473 F. Supp. 3d 909 (S.D. Iowa) ........................................................ 43

*Doe v. Marian Univ.,*
    No. 19-cv-388-JPS, 2019 WL 7370404 (E.D. Wisc. Dec. 31, 2019) ............ 17, 18

*Doe v. Purdue Univ.,*
    928 F.3d 652 (7th Cir. 2019) ....................................................... 9, 10, 13

*Doe v. Rollins Coll.,*
    No. 6:18-cv-1069-Orl-37LRH, 2020 WL 8408453 (M.D. Fla. July 13, 2020) ........ 38

*Doe v. St. Joseph Univ.,*
    832 F. App'x 770 (3d Cir. 2020) ......................................................... 41

*Doe v. Texas Christian Univ.*
    No. 4:22-cv-00297-O, 2022 WL 17631668 (N.D. Tex. Dec. 13, 2022) ............ 26

*Doe v. Univ. of Denver,*
    952 F.3d 1182 (10th Cir. 2020) ................................. 13, 17, 18, 33, 36, 37, 40, 41

*Doe v. Univ. of S. Ind.,*
    43 F.4th 784 (7th Cir. 2022) ................................................................. 8

*Doe v. Virginia Polytechnic Inst.*,
    No. 7:19-cv-00249, 2022 WL 3334501 (W.D. Va. Aug. 11, 2022)...........................17

*Doe v. Williams Coll.*,
    530 F. Supp. 3d 92 (D. Mass. 2021) .........................................................................13

*Johnson v. Marian Univ.*,
    829 F. App'x 731 (7th Cir. Nov. 20, 2020) ................................... 8, 10, 11, 13, 14, 39

*Moe v. Grinnell Coll.*,
    556 F. Supp. 3d 916 (S.D. Iowa 2021) ....................................................................44

*Raethz v. Aurora Univ.*,
    805 N.E. 2d 696 (Ill. App. Ct. 2004) ......................................................................44

*Rossley v. Drake Univ.*,
    979 F.3d 1184 (8th Cir. 2020) ............................................................. 13, 17, 18, 40

## JURISDICTIONAL STATEMENT

The jurisdictional statement in the appellant's brief is complete and correct.

## STATEMENT OF THE CASE

### I.     Statement of Facts

#### A.     Two Internal Disciplinary Complaints.

During the 2015-2016 academic year, John Doe was a junior at Loyola University of Chicago ("Loyola"), and Jane Roe was an undergraduate student-athlete at Loyola. Dkt. 128-02 at ¶14; Dkt. 135-06 at PageID #:2482-83.[1] They had three sexual encounters in January 2016. Dkt. 135-06 at PageID #:2482-91. In October 2016, Jane filed a formal complaint of gender-based misconduct regarding those three encounters pursuant to Loyola's Gender-Based Discrimination and Misconduct Policy ("Policy"), contained in the University's Community Standards ("Community Standards"). Dkt. 135-6 at PageID #:2482; Dkt. 135-24 at ¶¶5-6, Dkt. 136-2 at 49-54. Another former student, Elizabeth, filed a complaint accusing John of gender-based misconduct. Dkt. 135-6 at PageID #:2482; Dkt. 135-24 at ¶5.

For each complaint, Loyola followed procedures in its Policy, including an investigation and hearing. Dkt. 136-2 at 52-54; Dkt. 135-24 at ¶¶6, 8; Dkt. 135-6; Dkt. 135-1. Two investigators – Raymond Tennison ("Tennison") and Leslie Watland ("Watland") (collectively the "Investigators") – interviewed the parties and witnesses, audio recorded the interviews, delivered written interview summaries to each interviewee, and prepared a separate Final Investigative Report ("FIR") containing

---

[1] Citations to the district court record are in the form "Dkt. __ at __."

1

all evidence collected for each case, which was shared with the parties and respective hearing boards. Dkt. 136-2 at 53; Dkt. 136-46 at 79, 144-49; Dkt. 136-47 at 15; Dkt. 136-40 at ¶¶2-3, 5-8; Dkt. 135-6 at 2522-25, 2530-32. John reviewed a summary of his interview regarding Jane's allegations, which Watland prepared using the audio recording, and John certified its accuracy twice. Dkt. 136-47 at 75-76, 110, 192-93; Dkt. 136-40 at ¶¶3, 5-6; Dkt. 136-42 at 155-61; Dkt. 135-6 at PageID #:2526-29; Dkt. 135-9; Dkt. 135-10. Jane and a female student, "Witness #1," were interviewed because Jane told Witness #1 about the sexual encounters. Dkt. 136-40 at ¶7; Dkt. 136-47 at 171-73. John did not report that anyone observed or learned about his sexual encounters with Jane.  Dkt. 136-40 at ¶4; Dkt. 135-6 at PageID #:2489-90; Dkt. 135-13 at PageID #:2578; Dkt. 135-15. After each FIR was completed, hearings occurred on December 14, 2016 and December 16, 2016, respectively, before separate hearing boards. Dkt. 135-5; Dkt. 135-7; Dkt. 135-13 at PageID #:2578; Dkt. 135-15; Dkt. 19 at ¶142. The hearing boards issued decision letters on December 20, 2016, finding John not responsible in Elizabeth's case and finding him responsible for a policy violation in Jane's. Dkt. 19 at ¶¶144-45; Dkt. 135-11.

Pertinent aspects of the Community Standards applied during the process included two specific sections.[2] First, this consent definition:

> "Consent," at a minimum, means freely given, mutually understandable permission to engage in a specific sexual activity.  Silence or a person's lack of verbal or physical resistance does not equal consent.  Submission resulting

---

[2] Loyola applied the Policy definitions from the Community Standards in effect in January 2016 (the time of the alleged misconduct) to the adjudication of Jane's complaint, which were the 2015-2016 Community Standards. Loyola followed the procedures in the Community Standards in place at time of Jane's October 2016 complaint contained in the 2016-2017 Community Standards. Dkt. 135-24 at ¶6.

from intimidation, the use of force or the threat of force is not consent. Dkt. 136-26 at PageID #:2865.

Second, a procedure related to witness interview records stating:

> The University reserves the right to audio record each individual interview collected during meetings for the sole purpose of preparing the Final Investigative Report. These audio recordings will not be shared beyond the Investigators. The recordings are not retained as part of an educational record. Audio recordings may be retained as needed at the discretion of the University. Dkt. 136-2 at 53.

A three-hour hearing on Jane's complaint involved a panel of Brian Houze ("Houze"), Angela King-Taylor, and Jessica Landis ("Landis"), (collectively referred to as the "Board"). Dkt. 135-1 at 2-3, 16; Dkt. 135-2; Dkt. 135-6 at PageID #:2462. Statements regarding Jane's claims presented to the Board, included:

> **1st encounter (January 13, 2016):** both parties explained they went to dinner, back to John's apartment, and engaged in sexual activity in his bedroom. Both agreed this activity included Jane removing her sweater and bra, John kissing Jane's bare chest, Jane touching John's penis with her hand and then performing oral sex on him, and him performing oral sex on her. They agree that there was no verbal indication of consent to most activity. They disagreed about other specifics, including the progression of conduct and what conduct occurred. Dkt. 135-6 at PageID #:2483-86, 2489-90; Dkt. 135-1 at 17-21, 23-24, 34-39, 45-46, 48-49, 57-61, 65-66, 71, 78-81, 85-86, 138-39.

> Jane said that: John Doe said he is a "butt guy," Jane said that's good because she had "no boobs," he asked if he would get to see her boobs, and she said "no"; he asked if she would feel better if he kissed her when she was shaking and that she said "no"; they started kissing and he got on top of her, moving down her body and saying her sweater was in the way, which she removed; he was kissing the top of her boobs and pulling bra straps off her shoulders and she unhooked her bra and took it off while her pants were still on; kissing paused and she told him she felt "vulnerable" while her pants were still on; kissing resumed and he took his pants off and pulled his penis out of his boxers on his own; she "shook my head no" when he asked her to get his penis wet; she performed oral sex on him first while her pants were still on; he asked "let's just 69" and she said "no"; he stuck his fingers in the top of her pants and she said "No, no, my pants aren't coming off"; he got on top of her, removed her pants, and performed oral sex on her simultaneously with her doing the same for him;

he asked her to let him watch her pleasure herself, which she did; he knelt next to the bed, inserted his penis in her mouth while using his hand to touch her clitoris; he rubbed his penis on her clitoris without penetrating and asked if he could insert "just the tip" into her vagina and Jane said "no," which she described as "the only thing he ever listened to." Dkt. 135-6 at PageID #:2483-86; Dkt. 135-1 at 25-29, 34-36, 40-42, 45, 52-54, 62, 77-79, 81, 139-140, 152.

John said: Jane non-verbally consented by leaning in to kiss him, getting on top of him while kissing, helping undo his pants and helping take her own pants off before her sweater came off, straddling him with her underwear on, reaching down to touch his penis while his boxers were on, saying "only if you return the favor" when he asked her to perform oral sex on him, touching his penis while his boxers were still on and she was on top of him without him asking her to, saying "yes" when he was performing oral sex on her, and performing oral sex on him. He asserted they never discussed his preference for butts over boobs, he did not ask to kiss her, she was never shaking, she never said "no" to anything, they took her sweater and pants off together, she took off her own bra, the kissing never paused, he performed oral sex on her before she did on him, he never asked Jane to "just touch it" or "get it wet" (referring to his penis) and she did not give him a hand job skin to skin, the two of them did not perform simultaneous oral sex, he did not ask her to pleasure herself while he watched, he did not rub his penis on her clitoris or ask if he could insert the tip into her vagina. Dkt. 135-6 at PageID #:2489-90; Dkt. 135-1 at 27-29, 32-34, 36-39, 48-49, 55, 59-61, 66-67, 70-71, 73-74, 76-77, 79-81, 85-87, 139-140.

**2nd encounter (January 15 or 16, 2016)**: both parties said they met at John's apartment, talked about how things were "moving too fast," and agreed to slow down sexual activity. They disagreed about their interactions as Jane left. Jane said John pushed her against the door, hugged her and began kissing her, used his hand to put her hand on his penis, and stated "see what you do to me." John said he walked her to the door, gave her a hug and a kiss, but did not grab her hand or say what Jane said he did. Dkt. 135-6 at PageID #:2486, 2490; Dkt. 135-1 at 92-93, 96-100.

**3rd encounter (January 17, 2016)**: both parties said they met at John's apartment and engaged in sexual activity, during which they kissed and Jane performed oral sex on him, after John asked her "are you sure?" They disagreed about other specifics. John said the sexual activity occurred on the couch, that they were kissing until Jane touched his crotch with her hand, that, when he asked "are you sure?", Jane said "yeah," and performed oral sex on him on the couch. Jane said the oral sex started in John Doe's bedroom with John taking off his own pants and had his penis hanging out of his boxers, then occurred on the couch, he asked "are you sure?" and she was not certain what she said

4

but could not deny his testimony that she said "yeah." Dkt. 135-06 at PageID #:2487, 2490-91; Dkt. 135-1 at 100-110.

The Board deliberated, weighed evidence focusing on the consent definition's first sentence, and unanimously found Jane's account more credible than John's for several reasons, including: Jane's consistent descriptions of events; John's contradictory statements about whether he and Jane discussed the issue of "coercion" after the first sexual encounter; and John's text referencing "rape" that created doubt as to whether he believed consent had been present. Dkt. 136-49 at 100, 108-113, 122-23, 133, 159-60, 186, 224-25, 231-32, 238-41; Dkt. 136-50 at 13-14, 26, 58-59, 268-70; Dkt. 135-11 at PageID #:2557; Dkt. 135-1 at 116-128. The Board's decision letter ("Decision Letter") listed five sexual acts for which John lacked "permission" and found John responsible for sexual misconduct during the first and second encounters. Dkt. 135-11 at PageID #:2557-61. The Board also determined that there was not any non-consensual conduct during the third encounter. Dkt. 136-49 at 164, 303; Dkt. 136-50 at 49-53.

John appealed this decision. Dkt. 135-13; Dkt. 135-15; Dkt. 136-43 at 221-22. The Community Standards provide grounds for appeal:  (1) new substantive information that could not have been discovered at the time of the hearing and that would have likely changed the outcome; (2) substantive procedural error or error in interpretation of University policy that prevented a fair hearing and decision; and (3) a finding that was "manifestly contrary to the information presented at the hearing" such as a decision that "was clearly unreasonable and unsupported by the great weight of information." Dkt. 136-2 at 54, 58-59. The appeal was assigned to Jack McLean

5

("McLean"), who reviewed written submissions and issued a decision denying the appeal. Dkt. 135-14; Dkt. 135-24 at ¶8; Dkt. 136-51 at 106.

### B.    Loyola's Adjudication of Other Student Gender-Based Misconduct Cases

In addition to the two cases against John (one finding him responsible, the other not), John filed his own case in 2017 against Jane alleging she engaged in sexual activity without his consent during the January 17, 2016 encounter. Dkt. 135-23; Dkt. 136-42 at 44-50. Loyola engaged its usual process to support survivors, until John acknowledged his complaint was not accurate because he did consent. Dkt. 135-3; Dkt. 136-52 at 42-44, 50-52; Dkt. 136-42 at 49-51.

Loyola's records of gender-based misconduct case outcomes against all students from 2013-2019 show Loyola found responsible: (1) 57% of male students accused of "non-consensual penetration"; (2) 56% of male students accused of "non-consensual sexual contact"; (3) 45% of male students accused of "sexual harassment." Dkt. 135-24 at ¶¶13-14 & Ex. 3. Records for that time period show: (1) no women were accused of "non-consensual penetration" or "non-consensual sexual contact"; and (2) of the six women accused of any gender-based misconduct charge, including sexual harassment and sexual exploitation, 50% were found responsible for a policy violation. *Id.* at ¶¶13, 15 & Ex. 3. During the two calendar years straddling the timing of John's cases (2016 and 2017), Loyola's records show male students were found <u>not responsible</u>: (1) 57% of the time when accused of "non-consensual penetration"; (2) 50% of the time when accused of "non-consensual sexual contact"; and (3) 45% of the time when accused of "sexual harassment". *Id.* at ¶¶13, 16 & Ex. 3.

## II.    The District Court's Decision

The district court issued a 74-page memorandum granting summary judgment in favor of Loyola on all of John's claims (gender discrimination under Title IX, breach of contract, and promissory estoppel). SA 1-74.[3] John appealed only the Title IX and breach of contract claims. The district court explained that "the issue is whether the record could support a finding that Loyola treated Doe adversely because he is a man" and "whether Loyola broke its contract with Doe through the disciplinary process." Excerpts of the district court's rationale (from 25 pages addressing gender bias) include:

- "[O]ne salient point stands out. Doe faced two disciplinary proceedings, based on accusations by two women. Doe won one, and lost one. Does has a hard time arguing that the deck is stacked against him, because he won one of the two hands. And even then the Board did not side with Roe on everything. Roe's complaint involved three encounters. The Board sided with Roe on two of them, and sided with Doe on one of them";
- "Evidence about Loyola's handling of Doe's specific case matters most";
- "Needless to say, this Court does not sit in judgment over the Board when it comes to credibility determinations"; and
- "True, at some point, the unfairness of a hearing could become so great that it gives rise to an inference of discrimination. At some point, if an accused is getting railroaded, it could support an inference that an illicit purpose drove the unfairness. Repeatedly getting the short end of the stick can give rise to an inference of discrimination. A jury could connect the dots if there are enough dots to form a picture of discrimination. But that's not this case."

SA 38, 40, 50, 64.

---

[3] This brief cites the district court's opinion in the short appendix filed by John as "SA __."

## SUMMARY OF THE ARGUMENT

Campus reports of sexual misconduct often involve only the two participants with knowledge of what happened, and widely diverging stories. Determining whether there was permission for sexual acts can be difficult, commonly requiring assessments about who to believe and what actually occurred. Yet federal law requires universities to follow their procedures, weigh evidence gathered, and render judgments. When they do in a reasoned way, based on evidence, and choose to expel the accused, gender-bias challenges under Title IX cannot second-guess how university personnel weighed the evidence. *Doe v. University of Southern Indiana,* 43 F.4th 784 (7th Cir. 2022). John Doe's appeal to this Court ignores that principle and barely mentions the only decision of this Court deciding a Title IX respondent's summary judgment challenge, which the district court correctly applied. *Johnson v. Marian University,* 829 F. App'x 731 (7th Cir. 2020) . Consistent with *Johnson,* the district court held that Loyola's decisions about Jane's complaint lacked any fact issue supporting an inference of gender bias in John's specific case; rather, a careful assessment found John lacked Jane's "permission" for five specific sexual acts.

John's appeal arguments avoid essential legal principles and evidence of the university's diligent deliberations or evidence collected as to whether John Doe received permission for sexual acts. Indeed, John never mentions the word "permission" or the consent definition that hinges on it, even though the Decision Letter repeatedly found he lacked Jane's permission. Instead, he presents arguments that rewrite the record, baldly asserting "the sole issue was whether John had forced

or coerced Jane," that evidence about that was withheld, and other procedural "irregularities" occurred. Br. at 16.[4] That erroneous framing of the question at issue seeks to elevate one piece of evidence (noting Jane did not believe she was forced or coerced) beyond its significance to a "materially inconsistent statement" from Jane that Loyola ignored, even though Jane never said she was forced or coerced and the Board never assessed that issue. The district court also correctly held that Loyola's policy language demonstrates adherence to applicable procedures, not anything irregular. All evidence of record supports summary judgment for Loyola, which this Court should affirm.

## ARGUMENT

### III.    Loyola is Entitled to Summary Judgment on John's Title IX Claim.

#### A.    The District Court Correctly Applied the Seventh Circuit Summary Judgment Standards, Aspects of which John Ignores.

John repeatedly cites *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019) as establishing the Title IX summary judgment standard. *Purdue* is a motion to dismiss case that establishes the general framework for the analysis of Title IX claims but not the standard of proof. *Purdue* clarified that a Title IX respondent must present facts which, "if true, raise a plausible inference that the university discriminated against [him] 'on the basis of sex'" *Purdue*, 928 F.3d at 667-68.  *Purdue* and another pleading standard case, *Doe v. Columbia College Chicago*, 933 F.3d 849 (7th Cir. 2019), also clarified that generalized background allegations are insufficient on their own to meet this standard and that a plaintiff "must allege facts raising the inference

---

[4] This brief will refer to John's brief as "Br. __."

9

that [the university] acted at least partly on the basis of sex *in his particular case*."
*Purdue*, 928 F.3d at 669 (emphasis added).

### 1. The decision below properly followed Johnson v. Marian University.

Only one Seventh Circuit case has considered a Title IX respondent case at summary judgment: *Johnson v. Marian University*, 829 F. App'x 731 (7th Cir. Nov. 20, 2020). The *Johnson* Court applied the fundamental principles of *Purdue* and *Columbia College* to the "put up or shut up" stage of litigation that is summary judgment, sharpening its analysis on whether there was evidence of gender bias in the plaintiff's particular case. *Id.* at 733. The Court reiterated that background evidence (external pressure, etc.) can be relevant to this analysis but is insufficient on its own to create a genuine issue of fact without "facts creating an inference that, in [*the plaintiff's*] *specific case*, the institution treated him differently because of his sex." *Id.* at 732 (quoting *Columbia Coll.*, 933 F.3d at 855). *Johnson* focused entirely on whether a trial was warranted based on the evidence regarding plaintiff's specific case, including that the dean who received complainant's report: (1) stated that the events complainant described amounted to violations of university policy based on her report alone; and (2) posted tweets defending Christine Blasey Ford and another woman who complained of harassment. *Id.* at 733. The Court found that the dean's statements demonstrated at most a pro-victim bias, not sex-based bias, and the dean's tweets lacked connection to the plaintiff's case. *Id.* The Court further found plaintiff's "general allegations about the school administration's perceived anti-male culture" insufficient to create a triable issue on sex discrimination without further analysis. *Id.* at 733.

The *Johnson* court's analysis is squarely on point, and the district court properly followed its framework. SA 39-40. Applying *Johnson*, the district court observed that "evidence about the handling of sexual misconduct cases in general 'can be relevant' when deciding whether a university mistreated someone on the basis of sex," but "[r]elevancy is one thing; sufficiency is another," and "[e]vidence about Loyola's handling of [John's] specific case matters most." *Id.* at 40. John needed "evidence of mistreatment in his particular case to get over the summary judgment hump and land at trial." *Id.* at 40, 64-65. Following *Johnson*, the district court then analyzed the alleged examples of case-specific bias John presented. It first considered each such example individually before combining those assessments to find that they did not collectively reflect an inference of gender bias in John's proceeding.

### 2. John's arguments avoid applicable law and misstate the district court's analysis.

Without addressing *Johnson*,[5] John argues that the district court applied an incorrect standard of review by not considering the "totality of the circumstances." Br. at 49. John misstates the actual district court decision, arguing that it: (1) found "John could not prevail because he did not prove each act was done for discriminatory reasons"; (2) determined "because John lacked *direct proof* that each act of mistreatment was due to discrimination, it did not need to consider any *other* evidence"; and (3) "erred by doing what the Seventh Circuit has repeatedly said a court should not: asking whether any particular piece of evidence proves the case by itself rather than aggregating the evidence" to assess whether the evidence created an inference of

---

[5] John's brief cites the decision once and describes it in passing in a footnote. Br. at 26, fn 7.

gender bias in his specific case. Br. at 17-18 (emphasis added). The district court never referenced the concept of "direct proof." Instead, the court devoted 24 pages to analyzing detailed circumstantial evidence John presented regarding the alleged procedural irregularities of his case. The district court also never asserted that John had to prove discriminatory reasons for "each act" but, rather, explained:

- "This Court's role is simply to survey the record and decide whether there is *any evidence* of discrimination" (SA 50, emphasis added); and

- "True, at some point, the unfairness of a hearing could become so great that it gives rise to an inference of discrimination. At some point, if an accused is getting railroaded, it could support an inference that an illicit purpose drove the unfairness. Repeatedly getting the short end of the stick can give rise to an inference of discrimination. A jury could connect the dots if there are enough dots to form a picture of discrimination. *But that's not this case.*" (SA 64, emphasis added).

John's argument also ignores or misstates other key Title IX summary judgment standards, including from other Seventh Circuit cases. John relies upon *Doe v. University of Southern Indiana*, which noted "appellate courts do not quickly infer that procedural errors in a trial show the judge was biased" but if such errors are "sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination." 43 F.4th 784, 793 (7th Cir. 2022). However, John ignores a central tenet of that decision applicable here:

> [T]he federal district and appellate courts do not provide third and fourth forums—after the university committee's hearing and the administrative appeal—to decide what actually happened between Jane and John.

*Id.* at 792; *see also Columbia Coll.,* 933 F. 3d at 856. Instead, where a hearing panel weighs the evidence, including hearing directly from both parties, and assesses credibility to render a decision, courts should not second-guess that assessment, as long

as the panel's "choice to credit Jane's account over John's appears reasonable." *Univ. of S. Ind.*, 43 F.4th at 800; *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1198 (10th Cir. 2020). As one court explained:

> "[W]hether a different factfinder would assess [complainant's] credibility differently is not a relevant line of inquiry. At issue is whether the College met its obligations to provide Doe with a fair disciplinary process consistent with the requirements of the law and its contractual obligations" and presenting "reasons why another factfinder might choose not to credit [complainant's] version of events" cannot create any inference of gender bias.

*Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99, 115 (D. Mass. 2021); *see also Columbia Coll.*, 933 F.3d at 856; *Univ. of Denver*, 952 F.3d at 1194; *Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020).[6]  The district court applied the correct summary judgment standard, and, as explained below, thoroughly evaluated the absence of gender-bias evidence in John's specific case. It correctly determined no jury issue existed. It also acknowledged general evidence John had presented unrelated to his particular case but, as in *Johnson*, correctly determined that such evidence could not create a triable issue of gender bias so declined to analyze it in detail. This Court should affirm those findings.

---

[6] Instead of squarely addressing that courts are not to re-review a disciplinary panel's credibility assessment, John's Brief repeatedly references *Purdue's* language about "perplexing" decision making that can support gender-bias inferences. Br. at 15, 18, 21, 34. He claims the Board's rationale was "perplexing" like in *Purdue,* and specifically cites to a 2022 summary judgment decision in the district court in *Purdue* as allowing judicial disagreement with credibility assessments to create gender-bias inferences. *Id.* at 46. But that case is not this one. In *Purdue,* the female complainant never said or wrote a word; others asserted her claims and had anti-male agendas; and the decision makers did not even read the male respondent's submissions but still found Jane credible and John not. Judge Seeger aptly described *Purdue* as a "difficult starting point for Doe, to put it mildly." SA 41.

Alternatively, as discussed in section I.E below, even if the general evidence John presented were considered, it cannot create any gender-bias fact issue.

**B.      Loyola Thoroughly Weighed Consent Evidence in a Reasonable Manner.**

Pursuant to *Johnson* and the other Seventh Circuit decisions addressed above, the first question at summary judgment is whether Loyola engaged in a reasonable evidence-based analysis. If it did, no inference of gender-bias can stem from disagreements with that judgment. There is voluminous uncontested evidence that the Board carefully evaluated evidence and rendered a reasoned decision about consent. As discussed below, such evidence includes the consent definition within Loyola's policies, information the parties provided, the Board's assessment of such information, and the reasons for the Board's decision that John lacked Jane's permission for certain sexual acts. That evidence shows nothing remotely "perplexing" about the Board's determination because it found Jane never expressed permission.

John's Brief seeks to obscure the focus within Loyola's internal proceeding on whether permission was expressed for sexual activities. He barely mentions the concept of permission, let alone the vast evidence the Board considered on that issue (i.e., the details collected about the interactions between Jane and John). Instead, John describes the sexual encounters from only John's perspective, as if the Board did not consider other evidence. Br. at 5-6. Review of Loyola's careful efforts to render an evidence-based, well-reasoned decision belies any gender bias inference.

14

In accordance with the Community Standards' "consent" definition, the Board weighed evidence to determine if there was "freely given, mutually understandable permission" to engage in each specific sexual activity. Dkt. 136-26 at PageID #:2865. John and Jane presented drastically different accounts as to whether Jane conveyed freely given permission for each activity, including the following:

> John testified: (1) Jane did not verbally consent to any sexual acts during their first encounter but initiated most of the progression from one sexual act to the other, including removing her own sweater, bra, and pants, never expressed any resistance or hesitance, and engaged in many acts while on top of John; (2) during the second encounter, they only kissed and hugged after they talked about slowing things down sexually; and (3) during the third encounter, Jane initiated oral sex and only did so after John asked, "are you sure?" and she agreed. *See* pp. 3-5, *supra*.

> Jane testified: (1) during the first encounter, she verbally sought to reject John's advances five specific times ("no" to seeing her boobs, "no" to the question about kissing, "shook my head no" to the request to get his penis wet, "no" to the request to "let's just 69", and "no, no, my pants aren't coming off" when he stuck his fingers in the top of her pants); John responded to each rejection not by stopping the activity but by pushing Jane to engage in progressively more intimate activity; for instance, he described her sweater as being in the way, pulled the straps of her bra off her shoulders, got on top of her and removed her pants, and rubbed his penis on her clitoris without asking and then asked if he could insert "just the tip" into her vagina, to which she said "no"; (2) during the second encounter, they kissed and hugged after talking about slowing things down sexually, but John then grabbed her hand and pulled it to touch his crotch and said "see what you do to me?"; and (3) during the third encounter, John removed his own pants before asking her "are you sure"? about performing oral sex on him, which she said she could not deny agreeing to. *See id.*

The record proves that the Board weighed all of this by inquiring at the hearing in detail about points of disagreement and discussing the evidence collected during diligent deliberations. Dkt. 135-1 at 17-19, 23-128, 136-40, 152; Dkt. 136-49 at 100, 106-113, 122-23, 132-133, 144, 164, 231-32, 303-04; Dkt. 136-50 at 26, 49-53, 143-44.

Because the accounts about whether Jane had expressed "freely-given, mutually understandable permission" conflicted starkly, the Board focused on each party's credibility. *See* Dkt. 135-11. The Board determined that Jane consistently reported an absence of speech or action conveying her permission for sexual activities during the first and second encounters, including: (1) on January 13, 2016, kissing her, removing her pants, performing oral sex, touching her clitoris while his penis was in her mouth, and rubbing his penis on her clitoris; and (2) on January 15 or 16, 2016, using his hand to put her hand on his penis (over his pants). *Id.* at PageID #:2558-60; Dkt. 136-49 at 61-63, 224. In contrast, during the third encounter (on January 17, 2016), the evidence included John's report that Jane verbally granted permission and Jane's candid inability to deny doing so, which led the Board to find permission was expressed for that activity. Dkt. 136-49 at 164, 303; Dkt. 136-50 at 49-53; Dkt. 135-1 at 110. The Board noted John's very different descriptions of whether consent was present and determined he was less credible than Jane for explicit reasons supported by the record: (1) his contradiction of his own statements to investigators about discussions with Jane related to consent; (2) John's struggle in explaining why he texted Jane after their third encounter about how she might accuse John of "rape." Dkt. 135-6 at PageID #:2538-39; Dkt. 135-1 at 116-28; Dkt. 136-49 at 108, 113; Dkt. 136-50 at 13-14, 268-270. As Houze explained:

> "There were two main considerations around credibility that ultimately for me had me feeling that [John] was less credible. One of those instances [was] the conversation around whether or not John and Jane had discussed coercion and whether or not anyone was coerced on that initial night of sexual interaction. ... Given that it was on the topic of coercion, even though coercion wasn't necessarily a main consideration,

just the notion that they had been discussing coercion or – or weren't, to me indicates there was some notion in John Doe's head possibly that Jane Roe had not been okay with everything that occurred at the time. So that was one aspect. And I'd say the other aspect was finding John Doe's explanation of his text message that, you know, suggested that Jane Roe might accuse him of rape in the future. I didn't find his explanation of that to be particularly convincing or … adequate. … "[I]t suggests to me that he had considered the notion that Jane Roe was not okay with everything that had occurred because that seemed to John to be the – and I quote, 'what made the most sense to him.'"  Dkt. 136-50 at 13-14.

The record demonstrating that the Board's determinations were all evidence-based, and that some sided with each party, precludes any gender-bias inference based on disagreement with how the Board weighed the evidence or the determinations it reached. *See Columbia Coll.,* 933 F.3d at 856 (no gender bias where disciplinary record showed hearing board did not "blindly accept Roe's allegations while finding Doe incredible" but "after considering all of the evidence the hearing panel found some claims were substantiated and others were not"); *Doe v. Marian Univ.*, No. 19-cv-388-JPS, 2019 WL 7370404, at *10 (E.D. Wisc. Dec. 31, 2019)*; Univ. of Denver,* 952 F. 3d at 1198; *Rossley,* 979 F. 3d at 1193; *Doe v. Virginia Polytechnic Inst.*, No. 7:19-cv-00249, 2022 WL 3334501, at *11 (W.D. Va. Aug. 11, 2022) (gender bias lacking because hearing officers finding Doe not responsible for some charges showed they did not merely accept unsupported accuser's version of events).

The district court also correctly evaluated Loyola's deliberations, finding that the Board "was listening, thinking critically, and weighing the evidence," "conducted the hearing in a professional manner," and "did not side with Roe on everything." SA 39, 50, 59. It found that "[o]n this record, the credibility determinations were within the

field of play" to support the Board's decisions that John was responsible for "non-consensual" sexual acts during the first and second encounters and stated it would "not sit in judgment over the Board when it comes to credibility determinations." *Id.* at 30, 50. *See Univ. of Denver,* 952 F.3d at 1198; *Columbia Coll.,* 933 F.3d at 856 (argument that hearing board's decision "was against the weight of the evidence" "does not imply that the board's decision was based on Doe's gender" where "after considering all of the evidence the hearing panel found some claims were substantiated and others were not"); *Rossley,* 979 F. 3d at 1193; *Marian Univ.*, 2019 WL 7370404, at *10.

### C.   John's Attacks on Loyola's Substantive Decisions and His Procedural Irregularity Arguments Lack Factual or Legal Support.

John's Brief does not address the evidence that led the Board to find he lacked "freely given permission" from Jane for various sexual activities, or the legal standards instructing courts not to judge evidence-based assessments of consent determinations. Instead, to conjure up purportedly "lopsided" or "important" procedural irregularities, John frames the basic question at issue in the internal disciplinary proceeding inaccurately (that the Board found John forced or coerced Jane rather than lacked permission) and, within that false rubric, attempts to create non-existent fact issues. Primarily, John argues that (1) Jane made a purportedly inconsistent statement about force and coercion that was wrongly withheld from the Board and (2) the Board's concerns about his credibility could have been resolved by reviewing the audio recording of his interview yet the Board (and appellate officer) refused to do so without any good reason. Br. at 26. Each argument relies on

18

distortions of record evidence or rhetoric unsupported by any evidence, which cannot create a triable issue of fact. John also presents a laundry list of other, cursory challenges to Loyola's processes that are addressed separately below and also cannot withstand careful evidence-based scrutiny.

### 1. John cannot create any triable issue by claiming this case was about force or coercion.

John's first procedural irregularity argument includes extensive misstatement of the record, starting with his summary argument section to this Court. John asserts that, at his hearing, "the sole issue was whether John had forced or coerced Jane into non-consensual sexual activity" and Loyola failed to consider Jane's "materially inconsistent statement" on that very issue. Br. at 16. No evidence in the voluminous records supports these assertions. None. Instead, each of the following is true:

- Jane never said John forced or coerced her;
- The Board never considered whether John forced or coerced Jane; and
- John presents no evidence that anyone actually deciding his case (the Board and Appeal Officer) even contemplated those substantive issues much less decided one way or the other if force or coercion had occurred.

John's focus on whether he "forced or coerced" Jane seeks to create a false narrative in which Rabia Kahn Harvey's notes become a smoking gun that would have undermined Jane's credibility. Review of evidence of record unravels this entire argument.

### a. Jane said John lacked permission, not that he engaged in force or coercion.

A comprehensive review of Jane's statements during the internal disciplinary proceeding prove the fallacy of John's attempt to misstate the fundamental questions at issue. *See* pp. 3-5, *supra.* It is clear from Jane's interview summary and hearing

19

testimony, which the Board assessed to be more likely than not an accurate account of what occurred, that Jane did not express permission for many of the sexual acts at issue, including by verbalizing "no" multiple times. She also acknowledged taking off her own sweater and bra and engaging in various sexual activities that John initiated without stopping or resisting him beyond her outward expressions of not wanting to engage in them, including that she "gave in" to requests after first saying "no." *See* pp. 3-4, *supra*. But Jane never claimed John forced or coerced her; he just did not receive permission. Further, her coach submitted a written report regarding her conversation with Jane stating Jane did not share "specifics" but explained how Jane had said she "felt," which included feeling "pressured to do things physically past the point she was comfortable with, even saying no" and feeling "like what she was talked into certain things she wasn't ready to do." Dkt. 135-6 at PageID #:2502. Those statements are consistent with the evidence Jane presented herself to the Board that led to their findings that there was a lack of permission.[7]

### b. The Board did not decide whether there was force or coercion.

Review of John's statements further reveal what the Board had to actually decide. John agreed that, during the first encounter, Jane never verbally consented; but he reported Jane conveyed her consent by initiating conduct in a variety of ways. *See* pp. 3-5, *supra*. Jane disagreed with most of what John said she initiated. *See id.* Thus, for that first encounter, the Board had to decide whether to believe John or Jane

---

[7] The applicable definition of "coercion" in the 2015-2016 Community Standards includes only "unreasonable pressure" and states that "pressure . . . can be coercion," not that all pressure is coercion. Dkt. 136-26 at PageID #:2894.

about expressions of permission or rejections of advances (verbal and otherwise) and who initiated what conduct. The issue was not whether anyone was forced or coerced. For the second encounter, John denied any sexual activity occurred, creating questions as to whether the sexual conduct occurred at all and, if it did, whether Jane had freely given permission for it. Again, Jane said John grabbed her hand and placed it on his penis, but not in a physically-forcible way; there was no issue of force or coercion. Moreover, for the third encounter, the Board did not find John "innocent" based on any absence of force or coercion but, rather, based on evidence about expressions of permission (Jane's inability to deny saying "yeah" to John's question about whether she was "sure"). Dkt. 135-1 at 110; Dkt. 136-49 at 164, 303; Dkt. 136-50 at 49-53.

Evidence about the Board's decision also reflects it did not consider whether John forced or coerced Jane. Instead, the Board discussed and wrote about a lack of "permission" from Jane and "there was not freely given consent" for sexual conduct in which John engaged during the first and second encounters. Dkt. 135-11 at PageID #:2558-60. As Board members explained, Jane's "account doesn't in any way suggest that permission was freely given or mutually understood," and their evaluation of consent focused on the "first sentence" of the policy definition to evaluate "was there permission for specific sexual activity, was that permission mutually understandable." Dkt. 136-49 at 63; Dkt. 136-50 at 68-69, 74.

The appeal also did not focus on force or coercion. John's written submissions argued Jane had consented because she "showed zero negative response or unwilling

21

behavior," "never yelled out, and never pushed." Dkt. 135-13; Dkt. 135-15; Dkt. 136-43 at 221-22, 227-231; Dkt. 136-51 at 176-77. McLean's written decision listed John's consent-focused arguments and wrote they "fail[ed] to appreciate what 'consent' is, as defined by the Community Standards," and that Jane's "failure to complain, resist, or object or flee, does not amount to consent."  Dkt. 135-14 at PageID #:2585-86; Dkt. 136-51 at 176-77. Again, the appeal letter made no finding about force or coercion. John's arguments to this Court similarly lack appreciation that "consent," as defined within Loyola's policy, means "freely given, mutually understood permission" that can be lacking in situations where a person does not yell or resist *without force or coercion.* Whether John forced or coerced Jane was simply not at issue, and John's suggestion that it was the "sole issue" under review misstates the abundant record.

### c. *John relies on evidence separate from Jane's own statements in attempts to conjure "inconsistency" that does not exist.*

John also asserts that Jane placed "coercion" at issue based on comments by other people, none of which supports his argument. First, he describes Tim Love's ("Love") comment about coercion at the outset of internal proceedings as Love telling John "Jane contended that she was 'coerced' into sexual activity." Br. at 8. The record clarifies that Love told John, in referencing Elizabeth's and Jane's cases, "to me these cases tend to hinge on questions of whether there was pressure, unreasonable pressure, coercion, etc." Dkt. 136-46 at 153-54. Quoting Love but omitting the "to me" part at the beginning implies Jane was the source of that assertion. She was not. Love, based on his limited knowledge of Jane's and Elizabeth's initial assertions, thought that they might involve assertions of pressure or coercion; but a comment

about his own perspective is not evidence of Jane's statements or that she ever contradicted herself.

Second, John references discussion of "coercion" in the Decision Letter as if it reflects that the Board considered whether Jane was actually coerced. Br. at 12. Not so. All Board consideration of the notion of coercion stemmed from John's conflicting statements that "coercion" was *a topic of discussion between himself and Jane* that undermined his credibility. John first told the Investigators he and Jane talked about that issue, then told the Board they did not do so. The board viewed that as self-contradicting testimony. Any testimonial change is important for credibility, but the Board found this one, about whether they discussed phrases relating to consent, fundamentally damaging to John's credibility. Again, this credibility assessment was the only reason the Board talked about, asked questions about, or wrote anything about "coercion."

Third, John argues that notes taken by Kahn Harvey contain a "materially inconsistent statement" from Jane about force or coercion that was withheld from him and the Board. Br. at 36. Again, it is important to note that neither John's Brief nor the record contain citation to any evidence that Jane ever said she **was** forced or coerced. She reported saying "no" and repeatedly communicated an absence of permission. The note at issue contains only Kahn Harvey's impression that Jane "does not believe she was forced or coerced." That is similar and not inconsistent with, everything Jane said in the disciplinary proceeding. John also baldly argues that not knowing about Kahn Harvey's notes "led directly to the board's decision." Br. at 28.

23

Evidence squarely on point (but not in John's Brief) includes supplemental submissions from each party, specifically requested by Judge Seeger, demonstrating the opposite: Kahn Harvey's notes would not have affected the Board's decision. Dkt. 180 at PageID #8235-36. Specifically, Board members confirmed Jane never said there was any force or coercion, and the chair of the Board testified directly as follows:

> Q:  Is this something, a statement, to Rabia Khan that you would have wanted to know as part of your hearing of Jane's claim against John?
>
> A:  I mean, this isn't necessarily inconsistent with what we have in the report.
>
> Q:  So you don't believe that Jane reporting that she was not – she didn't believe she was forced or coerced is inconsistent with anything she's said at the hearing or to investigators or to any of the witnesses?
>
> A:  I'm reading that that's really similar to what she said, talking about the interaction on Sunday.
>
>         \*          \*          \*
>
> Q:  Would you have viewed a statement that Jane did not view the January 13th sexual encounters as being forced or coerced as contradictory to what she said in her interview with the investigators and at the hearing?
>
>         \*          \*          \*
>
> A:  She stated that she said "no" four times, and she was not listened to and things still happened. But that's just blatant; there was not permission to do that. That's not necessarily saying it was force or coercion. It was not listening to someone's request.
>
> Q:  So are you saying, if you had the information that Jane had told Rabia Khan Harvey that the events on January 13, that Wednesday, were not forced or coerced, you wouldn't have put that on the whiteboard as an inconsistent statement with what she said at the hearing and in her interviews? Is that your testimony?
>
> A:  What I can say is this: Looking at this right here, this line of 'while she doesn't believe she was forced or coerced,' that is not inconsistent with the information in the report, because in the report, she's saying she didn't give consent. She's not specifically saying she was forced. She's not specifically saying she was coerced. She's describing her interaction, she's not necessarily looking at force or coercion. She's looking at whether or not there was consent.

24

*Id.*; Dkt. 136-49 at 219-25.[8] Thus, Kahn Harvey's notes of her impressions from her meeting with Jane were not an "inconsistent statement."

### d. *Exculpatory evidence cases John cites are inapposite.*

This situation is also unlike cases John cites where "exculpatory evidence" was not shared. Br. at 26. In *Doe v. Dordt University*, -- F. Supp. 3d ---, 2022 WL 2833987 (N.D. Iowa 2022), the hearing panel received complex evidence, including: that S.S., the student who initiated a complaint concerning a sexual encounter between Doe and Roe, had explicitly stated she wanted Doe removed from campus and blackmailed Doe's roommate into testifying against Doe; there were several conflicts of interest; and information regarding Roe expressing verbal consent and her alleged incapacity due to alcohol consumption would be the only basis for rendering that consent invalid. *Id.* at **6-10, 15-16. *Dordt* also involved multiple additional egregious procedural deficiencies, including that the Title IX Coordinator: (1) prepared two versions of a decision letter, each finding Doe responsible for sexual assault, and provided them to the hearing panel *before the hearing even occurred*; and (2) prepared Doe's appeal packet even though he acknowledged he was not impartial to Doe at that time, and included in that packet his notes that Doe might be "a violent, pattern sexual predator" and a copy of a criminal subpoena although he knew that the criminal case had been dropped for lack of evidence. *Id.* at *9, 11, 18. Second, in *Cephus v. Blank*,

---

[8] John's supplemental response referred to arguments, not evidence (Dkt. 179 at PageID #:8228), relying on the Decision Letter's reference to coercion as "foundational component to determining whether consent was present." But, as noted above, that related to John's contradictions about discussions with Jane about "coercion" and his credibility.

plaintiff's allegations of different treatment based on sex were found sufficient to withstand a motion to dismiss. No. 21-CV-126-WMC, 2022 WL 17668793, at **2, 4, 7 (W.D. Wisc. Dec. 14, 2022). Of particular significance were allegations that the university had failed to obtain exculpatory evidence, including photographs, security camera footage, text messages, toxicology reports and expert testimony that university was aware the police had obtained in connection with its parallel criminal proceeding and that plaintiff ultimately presented at a jury trial that resulted in a not-guilty verdict. *Id.*   Third, *Doe v. Texas Christian University* involved evidence of numerous procedural flaws, including that a text in which Roe stated "I don't think it's rape" was presented to the hearing panel but the panel was instructed to disregard that text. No. 4:22-cv-00297-O, 2022 WL 17631668, at *3 (N.D. Tex. Dec. 13, 2022).

The unreviewed evidence in these three cases related directly to decision points in each respondent's case:  consent for sexual activity. By contrast, here all evidence of Jane's assertion that John lacked permission was available to John, the Board, and the Appeals Officer.

### 2. The University's preparation of John's interview summary and use of related audio recording followed procedures.

John's second emphasized example of what he views as an "irregularity" – treatment of his interview summary and audio recording – actually demonstrates Loyola following its procedures to the letter. Br. at 31-37. Missing from John's arguments to this Court is the key evidence of record about what Loyola's procedures actually said and how Loyola followed them. Such evidence reveals the district court

correctly described John's assertions as "weak" and focused on what the record shows was a "neutral, even-handed practice." SA 41, 44.

### a. Loyola followed Community Standards for interview audio recordings.

As an initial matter, the Community Standards directly address the creation and use of interview recordings and written interview summaries. Dkt. 136-2 at 53. The procedure expressly restricts access to interview audio recordings to only "the Investigators" and their use "for the sole purpose of preparing the Final Investigative Report," which is exactly what Loyola did with every interview recording in John's case. *Id.* The procedures further called for investigators to use the recordings to prepare an interview summary, which each witness would review and certify. *Id.* Again, Loyola did exactly that with every interview in John's case, including his. *See* pp. 1-2, *supra*; p. 29, *infra*. Following applicable procedures is the opposite of a procedural irregularity.

John's Brief not only avoids this policy language but asserts claims refuted by evidence or lacking logic. He claims "the board could have cleared up the dispute regarding what John said to the investigators by listening to the interview recording" but "chose not to listen to it" and describes that decision as "perplexing." Br. at 16, 34. There is nothing perplexing about following a clearly stated policy. As the district court found: "The standards do not suggest that the Board can hear the recordings if it wants to.  Instead, they do the opposite" and "only the investigators will hear the recordings." SA 73. The policy limited review of interview recordings to certain people (investigators) and for specific, limited purposes (preparation of the FIR). The

27

absence of anything perplexing is even clearer considering: (1) the Board knew John had twice certified the accuracy of the interview summary; and (2) the Board directly asked Watland during the hearing about what John had told the Investigators, and she clearly explained "He did say that when they had had that conversation, that they were- he kept saying they had mutually agreed that they had moved too quickly and he said that they mutually agreed that no one was coerced." Dkt. 135-1 at 95; Dkt. 135-6 at PageID #:2526-29. John's Brief also notes that Board Chair Landis reviewed the audio recording of the hearing, but not of John's interview, and labels that "another irregularity that prejudiced John." Br. at 12, 34. But, again, John ignores undisputed procedures: the Community Standards permit hearing board members to review hearing recordings and specifically direct interview recordings "will not be shared beyond the Investigators." All of this means board members should listen to hearing recordings and would violate procedures by listening to recordings of interviews. Loyola followed its policies without any irregularity here.[9]

### b. *Loyola followed procedures for interview summary preparation.*

All evidence shows Loyola also followed its procedures with respect to preparation and use of John's interview summary. An investigator (Watland) testified that she carefully listened to the audio recording of John's interview "multiple times" as she

---

[9]  John asserts that McLean authored an appeal decision in 2015 "holding that failing to disclose exonerating evidence … mandated a finding in favor or the respondent." Br. at 35. This misstates the record. In his decision, McLean noted the case turned on issues of capacity and consent, and at one point video tapes existed that could have helped to illuminate these issues, but they had since been deleted through no fault of the respondent or Loyola. Dkt. 128-41. By contrast, John's case did not present the same challenges. Indeed, McLean's decision favoring a prior male respondent in a close case belies any argument that McLean was motivated by gender bias in John's case.

typed the summary, included "precise words" from that recording, and only quoted words in the summary that were contained in that recording. Dkt. 136-47 at 75-76, 110, 192-93; Dkt. 136-40 at ¶3. No evidence disputes how Watland prepared the summary. John's interview summary included a paragraph about a conversation between Jane and John the first time they saw each other after the first sexual encounter, which stated:

> In person, when Respondent next saw Complainant, they shared that they had both rushed into things. They mutually agreed that they had moved fast physically and "that no one was coerced." Both independently said they had regretted moving so fast. The Respondent shared that he believed that being physical so early in the relationship could jeopardize he and the Complainant not having a serious dating relationship. Respondent acknowledged it was Complainant's first time doing most of those things, and that he knew that they had moved quickly. She had described to him that it was her first time in many of those activities and that they should have taken their time with things. He wanted to have a relationship with her, and they agreed to "pump the brakes" on the physical activity so that they could develop a relationship outside of being physical.

Dkt. 135-6 at PageID #:2490. John argued at the hearing that he and Jane did not discuss coercion, and that his comment about "no one was coerced" was just something he told the investigators. But John twice reviewed the summary, which highlighted the "no one was coerced" comment in quotes, as a key point of a paragraph describing his discussion with Jane, and he verified its accuracy both times. The district court correctly found that John repeatedly reviewed and confirmed his summary and "doesn't have much of a leg to stand on when it comes to any error in the investigator's summary." SA 47.

In the face of uncontested record evidence about John's multiple opportunities to review and two explicit confirmations of the accuracy of his summary, John's Brief describes it as if it records something other than his own verified account. Br. at 10,

32 (referencing "a statement in the third person attributed to him" that had "ambiguity" and related to something only "implied in the FIR"). This ignores the context of the entire paragraph and evidence Watland provided about her preparation of the summary while listening to the recording. That evidence cannot be disputed, and Loyola's reliance on the credibility of its investigator's testimony over John's changing testimony is the type of credibility assessment courts leave to hearing boards and cannot create a triable issue. *Univ. of S. Ind.*, 43 F.4th at 792 (noting "federal district and appellate courts do not provide" additional forums to "decide what actually happened between Jane and John").

All evidence relating to John's interview summary and Loyola's consideration of it reflects an institution and its personnel carefully following procedures without any irregularity.

### c. Loyola's deletion of all interview audio recordings in Jane's case followed applicable procedures.

Last, John's Brief attempts to describe the deletion of John's audio recording from Loyola's internal records as a procedural irregularity based on a myriad of arguments, none of which have any support. John first argues that Loyola claimed "its policies mandated its destruction," but that is simply not true. Br. at 35.[10] Loyola's policy states that the "recordings are not retained as part of an educational record.

---

[10] John's Brief cites Loyola's Response to Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts, at paragraph 75 for claim that "Loyola instead destroyed the recording, later claiming that its policies had mandated its destruction." Br. at 35. The cited paragraph 75 describes evidence of how the recording device was checked out and then returned to an office independent of any of John's proceedings. Dkt. 161 at Page ID #:4367-68. It does not support John's claim that Loyola claimed deletion was mandated by policy.

Audio recordings may be retained as needed at the discretion of the University." Dkt. 136-2 at 53. And, while John argues Loyola's destruction of interview recordings was out of the ordinary (because of eight cases in 2016 and 2017, all respondent interviews were retained except John's), evidence shows that the University did not preserve any recordings in John's case and that recordings were not preserved in 11 of 19 cases between 2016-2017. Dkt. 135-24 at ¶12 & Ex. 2. Again, the district court properly reviewed the record and cited these figures as illustrating "Doe's case was well within the mainstream" with respect to audio recording preservation. SA 45.[11]

### D.   John's Other Purported Procedural Irregularities Lack Evidentiary Support.

After highlighting the two procedural issues described above, John's Brief presents other arguments hoping something will stick. Nothing does. These ancillary assertions ignore key evidence or rely on reasoning that cannot withstand scrutiny.

### 1.   No evidence suggests any Board member had gender bias.

John asserts that the Board was biased against him for two reasons: (1) that Board members expressed biased views and (2) the Board applied greater rigor to evaluating Jane's credibility. Br. at 43. The attack on the Board's independence is unsupported.

---

[11] John's Brief also argues Loyola had a policy to not delete interview audio recordings while case was pending on appeal and ignored a litigation hold notice. Br. at 35. There is no admissible evidence of such a policy, as John refers to testimony of a witness who clarified she lacked knowledge of any policy or practice relating to deletion of interview audio recordings. Dkt. 161 at PageID #:4362. Record evidence also demonstrates that Love directed all personnel with any involvement with John's case to preserve all documents on the date the attorney letter was received. *Id.* at PageID #:4366.

*Board members expressed biased views*:  John says that Houze had "authored" a different decision tying "gender-based violence" to "a cultural narrative that glorifies masculine domination [and] masculine imposition of power," and said that he considered Jane more credible because he deemed it unlikely she would engage in the sexual acts at issue because she was inexperienced. Br. at 44. This misstates the record. The March 2016 decision John references was issued by a three-person panel including Houze, but it was not signed by Houze and there is no indication Houze "authored" any of it. Dkt. 164-54. Moreover, the case concerned a Facebook comment stating, "IM GONNA RAPE YOUR MOTHER AGAIN TONIGHT." *Id.* The respondent was found not responsible for two policy violations (abusive conduct or disruptive or disorderly conduct) and responsible for one (harassment and bullying). The only reference to "masculine domination" or "masculine imposition of power" exists in the written decision absolving respondent of any disruptive and disorderly conduct. Dkt. 164-54 at PageID #:7190. Read in context, there is no gender-bias inference.

John also misstates Houze's point about finding John's account of Jane initiating sexual contact surprising. Houze explained that additional credibility elements contributed to his thoughts at the time of the decision. Those included that Jane's lack of prior sexual experience led him to find John's account of Jane initiating many sexual acts surprising, compared to Jane's description of her behavior as hesitant given that she had never previously gone further than kissing and no male had seen her naked. Dkt. 136-50 at 12-13, 58-59. Those impressions were based on specific statements by Jane regarding her prior experience, not broad gender stereotypes. Further,

32

Houze clearly testified that the Board's credibility determination was based on "two main considerations" independent of this issue. *Id.* at 13-15.

John also strays from the actual evidence to assert Landis was biased. Br. at 45. In her deposition, Landis testified about how Jane "was willing to share information against her own interest," which she explained related to Jane correcting a detail from Witness 1's interview that would have helped her case.[12] Dkt. 136-49 at 186-87. Landis also explained that John agreed with Jane's account of their encounter except for a statement that would be a policy violation or things he didn't think put him in a good light. Dkt. 136-49 at 211-12. In other words, Jane seemed candid and John seemed calculating and less candid, which Landis found less believable. Those observations were divorced from gender.

At the end of the day, these bias arguments reflect John's invitation to this Court to disagree with the Board's credibility assessments, which cannot create gender-bias inference as a matter of law. *Univ. of S. Ind.,* 43 F.3d at 792. John also labels such testimony "post hoc rationalizations" merely because Board member testimony amplified the summary contained in the Decision Letter. Br. at 26, 29. Not only is this argument unsupported, but it has been rejected by other courts recognizing deposition testimony can supplement documented rationale without creating inference of gender-bias. *See Univ. of Denver*, 952 F.3d at 1199 (finding panel member's deposition testimony explaining reasons not contained in decision letter "strongly suggests the [hearing panel] did consider those factors" and leaving court with "no call to

---

[12] The district court observed the difference between Jane correcting someone else's report of a discussion involving her and John's contradiction of himself. SA 49.

review the [hearing panel's] consideration" of the additional rationale from the deposition).

### 2. Love's involvement was minor, and John's effort to amplify it lacks support.

John's Brief depicts Love as driving this case, influencing the outcome in extensive ways the record cannot support. Br. at 43. The undisputed record demonstrates that Love's role involved coordinating efforts of various people conducting the internal disciplinary process. *See* Dkt. 135-5; Dkt. 135-7; Dkt. 135-24 at ¶8. There is nothing suggesting he reviewed all evidence before the Board (including hearing testimony), rendered any judgments of relative credibility, or weighed in about finding John responsible or not. There is no evidence he sought to influence any decision-maker's assessment of credibility, with one limited exception that sought to *help John*. After the hearing, when Landis shared that John's credibility was hindered by statements about his coercion discussion with Jane, Love clarified for Landis that John and Love had discussed coercion in an effort to help the Board fully assess evidence on that critical issue. Dkt. 136-46 at 274-76. John describes Love as having his "finger on the scale," but this was an effort to lift the scale in John's favor. Specifically, John's claims that Love improperly involved himself on Jane's behalf in four ways, none of which withstand scrutiny.

*Kahn Harvey's notes:*  There is no evidence that Love intentionally excluded Khan Harvey's notes from the FIR (Br. at 37), and certainly none connecting such decision to John's gender, as the district court correctly determined. SA 63-64. The absence of

any "inconsistent statement" as discussed above further undermines any inference of Love seeking to affect the outcome.

*Sharing existence of two cases with board chairs:* John asserts that Love "improperly told the board members about another disciplinary hearing involving John." Br. at 42. This stems from one email stating that Jane and Elizabeth's cases would be heard by "separate and distinct hearing boards (with different personnel serving on each board)." *Id.*; Dkt. 135-5. John argues that "Love failed to keep the cases separate" because Love told Landis that John was subject to another proceeding. But nothing Love did contradicts his email, and John admitted that Love expressly told John that the Board members would learn of the existence of the other case. Dkt. 136-42 at 86-89; Dkt. 135-5. Sharing basic information as John was told would happen is not an irregularity.[13]

*Witness interview decisions:* John claims Love directed the Investigators not to interview John's witnesses, based on speculation. All John presents is a voice message Watland left Love about witnesses and that, thereafter, the Investigators did not interview W.T. and C.R. Br. at 41. Watland and Tennison never testified that Love directed them about who to interview. Tennison testified he did not think W.T. could help explain any "discrepancy" at issue between Jane and John's accounts of what happened. SA 55; Dkt. 136-48 at 165-66. Watland also indicated people were chosen for interviews if they observed or were told about the sexual encounters

---

[13] John asserts that "Love also sent an email to another board member" about both cases. Br. at 42. The email was sent by an OSCCR staff member, not Love, to Houze and two of the Board members for Elizabeth's case. Dkt. 164-11; Dkt. 136-50 at 109. There is no evidence connecting Love to this email.

themselves. Dkt. 136-47 at 91-92, 97-98; Dkt. 136-40 at ¶¶4, 7, 8. Jane told Witness #1 about the sexual encounters, so she was interviewed. W.T. or C.R. were not identified as knowing anything about the sexual encounters, and they were not interviewed. John's argument also ignores that Jane and John both mentioned W.T. (he was not just "John's witness"). Dkt. 135-6 at PageID #:2486. Again, no irregularity exists here, nor any basis for determining that Love somehow directed such choices.

These undisputed facts distinguish this case from *Purdue* and *Columbia University*. *Purdue* involved allegations that the hearing panelists "refused to hear from John's witnesses, including his male roommate who maintained that he was *in the room at the time of the alleged assault* and that Jane's rendition of events was false." 928 F.3d at 669 (emphasis added). *Columbia* involved allegations that "both the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable to him." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). Here, John never requested that they either be interviewed or testify, and C.R. and W.T. were not present during or told about any of the sexual interactions at issue.

Another case upon which John relies illustrates when witness interview decisions can create inference of gender bias, and how this case is so different. In *Doe v. University of Denver,* key issues were whether Jane consented and whether she was too intoxicated to do so. 1 F.4th 822 (10th Cir. 2021). The investigators interviewed 11 witnesses Jane proposed but none of the five witnesses (all male) John proffered, including people identified as having contemporaneously learned about the sexual

encounter from John and having witnessed John and Jane in the hours surrounding the alleged assault. *Id.* at 832.  The irregularity was not interviewing male witnesses who could attest to levels of intoxication and share what they were told about the sexual encounters. Here, capacity to consent was not at issue, and W.T and C.R. were never identified as knowing anything about the sexual encounters themselves.

*Communications with Appeal Officer:*  John argues that Love improperly advised McLean not to be persuaded by John's attorney's letter, even though it contained "new substantive information." Br. at 38-40. This argument ignores Loyola's appeal procedures and pertinent evidence. The Community Standards allow written submissions within a short time of a decision and limit consideration of something new to "new substantive information *that could not have been discovered by a diligent respondent at the time of the hearing*." Dkt. 136-02 at 54, 58 (emphasis added). Weeks after the deadline, John's attorney delivered a letter threatening litigation and seeking to deliver statements from W.T and C.R. to supplement the record on appeal. Dkt. 135-22. That letter arrived after "the window had already closed for appeal statements," and McLean thus did not review it. Dkt. 136-51 at 115-16, 123-24. Love's email also merely noted the attorney letter appeared to "insinuate litigation" and then stated: "Jack, I trust that you will render a decision based on the merits of the appellant's case and not be persuaded by the pressure this letter intends to exert." Dkt. 164-24 at PageID #:6176. Loyola again followed its procedures, which John claims was "irregular." It was not.

37

Also, Love's neutrality is reflected in fact that he administered Elizabeth's and Jane's cases similarly, and John won Elizabeth's case. John argues that "by the time [Elizabeth's ] case went to hearing, Love already knew that John had lost Jane's case and would be expelled," and therefore, a "reasonable inference is that Love had no reason to put his thumb on the scale in Elizabeth's case." Br. at 43. But, most of what John claims Love did improperly occurred before Elizabeth's hearing (on December 16), yet he makes no similar claims that Love's actions improperly influenced that hearing. In addition, the decision in Jane's case was not issued until December 20. Thus, "[b]y the time [Elizabeth's] case went to hearing," there was not even an initial decision in Jane's case. John's exoneration in Elizabeth's case supports an inference that Love allowed each case to proceed on its own.

### E.  Even if Considered, Evidence Regarding Purported Bias Outside of Jane's Specific Case Against John Does Not Reflect any Gender Bias.

As explained, Judge Seeger's careful decision about the absence of gender bias in John's case supports summary judgment pursuant to Seventh Circuit standards, without considering general evidence of purported bias outside of John's specific case. *See* pp. 10-13, *supra; see also Doe v. Rollins Coll.,* No. 6:18-cv-1069-Orl-37LRH, 2020 WL 8408453 (M.D. Fla. July 13, 2020) (opinion granted summary judgment given lack of gender bias in specific case, without addressing general evidence presented in plaintiff's briefs). But, even if evidence outside of John's case were considered, it cannot create a triable issue. John's Brief argues that all such evidence presented "was highly probative of discriminatory intent." Br. at 18. Review of the actual

38

evidence reveals the opposite: even-handed, gender-neutral evidence or evidence unrelated to gender at all.

First, evidence outside of Jane's case includes that Loyola handled two other sexual misconduct cases involving John: Elizabeth's claims against John, and John's later claim against Jane. Evidence from each reflects positive treatment of John, as a man. In Elizabeth's case, the process involved the same investigators and Title IX Deputy Coordinator (Love) who John claims were biased but led to a decision in John's favor. Dkt. 136-46 at 144-49; Dkt. 135-5; Dkt. 19 at ¶145. That shows the opposite of male bias, which the district court emphasized. SA at 38. Also, when John filed a false complaint against Jane nearly a year later accusing Jane of sexually assaulting him, Loyola offered him the same support it offers to any "survivor," regardless of gender. Dkt. 135-23; Dkt. 135-3; Dkt. 136-42 at 46-51; Dkt. 136-52 at 42-43, 50-52. John admitted that he falsely portrayed himself as a sexual assault victim, yet Loyola treated him, a male student, like any other "survivor." Loyola's approach to John's admittedly false complaint is particularly strong general evidence of gender-neutrality relating to "survivor" issues within Loyola's sexual misconduct process.[14]

Second, statistical evidence demonstrates systemic gender neutrality within the University's process. Over a six-year period (2013-2019), male respondents accused,

---

[14] John also seeks to create gender-bias inferences from an email Love wrote referencing "partnership with Jane and the survivor community" and labels that a "conflict of interest." Br. at 40. But that email followed a communication mistake that left Jane unnotified that John could return to campus, which required rebuilding trust; that supports only interest in helping alleged victims of sexual misconduct, which is not gender bias as a matter of law. *See Johnson,* 829 F. App'x at 733.

like John, were only found responsible approximately 50% of the time, and even men accused of non-consensual penetration (the most extreme conduct) were only found responsible 38% of the time. Dkt. 135-24 at ¶¶13-14 & Ex. 3. After learning such data, John sought to rely on expert testimony comparing the percentage of male/female split within Loyola's student body to the percentage of male and female students accused of sexual misconduct, which courts have routinely rejected as incapable of creating any gender-based inference. *Univ. of Denver,* 952 F. 3d at 1194; *Rossley,* 979 F.3d at 1195. The reason is simple:  men and women are not accused in equal proportions, and Loyola lacks any control over the flow of complaints.

In the district court, John ignored all meaningful statistical data and relied on the same limited information he now presents to this Court:  a sliver of data referenced briefly in a footnote about one semester, arguing that "statistical evidence" of gender bias exists because "[a]ll four men whom Loyola charged with sexual misconduct in the fall of 2016 were found responsible for at least one gender-based misconduct charge." Br. at 25, fn 6. That ignores each of the following examples of statistical information presented to the district court:

- During the same time his own appeal was decided during the Spring 2017 semester, Loyola found three of five men accused by women of sexual misconduct not responsible.
- During the precise window of time of John's expulsion (six months prior to and after his expulsion) male students accused of non-consensual penetration were only found responsible for any sexual misconduct charge (including lesser offenses) 50% of the time.
- During a slightly expanded time period (the two calendar years that straddled the timing of John's cases, men charged with the three violations John was accused of were found responsible approximately 50% of the time.

40

Dkt. 135-24 at ¶¶13, 16-17 & Ex. 3. These statistics demonstrate the gender neutrality of outcomes from Loyola's internal process, which fundamentally undermines any gender-bias argument.

Third, limited evidence John presented below regarding federal government or media pressure on Loyola to punish men lacked essential elements, particularly (a) gender-specific pressure regarding outcomes of sexual misconduct cases and (b) the existence of any basis to determine that people actually deciding Jane's case against John were influenced by any anti-male pressure.

*Gender-specific pressure:*  there is no example of media or federal government pressure on Loyola focused on punishing males through the internal disciplinary process. *Univ. of Denver,* 952 F. 3d at 1198 (noting evidence required is "substantial criticism from the student body and the public media accusing the school of not taking seriously complaints of *female* students alleging sexual assault by *male* students); *Doe v. St. Joseph Univ.,* 832 F. App'x 770, 774-75 (3d Cir. 2020) (collecting cases and noting all rely on media pressure within "specific intent to punish males"). John's Brief points this Court (as he did below) to media reports addressing Title IX issues more generally, not whether defenses from men accused of sexual assault were taken seriously. *See* Br. at 4-5, 24-25. For instance, what captured national news attention on the day of John's hearing related to a former male student who plead guilty to a sex offense in Georgia years before he matriculated to Loyola, not Loyola's processes. Dkt. 164-64; Dkt. 164-65; Dkt. 164-66; Dkt. 164-67. The other examples John offers are:  reports in September 2016 that a man unconnected with Loyola was arrested

for groping women on Loyola's campus (Dkt. 136-34; Dkt. 136-35); a portion of the Wellness Center's Spring 2016 newsletter providing a "brief snapshot" of three stories related to gender-based violence issues, including a counter-protest against a planned "Men's Right's Activists" meeting near Loyola's campus, as well as a gathering of student groups to support the singer Kesha and bring awareness to gender violence, and Lady Gaga's performance at the Oscars (Dkt. 164-53 at PageID #:7179); and a November 2016 protest by the Students for Reproductive Justice ("SRJ") concerning how Loyola allegedly mishandled sexual assault issues, including that Love allegedly "lost and mishandled" one sexual misconduct case. (Dkt. 164-62).[15] None of those examples called for punishing men within Loyola's disciplinary proceedings, involved criticism focusing on how Loyola treated complaints from women about male sexual misconduct, or broadly blame men for sexual violence.[16]

Also, John's suggestion that reputation management meetings were "convene[d]" to address pressure relating to Loyola's handling of sexual misconduct cases is inaccurate. Br. at 5, 15. Loyola had standing reputational management meetings to address any reputational concerns, which Loyola described broadly as "any sort of student satisfaction" issue. Dkt. 164-51 at 115-16. These meetings took place "usually

---

[15] Further John's assertion that "additional media reports in October through December 2016 criticized Loyola's handling of sexual assault claims involving female accusers and alleged male perpetrators" is inaccurate. Br. at 5. The articles cited report on one incident in which a student's report was not immediately filed with Love's office – the same incident at issue in SRJ's November 2016 protest. Dkt. 164-57; Dkt. 164-58; Dkt. 164-59; Dkt. 164-62.

[16] Further, although Jane Neufeld referred to SRJ as the "bane of her existence," she explained that was due to their advocacy for "things [Loyola] would never do as a Catholic institution such as distributing condoms on campus and promoting Planned Parenthood; when she made that comment, she did not recall SRJ's advocacy for changes in Loyola's gender-based misconduct policies. Dkt. 164-21 at 55.

once a week, to bring together key individuals from across the university to make sure that the marketing and communications individuals who might need to respond to wide and varied concerns would be alerted" to those issues and "to prepare a response or just be prepared for a response" publicly. Dkt. 164-51 at PageID #:7047. There is no evidence that the reputational management committee considered Jane a source for "potential relief." Br. at 25. The January 9 meeting notes about a planned op-ed that John cites only states: "An on-campus survivor group was interested in writing an op-ed for the Phoenix in response to Students for Reproductive Justice's efforts." Dkt. 164-68. There is no mention of the membership of this group generally and mention of Jane, in particular. *Id.*

*Decisions in John's Case:* The decision-makers in John's case were the Board members and Appeal Officer McLean. John does not even suggest any gender bias or pressure placed on these individuals. Courts have found this critical at summary judgment. *See Doe v. Grinnell College,* 473 F. Supp. 3d 909, 926 (S.D. Iowa) (absence of evidence that decision makers considered media accounts foreclosed any gender bias inference).

## IV. The District Court Properly Granted Summary Judgment in Favor of Loyola on Doe's Breach of Contract Claim.

Illinois courts are reluctant to interfere with regulation of student conduct in the private university setting and apply a deferential standard to breach of contract claims. Thus, in addition to requiring evidence of the existence of specific contractual promises that were breached, John's breach of contract claim challenging his expulsion can survive summary judgment "only if that decision was made arbitrarily,

43

capriciously, or in bad faith." *DiPerna v. Chicago Sch. of Prof'l Psychology*, 893 F.3d 1001, 1006–07 (7th Cir. 2018) (emphasis in original) (quoting *Raethz v. Aurora Univ.*, 805 N.E. 2d 696, 699 (Ill. App. Ct. 2004)). John must show that Loyola's decision to expel him was "without any discernible rational basis," completely irrational, or "such a substantial departure from accepted academic norms as to demonstrate that [Loyola] did not actually exercise professional judgment." *Id.* at 1007 (quoting *Raethz*, 805 N.E.2d at 699). The district court correctly held that "Loyola is entitled to deference in its decision to expel" John and that the uncontested facts fall far short of this standard. SA 69, 71-73.

John now argues the expulsion decision was arbitrary and capricious based on mere disagreements, which cannot revive this claim for a jury. John asserts that Loyola was motivated by his gender, (Br. at 50), but as set forth in Section I *supra*, gender-bias assertions are unsupported.[17] John's assertions that Loyola "sought to expel him to placate Jane and ease the campus pressure on Love" are similarly unsupported. Br. at 50. For instance, John argues that an assistant athletic director and Love "set in motion the case against John." *Id.* at 51. Obviously, the internal proceeding against John started because Jane filed a formal complaint. Dkt. 135-6 at PageID #:2482; Dkt. 135-24 at ¶5; Dkt. 136-2 at 49, 53. Starting the investigation process was *required by policy,* which is anything but irrational. Also, the communications between Love and the athletic department personnel had nothing to do with expulsion

---

[17] The cases John cites are inapposite, as they do not apply Illinois law and do not support reversal. *Moe v. Grinnell College*, 556 F. Supp. 3d 916, 935-39 (S.D. Iowa 2021) (applying Iowa law without considering arbitrary or capricious standard); *Dordt*, 2022 WL 2833987 (same).

44

but, rather addressed other issues relating to John's presence in the varsity weight room as a non-athlete and ensuring that a student-athlete (Jane) felt safe in athletic department spaces. Dkt. 164-28 at 50-52, 60, 64; Dkt. 135-17. Love's reference to "another tool in our belt" responded to the specific concerns relating to John's presence in athletic facilities, and there is no basis to infer any effort to expel John before complaints had been investigated or presented to hearing panels. Dkt. 135-17.

John further argues that Love subsequently took actions that were arbitrary and capricious because they made it more likely John would be expelled, as well as violations of the Community Standards. Br. at 51. As addressed above, these procedural arguments are unsupported by the record evidence. They also fall far short of evidence that Loyola failed to investigate in good faith, did anything but follow its procedures with respect to interview recordings, or decided his case at the hearing board level or on appeal without a rational supportable basis. *See* SA 71-73. All evidence presented above about why John was found responsible demonstrates Loyola's reasons.

Ultimately, the essence of John's effort to revive his doomed breach of contract claim is disagreement with the Board's decision and its clearly-stated reasons to expel him as a sanction. Yet, as the district court properly determined: "the student must show the decision was 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." SA 69 (quoting *DiPerna*, 893 F.3d at 1007). There is no genuine issue of material fact as to whether Loyola (through its Board and appeal

process) exercised professional judgments, which requires judgment for the University on Count II for this reason alone.

Under established Illinois law, John's contract claim also cannot survive to a jury without evidence of a breach of a valid and enforceable contractual promise. *See Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 858 (7th Cir. 2019). There was no breach here. John relies on *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486 (Ill. App. Ct. 2019), to argue that the contract at issue was independent of any written materials, and accordingly, he need not cite any specific written contractual promise to state a claim. Br. at 49-50. *Bosch*, however, is inapposite, as it addresses the situation where a student has satisfactorily performed all coursework to earn her degree and alleges the university wrongfully withholds that degree. 155 N.E.3d at 497. John identifies no precedent applying this concept to a university's internal disciplinary proceeding.

The record evidence, including John's admissions, clarifies the absence of any breach of stated policies or procedures because: (1) the Community Standards lack any promise about how two simultaneous complaints should be adjudicated and explicitly limit interview recordings to use by Investigators in preparing the FIR, which is what Loyola did; (2) the Investigators lacked reason to interview C.R. or W.T. because neither John or Jane indicated they had firsthand knowledge of facts at issue in the sexual misconduct matter; and (3) the Board and appeal processes followed the Community Standards. Judgment for Loyola on Count II must be affirmed for the absence of breach as well.

## CONCLUSION

For the reasons set forth above, Defendant-Appellee Loyola University of Chicago respectfully requests that this Court affirm the district court's judgment in favor of Loyola.

Dated:  February 21, 2023           Respectfully submitted,

LOYOLA UNIVERSITY OF CHICAGO

By:    */s/Peter G. Land*
        *One of Defendant-Appellee's Attorneys*

Peter G. Land
Peter.Land@huschblackwell.com
Gwendolyn B. Morales
Gwendolyn.Morales@huschblackwell.com
Husch Blackwell LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
(312) 655-1500

47

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant-Appellee, Loyola University of Chicago, hereby certifies that this brief complies with Federal Rule of Appellate Procedure 32(a)(7)(b) and Circuit Rule 32(c) because the brief is produced with a proportionally spaced font and contains **13,996** words.

/s/Peter G. Land

Peter G. Land