## No. 22-2925

In the

# United States Court of Appeals
## for the Seventh Circuit

JOHN DOE,

*Plaintiff-Appellant,*

v.

LOYOLA UNIVERSITY CHICAGO,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:18-cv-07335.
The Honorable **Steven Charles Seeger**, Judge Presiding.

## REPLY BRIEF OF PLAINTIFF-APPELLANT

JONATHAN M. CYRLUK (*Counsel of Record*)
CARPENTER LIPPS LLP
180 North LaSalle Street
Suite 2105
Chicago, IL 60601
(312) 777-4300

PATRICIA M. HAMILL
LORIE K. DAKESSIAN
CLARK HILL
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(215) 640-8500

*Counsel for Plaintiff-Appellant*
*John Doe*

 

## TABLE OF CONTENTS

Table of Contents .................................................................................. ii

Table of Authorities .......................................................................... iv

I.    Summary of Reply Argument .......................................................... 1

II.   Loyola misstates the law. .............................................................. 4

      A.    *Purdue* and *Southern Indiana* control .................................... 4

      B.    *Purdue* and *Southern Indiana* do not require
            unquestioning deference to Loyola. .................................... 6

III.  Loyola's brief shows that there are genuine issues of
      material fact whether Loyola violated Title IX ............................ 8

      A.    Loyola admits that the district court disregarded
            evidence of pressure against Loyola and Love. .................... 8

      B.    Loyola's attempt to re-cast the board's decision as
            having nothing to do with force or coercion
            illustrates more fact issues. ........................................... 11

            1.    Tim Love believed the case concerned coercion .......... 12

            2.    The record belies Loyola's *post hoc* argument
                  that force or coercion were not issues. .................... 12

      C.    Loyola's discussion of the audio recording of John's
            interview proves that fact issues preclude summary
            judgment. ................................................................. 15

      D.    Loyola's attempt to minimize Love's involvement
            creates another fact issue. ............................................ 18

      E.    Loyola's attempt to bolster board members'
            credibility shows that there are fact issues
            precluding summary judgment. ....................................... 20

      F.    Loyola failed to refute John's argument that the
            board gave greater scrutiny to John's testimony
            than Jane's ................................................................. 22

IV.   Loyola's arguments regarding John's breach of contract
claim raise fact issues that cannot be decided on summary
judgment..................................................................................... 22

V.   Conclusion .......................................................................... 25

Certificate of Compliance .......................................................... 26

Certificate of Service.................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486 (Ill. App. Ct. 2019) ................................................................................ 4, 23, 24

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................... 10

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)............................................. 7

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849 (7th Cir. 2019)........................... 9

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016). ............................... 7

*Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987 (N.D. Iowa Jul. 20, 2022) ........................................................ 23

*Doe v. Grinnell College*, 473 F. Supp. 3d 909 (S.D. Iowa 2019) ................. 10

*Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020) ....................................... 7

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022)............................... 9

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ........................... *passim*

*Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643 (D. Conn. 2019)................. 16

*Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930 (9th Cir. 2022)................. 7

*Doe v. Rollins Coll.*, No. 6:18-cv-1069-ORL-37LRH, 2020 WL 8408453 (M.D. Fla. Jul. 13, 2020) ........................................................ 9

*Doe v. St. Joseph Univ.*, 823 F. App'x 770 (3d Cir. 2020)........................... 9

*Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78 (N.D. Tex. 2022)........................ 22

*Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668 (N.D. Tex. Dec. 13, 2022) ........................................................ 7

*Doe v. Univ. of Ark.- Fayetteville*, 974 F.3d 858 (8th Cir. 2020) ................. 7

*Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021) ................................. 6

*Doe v. Univ. of Denver,* 952 F.3d 1182 (10th Cir. 2020) ........................... 6, 9

*Doe v. Univ. of S. Ind.*, 45 F.4th 784 (7th Cir. 2022)........................... *passim*

*Doe v. Washington & Lee Univ.*, No. 6:19-cv-00023, 2021 WL
    1520001 (W.D. Va. Apr. 17, 2021) ................................................................ 7

*Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873 (7th Cir. 2022)................................... 24

*Johnson v. Marian University*, 829 F. App'x 731 (7th Cir. 2020) ................... 1, 5, 6, 9

*Joll v. Valparaiso Comm. Schools*, 953 F.3d 923 (7th Cir. 2020) .................. 2, 14, 18

*Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916 (S.D. Iowa 2021)................................. 7, 23

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)....................... 14, 18

*Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022) ................................. 14, 18

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994)..................................................... 8

## I.    Summary of Reply Argument

Faced with an evidentiary record demonstrating that John[1] met his burden at summary judgment, Loyola offers a two-fold response. First, it urges a Title IX standard contrary to the Court's settled precedent. Second, Loyola turns the summary-judgment standard on its head by presenting the facts in the light *least* favorable to John and resolving all inferences in its favor. Loyola's approach shows that there are multiple genuine disputes of material fact requiring reversal of the district court's judgment.

The Court's decisions in *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), and *Doe v. Univ. of S. Ind.*, 45 F.4th 784 (7th Cir. 2022), hold that a Title IX plaintiff can prove intentional discrimination (without direct evidence) by combining evidence of pressure on the university or those involved in the disciplinary process and other circumstantial evidence to support a reasonable inference that the university's actions were motivated by gender bias.

Loyola ignores the cases applying *Purdue* to summary judgment motions, which recognize that Title IX does not require unlimited deference to university administrative proceedings. Instead, Loyola relies heavily on an unpublished case, *Johnson v. Marian University*, 829 F. App'x 731 (7th Cir. 2020), presumably because, in that case, a Title IX plaintiff lost on summary judgment. But even *Marian* applied *Purdue,* albeit to facts easily distinguishable from this case.

---

[1]    Capitalized terms have the same meanings as in John's opening brief. John cites his opening brief as "Op. Br. __" and Loyola's response as "Resp. __."

As noted in *Southern Indiana*, the "devil is in the details." 43 F.4th at 794. In some cases, plaintiffs will present sufficient evidence to satisfy the *Purdue* framework. In others, they won't. John's case features more egregious irregularities than *Purdue*, and if his case cannot proceed to trial then it is difficult to imagine that any Title IX plaintiff could survive summary judgment.

Loyola previews arguments that it would present at trial, framing facts in its favor and disregarding any evidence that contradicts its narrative. But at summary judgment, the "court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll v. Valparaiso Comm. Schools*, 953 F.3d 923, 928 (7th Cir. 2020).

Here, the most persuasive story for *John* is:

Amidst federal pressure to crack down on campus sexual assault cases, Loyola wanted to avoid government scrutiny. [Dkt. 26 ¶19; Dkt. 171 ¶2.] At the time of Jane's allegations, Loyola and its deputy Title IX coordinator, Tim Love, faced specific, campus-based pressure from female students, including a demand to fire Love over his handling of Title IX cases involving accused males. [Dkt. 171 ¶¶38-52.]

Jane had complained about seeing John on campus, and Love and members of the athletic department discussed ways to remove John from his position in athletics. [Dkt. 164-28 at 50:8-53:1, 59:6-61:9, 65:7-21; Dkt. 171 ¶¶7-10.] Thereafter, Love encouraged Jane to file her complaint, which he welcomed as "another tool in our belt," presumably to expel John. [Dkt. 135-17.]

Love was involved in gathering evidence, guiding investigators and preparing the FIR given to the board, each time putting his thumb on the scale against John. Even though Love believed that Jane's case against John hinged on "coercion" [Dkt. 128-11 at 153:18-154:3; Dkt. 164 ¶20], Love suppressed a memo written by his predecessor, Rabia Khan Harvey, that memorialized her interview of Jane and specifically stated that

Jane "didn't believe she was forced or coerced" into sexual activity. [Dkt. 128-10 ECF 1537; Dkt. 136-46 at 253:24-256:13.] Loyola's investigators—after seeking Love's guidance—interviewed only one female witness perceived as supportive of Jane's story, but didn't interview the two male witnesses whose version of events supported John. [Dkt. 158-42 at ECF4157; Dkt. 128-4 at ECF1369-1372.]

Because Love withheld Khan Harvey's memo, Loyola's board found Jane credible, erroneously believing that Jane had been consistent throughout. [Dkt. 128-32 ECF 1976.] The board (whose members exhibited other indications of bias) also ignored Jane's inconsistencies, even thanking Jane for correcting a conflicting statement she previously made, but expelled John when he allegedly corrected an ambiguous statement in his interview summary. [*Id.* at ECF1976-1979; Dkt. 135-1 at 91:4-92:6.]

There is more. Despite basing its credibility determination on John's correction of that ambiguous clause, the board failed to listen to the audio recording of his interview (or ask the investigators to re-review it), which would have revealed precisely what John *did* say to investigators. [Dkt. 161 ¶150.] Worse, Loyola destroyed the recording despite a litigation hold letter from John's attorney mandating its preservation. [Dkt. 128-23; Dkt. 158 ¶120[B]; Dkt. 161 ¶¶67-69, 71, 73, 75.]

Love also influenced John's appeal. When John submitted declarations from the witnesses the investigators failed to interview, Love urged the appeals officer to quickly deny the appeal and ignore the declarations. [Dkt. 164-24.] This all occurred at a time when Jane, angered that John remained on campus, threatened to withdraw her public support of Love and Loyola. [Dkt. 171 ¶¶56, 59.] After the appeal was denied, Love reached out to Jane and reported back to colleagues his expectation of "continued positive relations and partnership with [Jane] and the survivor community moving forward." [Dkt. 135-21; Dkt. 158 ¶111.] Love's mission was complete. John was expelled. [Dkt. 128-40.]

In sum, John has combined evidence showing why Loyola "might have been motivated to discriminate against" him with evidence of significant irregularities from which a reasonable jury could conclude that Loyola did so. *Purdue*, 928 F.3d at 669.

Finally, Loyola's arguments on John's breach-of-contract claim largely restate its arguments on the Title IX claim and again seek to minimize Love's ubiquitous role. Those arguments fail for the same reasons the Title IX arguments fail. Ignoring the specific breaches of §§ 401.4-.5, 409, 409.6.b and 411 of the Community Standards, Loyola asserts (without analysis) that all facts show that it did not breach any provision of the Community Standards. But even if that were true, Loyola breached its implied promise that John would receive a degree upon successful completion of his coursework. *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486 (Ill. App. Ct. 2019). Loyola argues that *Bosch* applies only when a "university wrongfully withholds a degree." [Resp. 46.] Even if one were to accept that expelling John is different than withholding a degree from him, *Bosch* is not so limited. It held that a breach of contract exists if the university's decision to dismiss the student before earning his degree "was arbitrary and capricious or the product of bad faith or malice[.]" *Bosch*, 155 N.E.3d at 498.

The Court should reverse the district court's judgment.

## II.    Loyola misstates the law.

### A.    *Purdue* and *Southern Indiana* control.

Loyola rejects the settled Title IX standard adopted in *Purdue*, which simply asks whether "sex was a motivating factor in a university's decision to discipline a student." *Purdue*, 928 F.3d at 667. This requires a holistic analysis; "the ultimate

inquiry must consider the totality of the circumstances." *Southern Indiana*, 43 F.4th at 792.

Under *Purdue,* a Title IX plaintiff satisfies this inquiry by combining evidence of (a) pressure on the university or those involved in the student disciplinary process to crack down on male students accused of sexual misconduct, and (b) "other circumstantial evidence of bias in [a] specific proceeding." *Purdue*, 928 F.3d at 668-69. The circumstantial evidence can include significant irregularities, gender-biased statements, and findings that are irrational or clearly against the weight of the evidence. [Op. Br. 21 and cases cited therein.]

The district court failed to apply *Purdue*, stating that it would not consider evidence of pressure against Loyola and Love until John first showed that the irregularities in his case (which it acknowledged were "lousy," "unfair" and "difficult to understand") directly resulted from gender bias. [SA64-65.] In other words, the district court refused to consider the very evidence that supplies "a story about why [a university] might have been motivated to discriminate against males accused of sexual assault." *Purdue*, 928 F.3d at 669. This was error.

Loyola asserts that "the district court applied the correct summary judgment standard" [Resp. 13], claiming *Purdue* applies only to motions to dismiss, and *Marian* applies to summary judgment cases. [Resp. 9.] *Marian*, however, applied *Purdue* to a summary judgment case, and reaffirmed *Purdue's* totality standard. *Marian*, 829 F. App'x at 732. Likewise, other courts, utilizing the same standard but with stronger

facts than *Marian*, applied *Purdue* to deny a university motion for summary judgment. [*See* Op. Br. 22 n.5.]

Nor does *Marian* assist the Court in analyzing "the alleged examples of case-specific bias John presented" [Resp. 11], because the two case-specific allegations the student in *Marian* presented—a seemingly unsupported claim that the investigator prejudged the case and the investigator's "unrelated social media musings" about Christine Blasey Ford's allegations against Justice Kavanaugh—are unlike the issues in this case. *Marian,* 829 F. App'x at 733. *Marian* did not feature facts even remotely analogous to this case.

### B.   *Purdue* and *Southern Indiana* do not require unquestioning deference to Loyola.

Ignoring *Purdue*, Loyola cites a series of out-of-circuit cases, including *Doe v. Univ. of Denver,* 952 F.3d 1182 (10th Cir. 2020) ("*Denver I*"), for the notion that the Court must give near absolute deference to a university's credibility determinations. [Resp. 17; *see also id.* 13 n.6 and 33.] Loyola cites *Denver I* for nearly every legal argument it makes [Resp. 13, 17, 33, 41], but fails to cite a subsequent Tenth Circuit opinion that is more analogous to John's case, and in which the Tenth Circuit expressly applied *Purdue* in denying a university's summary judgment motion. *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) ("*Denver II*") (the *Purdue* approach "better accords with the text and analytical framework of Title IX").

What Loyola claims "courts are not to" do [Resp. 13 n.6] is exactly what this Court *did* do in *Purdue*: it denied the university's motion to dismiss in part because a Title IX official's "perplexing" credibility decision and lack of clarity as to how the

Purdue disciplinary "committee could have evaluated [the complainant's] credibility." *Purdue,* 928 F.3d at 664, 669. Many other circuits similarly have rejected Loyola's proposed standard. *See, e.g., Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 940 (9th Cir. 2022); *Doe v. Univ. of Ark.- Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016). District courts in multiple circuits that have embraced *Purdue* have declined to defer to university credibility decisions on summary judgment. *Doe v. Texas Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 17631668, at *3 (N.D. Tex. Dec. 13, 2022); *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 932 (S.D. Iowa 2021) ("[t]here are notable differences between the analyses and credibility findings of [an earlier] case and Moe's case"); *Doe v. Washington & Lee Univ.*, No. 6:19-cv-00023, 2021 WL 1520001, at *14 (W.D. Va. Apr. 17, 2021).

Loyola also quotes *Southern Indiana* for the proposition that courts do not act as "third and fourth forums . . .  to decide what actually happened between Jane and John[,]" to argue that a panel's weighing of the evidence deserves unfettered deference to the university's decision. [Resp. 12; *see also id.* 14.] John is not asking the Court to act as a "fourth forum" to review the evidence. Rather, he argues that the board did *not* have all the evidence to make its decision and that those involved in the decision demonstrated gender-biased views.

Nor does *Purdue* require unquestioning deference to a university's decisions. For nearly three decades, federal courts have recognized that ferreting out potential

7

gender discrimination requires scrutiny of university decisions. *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

## III. Loyola's brief shows that there are genuine issues of material fact whether Loyola violated Title IX.

Ignoring summary judgment standards, Loyola claims that "the first question at summary judgment is whether Loyola engaged in a reasonable evidence-based analysis." [Resp. 14.] Not so. The "first question" at summary judgment is whether, viewing the facts and inferences in the light most favorable to John, there are disputed issues of fact that preclude summary judgment. [Op. Br. 19.]

### A. Loyola admits that the district court disregarded evidence of pressure against Loyola and Love.

The district court refused to even consider the evidence of pressure on Loyola and Love, erroneously concluding that it would be relevant only if John could tie each substantive and procedural irregularity to direct evidence of discrimination.[2] [SA 63-65.] The district court erred. It ignored the evidence of why Loyola "may have been motivated to discriminate against" John and then failed to recognize that the substantial irregularities (which it said were "lousy," "unfair," and "hard to understand") are *themselves* evidence of discrimination. *Purdue*, 928 F.3d at 669.

Loyola treats the district court's error as an afterthought, relegating it to page 38 of its brief. [Resp. 38-43.] Loyola *concedes* that the district court did not address

---

[2]     Loyola contends that the district court did not use the words "direct evidence" or say that it looked at each irregularity in isolation. [Resp. 11-12.] But this is exactly what the district court did. The district court discussed each irregularity in isolation and, by refusing to look at an entire category of circumstantial evidence (*i.e.*, pressure on Loyola and Love), effectively required direct evidence that each irregularity was caused by gender bias.

John's pressure evidence but, based on out-of-circuit cases (including *Denver I*), argues that evidence of external pressure is irrelevant as a matter of law. [Resp. 38.][3]

Loyola also makes several arguments that only serve to highlight fact issues precluding summary judgment. *First*, citing *Denver I* and a non-precedential Third Circuit case, *Doe v. St. Joseph Univ.*, 823 F. App'x 770 (3d Cir. 2020),[4] Loyola argues that the evidence of pressure is not "gender-specific," claiming that "there is no example of media or federal government pressure on Loyola focused on punishing males through the internal disciplinary process." [Resp. 41.] Seventh Circuit precedent forecloses Loyola's argument. *Purdue, Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 855 (7th Cir. 2019)*,* and *Marian* all make clear that (among other things) the Dear Colleague letter and comparable pressure are relevant in shaping a general atmosphere of gender bias, even though the letter itself does not explicitly call for "punishing males through the internal disciplinary process." *Purdue*, 928 F.3d at 669; *Columbia Coll.*, 933 F.3d at 855; *Marian*, 829 F. App'x at 732.

Loyola also ignores that the pressure included stereotypes that men are responsible for sexual assault. For example, John pointed to (1) a university newsletter stating that a Men's Rights Activist group and groups like it "perpetuate rape culture

---

[3]     Loyola cites *Doe v. Rollins Coll.*, No. 6:18-cv-1069-ORL-37LRH, 2020 WL 8408453 (M.D. Fla. Jul. 13, 2020). [Resp. 38.] *Rollins College*, however, rejected the Third Circuit's opinion in *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020), which expressly followed *Purdue. Rollins Coll.*, 2020 WL 8408452, at **1-2.

[4]     The most recent published Third Circuit Title IX case, *Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022), holds the opposite. Citing *Purdue*, *Princeton* held that, while "pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination," it factors into the total mix of information supporting a plausible Title IX claim. *Id.* at 345.

and contribute to a culture that normalizes violence" [Dkt. 164-21 at 11:20-112:11; Dkt. 164-53; Dkt. 171 ¶36]; and (2) a disciplinary decision (from a panel including Houze) that expressed the belief that there are "cultural narratives that glorifies masculine domination, masculine power and gender-based violence[.]" [Dkt. 164-54].

*Second*, Loyola argues that it is irrelevant that Love was the target of protests because he was not a board member or the appeals officer. [Resp. 43.] Loyola's argument is illogical. If the person who determined what evidence was pursued and presented to the board is biased, then the board's work is tainted. *Cf. Brady v. Maryland*, 373 U.S. 83 (1963).[5] Moreover, Loyola's argument conflicts with *Purdue*, where the pressure "may have been particularly acute for" Purdue's Title IX coordinator who, like Love, "bore some responsibility for Purdue's compliance" with the Dear Colleague letter and made "perplexing" decisions in the accused student's particular case. *Purdue*, 928 F.3d at 668, 669. Here, despite noting that Loyola's decision to suppress Khan Harvey's memo was "difficult to understand" (*i.e.*, "perplexing") [SA60], the district court erred by failing to consider the evidence linking this substantial irregularity to Loyola's motive to discriminate against John.

*Third*, Loyola argues that the pressure evidence is irrelevant because the complaints were not couched as complaints about Loyola's "internal discipline process." [Resp. 41-43.] This is incorrect. Several articles were critical of Loyola's and Love's

---

[5]     Loyola's sole support is *Doe v. Grinnell College*, 473 F. Supp. 3d 909, 926 (S.D. Iowa 2019). [Resp. 43.] But *Grinnell* simply rejected the plaintiff's pressure argument because he had no evidence that "the decisionmakers in his case" had knowledge of the outside pressure. *Id.* at 926. Here, in contrast, Love and the board members were aware of the pressure. [Dkt.136-46 at 27:23-33:15, 84:24-185:5; Dkt. 136-47 at 178:3-179:3; Dkt. 136-50 at 88:2-90:23.]

"mishandl[ing]" of the "conduct hearing process" [Dkt. 164-57; *see also id.* Dkt. 164-58-60.] In addition, the only possible reason to demand that Loyola fire Tim Love, Loyola's Deputy Title IX coordinator, was dissatisfaction with his office's handling of cases going through the internal discipline process.[6]

**B.    Loyola's attempt to re-cast the board's decision as having nothing to do with force or coercion illustrates more fact issues.**

The board based its decision entirely on credibility determinations. It found Jane credible because she "consistently shared her account" from the date of the incident through the hearing, but acknowledged that it had no "other information" to question Jane's credibility. [Dkt. 128-32 ECF1971.] The board didn't have "other information" because Love suppressed it by withholding Jane's statement. This substantive irregularity, combined with the evidence of motive, would allow a reasonable jury to conclude that Loyola's expulsion of John was the product of gender discrimination. [Op. Br. 26-31.]

Recognizing that, if it concedes that John's case concerned "coercion," Love's omission would render the judgment below indefensible, Loyola re-writes history, arguing that "[w]hether John forced or coerced Jane was simply not an issue" [Resp. 22;

---

[6]    Loyola makes several strained arguments about the statistical evidence, which highlight fact issues that preclude summary judgment. *First*, Loyola argues that its treatment of Elizabeth's claim against John shows that John was treated fairly. [Resp. 39.] This "win some, lose some" argument is erroneous as a matter of law and was addressed in John's opening brief. [Op. Br. 43.] *Second*, Loyola gerrymanders statistics by counting *charges*, not *students* to reach its preferred results. Because Title IX is a discrimination statute, what matters is what happens to an individual student, not how charges are structured. Thus, the Court should evaluate the results according to student outcomes. The statistics show that 100% of all men charged in fall 2016 were found responsible of sexual misconduct. [Dkt. 136-38; Dkt. 159 ¶¶89-90.] The proper interpretation of the statistical evidence is a fact issue.

*see also id.* 19, 20.] Loyola's *post hoc* position beggars belief. The concept of "force and coercion" is in the coach's report [Dkt. 128-5 ECF1379]; in Khan Harvey's memo [Dkt. 128-10 ECF1537]; in Love' conversation with John [Dkt. 128-11 at 153:18-154:3; Dkt. 164 ¶20]; in Love's conversation with Landis [Dkt. 128-11 at 274:13-275:7]; and in the board's Decision Letter [Dkt 128-32 at ECF1977]. That Loyola now takes the position that coercion was "not an issue" is an attempt to avoid the unavoidable conclusion that if coercion was an issue, then the withholding of the Khan Harvey memo mandates reversal.

### 1. Tim Love believed the case concerned coercion.

Certainly Love believed the case concerned coercion. [Dkt. 128-23 at ECF1844-45 ¶9; 128-11 at 153:18-154:3; Dkt. 161 ¶20.] Yet Loyola disavows its own Deputy Title IX Coordinator, asserting that Love's belief was "based on his limited knowledge[.]" [Resp. 22.] But *after* John's hearing Love admitted to Landis that he told John "coercion" "was a sort of unique factor of this case." [Dkt 136-46 at 274:6-75:7.]

### 2. The record belies Loyola's *post hoc* argument that force or coercion were not issues.

Using the word "permission" 34 times, Loyola engages in a linguistic game, claiming that the case was actually about whether John had "permission" for sexual activity. [Resp. 2, 5, 8, 14-16, 18-24, 26.][7] The Decision Letter proves that "coercion"

---

[7]     The Community Standards do not draw a distinction between the lack of permission and force or coercion. They are two sides of the same coin. The Community Standards state that sexual activity that is coerced is considered forced and, therefore, is not consensual. [Dkt. 136-26 at ECF2893-2894.] "Coercion" is defined as "unreasonable pressure for any activity." [*Id*.] According to the Standards, "when an individual makes clear that the individual does

was an issue. It specifically states that "[t]he presence or lack of coercion is a *foundational component* to determining whether consent was present for a sexual interaction." [Dkt 128-32 at 3; emphasis added.][8] Despite writing that very sentence, at her deposition, Landis refused to admit her own words were true:

> Q.   Is the presence or lack of coercion a foundational component in determining whether consent was present for a sexual interaction?
>
> A.   In full transparency, it's just a little confusing to follow.
>
> \* \* \* \* \* \*
>
> Q.   Did you ever say the presence or lack of coercion is a foundational component in determining whether consent was present for a sexual interaction?
>
> A.   Because I'm having trouble following the question, I'm going to share what I think is important about coercion and consent.  I think coercion is a very important component of talking and understanding consent, and in certain cases could be a very important piece to evaluate in a case, depending on the circumstances of that case.

---

not want sex, wants to stop, or does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercion." [*Id.*] "Force" is "the use of physical violence, threats, intimidation (implied threats), and/or *coercion* to overcome resistance or objection." [*Id.* § 409(1)(f) at ECF2895; emphasis added; *see also* Dkt. 164-1 at 99:8-101:7.] In sum, a finding that sexual activity is *coerced* is akin to finding that there was no *permission* for the activity.

[8]     Loyola cannot have it both ways. It cannot simultaneously contend that "force or coercion" "was simply not an issue" [Resp. 22], while at the same time contending John's alleged inconsistency regarding whether he and Jane discussed coercion was so material that it warranted discrediting his entire testimony.

[Dkt. 136-49 at 67:6-68:21.] Landis only begrudgingly admitted that the board was "certainly evaluating all information to see if coercion was a factor." [*Id.* at 255:4-8.][9] Landis' evasive, *post hoc* testimony is itself circumstantial evidence of discrimination that creates a fact issue. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022); *Joll v. Valparaiso Community Schools*, 953 F.3d 923 (7th Cir. 2020).

The Decision Letter also found John responsible for sexual activity that could be non-consensual only if it was "forced or coerced," such as Jane manually stimulating herself after John asked to see her do it and Jane performing oral sex on John. [Dkt. 128-32 at ECF1978-1979.]

The Decision Letter further belies Loyola's assertion that "Jane said John grabbed her hand and placed it on his penis, *but not in a physically-forcible way.*" [Resp. 21; emphasis added.][10] The Decision Letter plainly states: "Respondent *physically forced* contact between the Complainant's hand and his genitals[.]" [Dkt. 128-32 at ECF1980; emphasis added.]

Loyola also re-writes Jane's claim, stating that "Jane never said John forced or coerced" her into sexual activity, but instead "Jane said John lacked permission[.]"

---

[9]    Oddly, Loyola cites Landis' equally equivocal testimony for the proposition that "Board members confirmed Jane never said there was any force or coercion." [Resp. 24.]

[10]    Loyola goes to great lengths to avoid using the word "coercion," but nevertheless can't help but describe such conduct: "John responded to each rejection not by stopping the activity but by *pushing Jane to engage in progressively more intimate activity*[.]" [Resp. 15; emphasis added.] Before the district court, Loyola similarly stated that Jane "repeatedly fended off John's pursuit *of increasingly intimate activity* through speech and actions that he ignored until she '*gave in*' and *stopped resisting*." [Dkt. 131 at ECF2303; emphasis added.]

The record contradicts Loyola's claim. For example, the word "permission" does not appear in the summary of Jane's interview [Dkt. 128:4 at ECF1360, ECF1366] and Jane only used the word "permission" three times at the hearing, each time describing activity that was *not* a basis for the board's responsibility finding [Dkt. 135-1 at 57:10-22; 101:19-102:1; 139:21-24]. The board *never* used any variation of the word "permission" in the hearing. [*Id., passim.*]

In contrast, Jane used words indicative of coercion. Sexual activity is coerced if there is "continued pressure" after the person indicates they did not want to go further. [Dkt. 136-26 at ECF2894; Dkt. 136-44 at 99-101.] Jane's statement to her coach that "she had felt pressured to do things physically past the point she was comfortable with, even after saying no" practically tracks the Community Standards' definition of "coercion." [Dkt. 128-5 at ECF1383.] More than ten months after indicating to Khan Harvey that she didn't "believe she was forced or coerced," Jane told the investigators and hearing board that she "gave in," which again tracks the definition of coercion. [Dkt.128-4 at lines 124, 139-40; *see also* Dkt. 135-1 at 30:5-9, 31:3-15, 31:16-25, 36:1-2, 44:14, 46:4-6, 57:18-19, 61:19-62:4, 62:17-63:3, 73:7-10, 76:7-20, 101:19-102:1, 102:17-20, 145:18-20, 157:4-9.]

## C.  Loyola's discussion of the audio recording of John's interview proves that fact issues preclude summary judgment.

The sole articulated basis in the Decision Letter for finding John not credible was John's purported correction at the hearing of an ambiguous statement in the FIR. The board reached and appeals officer Jack McLean affirmed this critical finding

15

without listening or asking the investigators to listen to the audio recording of John's interview. [Op. Br. 31-34.]

Worse, unrebutted circumstantial evidence indicates that Loyola destroyed the audio recording after it received John's litigation hold letter. [Op. Br. 35-37.] If Loyola destroyed the recording after receiving the litigation hold letter, John would be entitled to an appropriate adverse inference—including that Loyola later listened to the recording and it proved that John was telling the truth—that would foreclose summary judgment. *See Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 657 (D. Conn. 2019) (factfinder entitled to consider whether destroyed notes "likely contained evidence supporting Plaintiff's claim under Title IX that gender was a motivating factor in the decision to discipline him").

Loyola makes no effort to rebut either the facts showing that it destroyed the recording after it received the litigation hold letter or the legal consequence of its destruction. Instead, Loyola argues that it followed its 2016-17 Community Standards, which state that the "sole purpose" of recording interviews was to prepare the FIR and the recordings would be accessed by the investigators only. [Resp. 27; 30-31.] Loyola, however, failed to produce a document management policy requiring regular destruction of recordings, and the Community Standards say nothing about *destroying* anything. In fact, the Community Standards state that recordings "may be retained as needed at the discretion of the University," with no restriction on purpose. [Dkt. 136-2 at 53.] Moreover, Loyola trained its staff to preserve recordings, which

would "never" be deleted until the conclusion of an appeal. [Dkt. 128-45 at ECF2142; Dkt. 128-47 at ECF2216; Dkt. 161 ¶¶67-69; Dkt. 136-4 at 166:1-170:10; 247:16-50:3.]

More fundamentally, the issue of whether Loyola's policies *allowed* destruction of the recording is academic. Loyola was subject of a litigation hold letter that required it to suspend any policies that allowed destruction of the recording. [Op. Br. 35.]

On its failure to review the recording, Loyola casually asserts there is "nothing perplexing" about expelling John based on a supposed discrepancy between a single ambiguous clause in the FIR about what he said in his interview and his hearing testimony when the recording was at hand because (as the district court found) the Community Standards say recordings will not be shared "beyond the Investigators" and can be consulted only to draft the FIR. [Resp. 27.] Loyola's witnesses admitted that nothing prevented the board or McLean from asking the investigators to review the recording to confirm an asserted discrepancy. [Dkt. 161 ¶¶59-60; Dkt. 128-11 at 289:17-292:20; Dkt. 128-33 at 73:22-74:5; 79:13-80:19; 168:21-169:3.]

Loyola also infers that it is irrelevant that the board did not consult John's recording because it had several other reasons for finding John not credible. [Resp. 5, 16.] In a sleight of hand, Loyola attempts to insinuate that these other reasons were articulated before this litigation. [Resp. 5.] They weren't. The *only* basis stated in the Decision Letter for finding John not credible was his alleged correction of the ambig-

17

uous statement in his interview summary. The rest were post-litigation rationalizations, which themselves are circumstantial evidence of discrimination. *See Reeves*, *Runkel*, and *Joll*, cited above.[11]

Finally, Loyola asserts that the interview summary is correct because John "certified" it. [Resp. 28-29.][12] As the district court recognized, however, the sentence in which the phrase "no one was coerced" appears is grammatically ambiguous. [SA47.] Therefore, John's failure to assume that the board would subsequently interpret an inartful sentence much differently than he did means nothing and is not a "certification" that he said that he and Jane discussed "coercion."

### D.   Loyola's attempt to minimize Love's involvement creates another fact issue.

Disregarding contrary evidence, Loyola concludes that "Love's involvement was minor[.]" [Resp. 34.] Like Loyola's other arguments, Love's level of involvement is a fact issue that cannot be decided on summary judgment.

Loyola next asserts that "[t]here is no evidence that Love intentionally excluded Khan Harvey's notes from the FIR[.]" [Resp. 34.] *The exclusion is the evidence of intent*. In addition, Loyola ignores that, at a time he was facing a campus call for

---

[11]     Loyola contends that the board members' after-the-fact testimony only "amplified the summary contained in the Decision Letter." [Resp. 33.] They did not; they stated new reasons for finding John not credible. In addition, Landis gave evasive testimony, refusing to admit that the board's inclusion of only one basis for finding John not credible meant that the included item was the most significant. [Dkt. 136-49 at 110:15-114:15.]

[12]     John was not asked to "certify" the interview summary; Watland only asked him to confirm that it "accurately reflects your perspective from the interview." [Dkt. 135-6 ECF2529.] The summary accurately reflected John's perspective that his interactions with Jane were consensual. [Dkt. 158 ¶36 at ECF4151-4153.]

his dismissal, Love (1) knew about the Khan Harvey memo [Dkt. 161 ¶¶14, 32; Dkt. 136-46 at 254:6-255:6], (2) chose to include the full version of the coach's report in the FIR that suggested Jane was coerced [Dkt. 161 ¶¶27-29; Dkt. 128-4 and 5], (3) suggested that investigators not include evidence of consensual activity in the FIR [Dkt. 164-12 at ECF5717 (comment bubble in MS Word document)], and (4) couldn't give any explanation why he didn't include the Khan Harvey memo in the FIR [Dkt. 136-46 at 254:6-255:6]. From these facts, a reasonable jury could conclude that Love's omission was intentional.

Loyola then states that the investigators' testimony proves that Love was not involved in the decision to interview witnesses. [Resp. 36.] Loyola, however, ignores that (1) Watland left a message for Love seeking his guidance on witnesses to interview [Dkt. 158 ¶42 at ECF4157 (bottom of page)], (2) thereafter, the investigators did not interview WT and CR [Dkt. 128-4 at ECF1369-1372], and (3) Love and the investigators violated Loyola's procedures and did not include a statement in the FIR regarding why they did not interview the witnesses [Dkt. 128-47 ECF2216; Dkt. 128-4 and 5, *passim*].[13] A reasonable inference from these facts is that Love steered the investigators away from interviewing these witnesses.

Loyola also blames John for its failure to interview WT and CR. [Resp. 36.] But John named WT and CR as witnesses [Dkt. 136-43 at 223-25; Dkt. 128-4 at ECF1360-1369] and, even if he didn't do so, the burden was on Loyola to identify witnesses

---

[13]     This violation belies Loyola's claim that it "followed procedures in its Policy." [Resp. 1-2.]

based on what John and Jane said. [Dkt. 136-2 at 53, 56; Dkt. 136-46 at 45-47, 52, 215; Dkt. 136-48 at 78; Dkt. 136-44 at 172, 176; Dkt. 136-51 at 137-38.]

It is undisputed that, after Love suggested to McLean that he shouldn't be persuaded by John's attorney's letter, McLean "did not consider" the affidavits of WT and CR submitted with the letter. [Dkt. 136-51 at 116:2-118:4.] Even though Loyola's vice-president, Jane Neufeld, admitted that Love's communications with McLean were not appropriate [Dkt. 164-21 at 75:14-23; Dkt. 171 ¶101], Loyola now defends them. [Resp. 37.] Loyola's arguments raise fact issues that cannot be decided on summary judgment.

### E. Loyola's attempt to bolster board members' credibility shows that there are fact issues precluding summary judgment.

<u>Brian Houze.</u> John argued that Houze's post-litigation statement that he found "it potentially less than likely" that Jane would initiate sexual activity because "she had not had much experience or really any experience sexually" was evidence of gender discrimination because it was based on "outdated and discriminatory views of gender and sexuality." [Op. Br. 44.] Houze neither knew nor asked about John's level of sexual experience.

In response, Loyola argues that Houze's "impressions were based on specific statements by Jane regarding her prior experience, not broad gender stereotypes." [Resp. 32.] Loyola's circular argument proves John's point. Houze maintained an outdated gender stereotype – *i.e.*, that inexperienced females would not initiate sexual activity, but men, no matter their level of sexual experience, would. This mandates reversal. [Op. Br. 44 and cases cited therein.]

Finally, Loyola argues that a decision by a hearing board of which Houze was a member that expressly tied "gender-based violence" "to a cultural narrative that glorifies masculine domination [and] masculine imposition of power" cannot impugn Houze because (a) he did not actually author the decision, and (b) the respondent in that case was found not responsible. [Resp. 32.] These arguments create fact issues. A reasonable inference is that Houze adopted the views in the opinion by approving it. In addition, the opinion shows that the respondent was found not responsible because "the offense occurred in a non-Loyola social media community which did not impact the immediate greater Loyola community." [Dkt 164-54.]

<u>Jessica Landis.</u> In her deposition, Jessica Landis was asked if there was anything not contained in the Decision Letter "that formed the board's opinion that John was not credible[.]" Landis responded:

> There were pieces of information that the respondent would agree with [Jane] wholly except for anything that specifically related to either consent or something that – I remember him saying something about, this isn't flattering or this doesn't capture my character accurately.

[Dkt. 136-49 at 107:20-108:18.][14] In other words, Landis viewed Jane as the baseline for truth, and if John disagreed with that baseline, then he was not credible.

In response, Loyola argues that Landis merely stated that "Jane seemed candid and John seemed calculating and less candid[.]" [Resp. 33.] But Landis never said John was "calculating," and the circular argument about candor is just another way

---

[14]     In his opening brief John incorrectly cited Dkt. 158 ¶¶92-93 for the citation. The correct citation is Dkt. 158 ¶89 and the deposition pages cited therein.

of saying that Landis didn't believe John because he disagreed with Jane. A reasonable jury could conclude that Landis improperly credited Jane "based on her accusation alone." *See Purdue*, 928 F.3d at 669.

### F. Loyola failed to refute John's argument that the board gave greater scrutiny to John's testimony than Jane's.

In three and half pages of his opening brief, John showed how the board applied greater scrutiny to John's credibility than Jane's. Other than parroting the district court's statement that Jane was correcting a report of what she said and John was correcting himself, Loyola does not dispute John's arguments. [Resp. 33 n.12.] John was not correcting himself. Like Jane, he was correcting a witness's (*i.e.*, Watland's) statement regarding what John allegedly told that witness. *See, e.g., Washington & Lee Univ.*, 2021 WL 1520001, at *14 (board's disparate treatment of Doe and Roe on the same subject is evidence of gender bias).

The board's heightened scrutiny of John and its refusal to consult the audio recording of John's interview could lead a reasonable jury to conclude that the "most plausible explanation for the panel's decision is that the panel wanted to hold Doe responsible for *something*, regardless of what the evidence showed." *Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78, 89 (N.D. Tex. 2022).

### IV. Loyola's arguments regarding John's breach of contract claim raise fact issues that cannot be decided on summary judgment.

Loyola's arguments that its actions were not arbitrary, capricious, or in bad faith are largely devoted to arguing the merits rather than showing that there is no triable issue. [Resp. 43-46.] The Court should reverse for this reason alone.

At any rate, each of Loyola's arguments is wrong. *First*, Loyola appears to argue that, because Loyola did not discriminate against John, it did not breach any contract. [Resp. 44.] That is wrong, but also irrelevant. The question is whether there is a genuine fact dispute over whether Loyola acted capriciously, a question Loyola does not address.

*Second*, Loyola dismisses *Doe v. Dordt Univ.*, No. 19-CV-4082 CJW-KEM, 2022 WL 2833987 (N.D. Iowa July 20, 2022), and *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916 (S.D. Iowa 2021), because they apply Iowa law, but identifies no difference between Iowa and Illinois law. [Resp. 44 n.17.]

*Third*, Loyola again pretends that Love had nothing to do with John's expulsion. [Resp. 44-45.] Loyola suggests that Love's persuading Jane to file a complaint is irrelevant because it was Jane's complaint, not Love's words to her, that formally triggered the disciplinary process under Loyola's Community Standards, and following that procedural rule cannot be arbitrary or capricious. [Resp. 44.] Loyola's argument is without merit. Love can cause Loyola to breach its contract with a student if the university abuses its procedures. *Bosch*, 155 N.E.3d at 499 (holding that allegations that two clinical instructors "'wholly invented' criticisms of and charges against Bosch because they did not like him" was enough to state claim for breach of implied contract with university).

Loyola argues at length that Love's efforts to kick John out of the weight room and coordinate John's expulsion were proper. [Resp. 44-45.] Whether or not that is true (it is not) is not the issue. Love's statements create a reasonable inference that

he engineered John's expulsion for an improper purpose. That is all John needs do to overcome summary judgment.

*Finally,* Loyola claims that *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486 (Ill. App. Ct. 2019), applies only when "a student has satisfactorily performed all coursework to earn her degree and alleges the university withholds that degree." [Resp. 46.] *Bosch* is not so limited. It was a case in which the plaintiff (like John) was *expelled* after false allegations were made against him. A breach of contract claim exists if university's decision to dismiss a student before he earns his degree "was arbitrary and capricious or the product of bad faith or malice[.]" *Bosch*, 155 N.E.3d at 498. At a minimum, it holds that a bad faith campaign to expel a student states a claim. Moreover, this Court recently clarified that *Bosch* recognizes an implied promise to continue attending classes and is not as narrow as Loyola suggests. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873 (7th Cir. 2022). The Court thus should reject Loyola's limited reading of *Bosch* and reverse.[15]

---

[15]     Without citing the record, Loyola asserts that the investigators did not interview CR or WT because they did not have "firsthand knowledge" and "the Board and appeal processes followed the Community Standards." [Resp. 46.] Neither argument has merit. First, under Loyola's policies, both were witnesses. [Dkt. 136-2 ECF2797, EDCF2800.] Moreover, both had "firsthand" information. They both had direct interaction with Jane and John immediately after the alleged incidents. [Dkt. 128-4 ECF1363; Dkt. 128-23.] They were no different than Witness #1. Second, as shown in John's opening brief, Loyola's conduct breached §§ 201.6, 401.4-.5, 409.6.b and 411 of the Community Standards. [Op. Br. 30, 51.]

## V.    Conclusion

For the reasons stated above and in John's opening brief, the Court should reverse the judgment below and remand for trial.

Dated: March 14, 2023          Respectfully submitted,

                                   JOHN DOE


                             By:    /s/ Jonathan M. Cyrluk
                                 *One of John Doe's Attorneys*

Jonathan M. Cyrluk
CARPENTER LIPPS LLP
180 N. LaSalle St., Suite 2105
Chicago, Il 60601
Telephone: 312-777-4300
*cyrluk@carpenterlipps.com*

Patricia M. Hamill
Lorie K. Dakessian
CLARK HILL
Two Commerce Square
2001 Market St., Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
*phamill@clarkhill.com*
*ldakessian@clarkhill.com*

25

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 6,828 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook style font.

Dated: March 14, 2023

By:    /s/Jonathan M. Cyrluk
         Jonathan M. Cyrluk
One of the Attorneys for Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2023, the Reply Brief of Plaintiff-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 14, 2023

By:     /s/Jonathan M. Cyrluk
              Jonathan M. Cyrluk
              One of the Attorneys for Appellant